TRANSFERRED OUT

**JUDGE CROTTY**

## U.S. District Court
### Northern District of Alabama (Southern)
### CIVIL DOCKET FOR CASE #: 2:07-cv-01918-IPJ
Internal Use Only

## 08  CV  01571

Streit et al v. Twentieth Century Fox Film Corporation et al

Assigned to: Judge Inge P Johnson

Cause: 28:1332 Diversity-Personal Injury

Date Filed: 10/19/2007

Date Terminated: 01/24/2008

Jury Demand: Plaintiff

Nature of Suit: 360 P.I.: Other

Jurisdiction: Diversity

**Plaintiff**

**Cindy Streit**                    represented by **Brannon J Buck**
BADHAM & BUCK LLC
2585 Wachovia Tower
420 20th Street North
Birmingham, AL 35203
205-521-0036
Fax: 205-521-0037
Email: bbuck@badhambuck.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W Percy Badham, III**
BADHAM & BUCK LLC
2585 Wachovia Tower
420 20th Street North
Birmingham, AL 35203
205-521-0036
Fax: 205-521-0037
Email: pbadham@badhambuck.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Will A Smith**
MAYNARD COOPER & GALE PC
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL 35203
205-254-1000

Fax: 205-254-1999
Email:
wsmith@maynardcooper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**Ben K McKinnon**                    represented by    **Brannon J Buck**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **W Percy Badham, III**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Will A Smith**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**
**Michael M Jared**                   represented by    **Brannon J Buck**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **W Percy Badham, III**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Will A Smith**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**
**Lynn S Jared**                      represented by    **Brannon J Buck**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **W Percy Badham, III**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Will A Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sarah Moseley**                    represented by **Brannon J Buck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Will A Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Twentieth Century Fox Film**       represented by **Gray M Borden**
**Corporation**                      LIGHTFOOT FRANKLIN &
WHITE LLC
The Clark Building
400 North 20th Street
Birmingham, AL 35203
205-581-0700
Fax: 205-581-0799
Email: gborden@lfwlaw.com
*ATTORNEY TO BE NOTICED*

**J Banks Sewell, III**
LIGHTFOOT FRANKLIN &
WHITE LLC
The Clark Building
400 North 20th Street
Birmingham, AL 35203
205-581-0700
Fax: 205-380-9160
Email: bsewell@lfwlaw.com
*ATTORNEY TO BE NOTICED*

**William H Brooks**

LIGHTFOOT FRANKLIN &
WHITE LLC
The Clark Building
400 North 20th Street
Birmingham, AL 35203
205-581-0700
Fax: 205-581-0799
Email: wbrooks@lfwlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**One America Productions, Inc.**          represented by **Gray M Borden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Banks Sewell, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William H Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Springland Films**          represented by **Gray M Borden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Banks Sewell, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William H Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Todd Lewis Schulman**          represented by **Gray M Borden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Banks Sewell, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William H Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Monica Levenson**

represented by **Gray M Borden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Banks Sewell, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William H Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Julie Lynn Chounard**

represented by **Gray M Borden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Banks Sewell, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William H Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**
**Sacha Baron Cohen**

**Defendant**

**Everyman Pictures**

represented by **Gray M Borden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Banks Sewell, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William H Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gold/Miller Productions**

**Defendant**

**Major Studio Partners, Inc.**

**Defendant**

**Dune Entertainment, LLC**    represented by **Gray M Borden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Banks Sewell, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William H Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Four by Two Production
Company**

**Defendant**

**Peter Baynham**

**Defendant**

**Jan Mazer**

**Defendant**

**Anthony Hines**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/19/2007 | ●1 | COMPLAINT against all defendants (Filing fee $ 350, receipt #200 240848.), filed by Sarah Moseley, Michael M Jared, Lynn S Jared, Cindy Streit, Ben K McKinnon.(ASL, ) (Entered: 10/22/2007) |
| 10/19/2007 | ● | Request for service by certified mail filed by Michael M Jared, Lynn S Jared, Cindy Streit, Sarah Moseley, Ben K McKinnon. (w/i complaint) (ASL, ) (Entered: 10/23/2007) |
| 10/26/2007 | ●2 | Summons Issued as to dfts Twentieth Century Fox Film Corporation, One America Productions, Inc., Springland Films, Monica Levenson, Julie Lynn Chounard, Sacha Baron Cohen, |

CM/ECF - U.S. District Court Northern District of Alabama - Docket Report

|  |  | Everyman Pictures, Gold/Miller Productions, Major Studio Partners, Inc., Dune Entertainment, LLC, Four by Two Production Company, Peter Baynham, Jan Mazer, and Anthony Hines, mailed certified mail (ASL, ) (Entered: 10/29/2007) |
|---|---|---|
| 10/30/2007 | ●3 | Summons Issued as to Todd Lewis Schulman, mailed certified mail. (ASL, ) (Entered: 10/30/2007) |
| 11/05/2007 | ●4 | SUMMONS Returned Executed as to dft One America Productions, Inc. served on 11/2/2007(ASL, ) (Entered: 11/06/2007) |
| 11/05/2007 | ●5 | SUMMONS Returned Executed as to dft Todd Lewis Schulman served on 11/2/2007 (ASL, ) (Entered: 11/06/2007) |
| 11/05/2007 | ●6 | SUMMONS Returned Executed as to dft Gold/Miller Productions served on 11/2/2007(ASL, ) (Entered: 11/06/2007) |
| 11/05/2007 | ●7 | SUMMONS Returned Executed as to dft Julie Lynn Chounard served on 11/2/2007 (ASL, ) (Entered: 11/06/2007) |
| 11/05/2007 | ●8 | SUMMONS Returned Executed as to dft Monica Levenson served on 11/2/2007 (ASL, ) (Entered: 11/06/2007) |
| 11/06/2007 | ●9 | SUMMONS Returned Executed as to dft Twentieth Century Fox Film Corporation served on 11/1/2007(ASL, ) (Entered: 11/07/2007) |
| 11/06/2007 | ●10 | SUMMONS Returned Executed as to dft Peter Baynham served on 11/2/2007 (ASL, ) (Entered: 11/07/2007) |
| 11/06/2007 | ●11 | SUMMONS Returned Executed as to dft Four by Two Production Company served on 11/1/2007(ASL, ) (Entered: 11/07/2007) |
| 11/07/2007 | ●12 | SUMMONS Returned Executed as to dft Jan Mazer served on 11/2/2007 (ASL, ) (Entered: 11/07/2007) |
| 11/07/2007 | ●13 | SUMMONS Returned Executed as to dft Major Studio Partners, Inc. (ASL, ) (Entered: 11/07/2007) |
| 11/08/2007 | ●14 | SUMMONS Returned Executed upon Anthony Hines - served on 11/2/2007, answer due 11/23/2007. (CTS, ) (Entered: 11/09/2007) |
| 11/13/2007 | ●15 | SUMMONS Returned Executed as to dft Sacha Baron Cohen (ASL, ) (Entered: 11/15/2007) |
| 11/16/2007 | ●16 | SUMMONS Returned Executed as to dft Everyman Pictures (ASL, ) (Entered: 11/19/2007) |
| 11/16/2007 | ●17 | SUMMONS Returned Executed as to dft Dune Entertainment, LLC served on 11/2/2007(ASL, ) (Entered: 11/19/2007) |

| 11/19/2007 | ❍18 | Summons Returned Unexecuted as to dft Springland Films. (ASL, ) (Entered: 11/21/2007) |
| 12/05/2007 | ❍19 | MOTION to Dismiss *for Improper Venue, or alternatively, Transfer* by Twentieth Century Fox Film Corporation, One America Productions, Inc., Springland Films, Todd Lewis Schulman, Monica Levenson, Julie Lynn Chounard, Everyman Pictures, Dune Entertainment, LLC. (Attachments: # 1 Exhibit Affidavit of Joan Hansen)(Borden, Gray) (Entered: 12/05/2007) |
| 12/05/2007 | ❍20 | NOTICE of Corporate Disclosure by Twentieth Century Fox Film Corporation (Borden, Gray) (Entered: 12/05/2007) |
| 12/05/2007 | ❍21 | NOTICE of Corporate Disclosure by Dune Entertainment, LLC (Borden, Gray) (Entered: 12/05/2007) |
| 12/05/2007 | ❍22 | NOTICE of Corporate Disclosure by One America Productions, Inc. (Borden, Gray) (Entered: 12/05/2007) |
| 12/05/2007 | ❍23 | NOTICE of Corporate Disclosure by Everyman Pictures (Borden, Gray) (Entered: 12/05/2007) |
| 12/05/2007 | ❍ | NOTICE of Appearance by J Banks Sewell, III, William H Brooks on behalf of Twentieth Century Fox Film Corporation, One America Productions, Inc., Springland Films, Todd Lewis Schulman, Monica Levenson, Julie Lynn Chounard, Everyman Pictures, Dune Entertainment, LLC (w/i motion 19) (ASL, ) (Entered: 12/05/2007) |
| 12/06/2007 | ❍24 | ORDER re 19 MOTION to Dismiss *for Improper Venue, or alternatively, Transfer* filed by Everyman Pictures, Julie Lynn Chounard, Dune Entertainment, LLC, Todd Lewis Schulman, One America Productions, Inc., Monica Levenson, Springland Films, Twentieth Century Fox Film Corporation; plas are ORDERED to respond to said motion w/i 21 days. Signed by Judge Inge P Johnson on 12/6/07. (ASL, ) (Entered: 12/06/2007) |
| 12/13/2007 | ❍25 | MOTION for Extension of Time to File Response/Reply as to 19 MOTION to Dismiss *for Improper Venue, or alternatively, Transfer (Unopposed)* by Cindy Streit. (Buck, Brannon) (Entered: 12/13/2007) |
| 12/18/2007 | ❍26 | ORDER granting 25 Motion for Extension of Time to File Response; plas' response to motion to transfer shall be filed on or before 1/10/08. Signed by Judge Inge P Johnson on 12/18/07. (ASL, ) (Entered: 12/18/2007) |
| 01/10/2008 | ❍27 | Opposition to re 19 *Motion to Transfer, or in the Alternative, to Dismiss for Improper Venue* filed by Cindy Streit. (Attachments: # |

| | | |
|---|---|---|
| | | 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7)(Buck, Brannon) (Entered: 01/10/2008) |
| 01/22/2008 | ●28 | NOTICE by Twentieth Century Fox Film Corporation, One America Productions, Inc., Todd Lewis Schulman, Monica Levenson, Julie Lynn Chounard, Everyman Pictures, Dune Entertainment, LLC *Defendants' Submission of Supplemental Authority in Support of Motion to Transfer, or in the Alternative, to Dismiss for Improper Venue* (Brooks, William) (Entered: 01/22/2008) |
| 01/24/2008 | ●29 | ORDER transferring case to another district: ORDER transferring case to the USDC Southern District of New York; original electronic record will be electronically sent to Clerk of Court 10 business days from this date.. Signed by Judge Inge P Johnson on 1/24/08. (ASL, ) Modified on 2/5/2008 - electronically transferred to SDNY (ASL, ). (Entered: 01/24/2008) |
| 01/25/2008 | ●30 | NOTICE of Change of Address by Brannon J Buck (Buck, Brannon) (Entered: 01/25/2008) |
| 01/29/2008 | ●31 | MOTION to Vacate 29 Order Transferring Case To Another District, by Michael M Jared, Lynn S Jared, Cindy Streit, Sarah Moseley, Ben K McKinnon. (Buck, Brannon) (Entered: 01/29/2008) |
| 01/30/2008 | ●32 | ORDER denying 31 Motion for relief from Order. Signed by Judge Inge P Johnson on 1/30/08. (ASL, ) (Entered: 01/30/2008) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| Twentieth Century Fox Film Corporation; One America Productions, Inc.; Springland Films; Todd Lewis Schulman; Monica Levenson; Julie Lynn Chounard; Sacha Baron Cohen; Everyman Pictures; Gold/Miller; Productions; Major Studio Partners, Inc.; Dune Entertainment, LLC; Four by Two Production Company; Peter Baynham; Jan Mazer; and Anthony Hines, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. _____ |
| Defendants. | ) ) | |

## COMPLAINT AND JURY DEMAND

COME NOW Plaintiffs Cindy Streit, Sarah Moseley, Ben K. McKinnon, Michael M. Jared and Lynn S. Jared, by and through counsel, and bring this Complaint against Defendants Twentieth Century Fox Film Corporation, One America Productions, Inc., Springland Films, Todd Lewis Schulman, Monica Levenson, Julie Lynn Chounard, Sacha Baron Cohen, Everyman Pictures, Gold/Miller Productions, Major Studio Partners, Inc., Dune Entertainment, LLC, Four by Two Production Company, Peter Baynham, Jan Mazer, and Anthony Hines (referred to collectively as "Defendants").

## Introduction

Plaintiffs come before the Court as victims of an unlawful and fraudulent scheme committed by the Defendants. Sarah Moseley, Ben McKinnon, Michael Jared, Lynn Jared and Cindy Streit, the latter of whom owns the etiquette training business, Etiquette Training Services, Inc., were unknowingly and unwillingly made subjects of the recent movie "*Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan*" (the "*Borat* movie"), an R-rated film containing depictions of racism, child pornography, sexism, nudity, anti-Semitism and vulgarity. Defendants fraudulently represented that they were filming an "educational documentary for Belarus Television" and requested that Cindy Streit provide etiquette and dining skills training to a "foreign dignitary" from the Republic of Belarus. Defendants also requested that Streit and Etiquette Training Services, Inc. arrange a dinner to be attended by the "foreign dignitary," Streit and other attendees of Streit's choosing, which included Plaintiffs Sarah Moseley, Ben McKinnon, Michael Jared and Lynn Jared, among others. Defendants filmed both the etiquette training and dinner.

Unbeknownst to Plaintiffs, the "educational documentary" was actually the highly offensive *Borat* movie and the "foreign dignitary" was actually the actor/Defendant Sacha Baron Cohen who, along with all other Defendants, had conspired to subject the Plaintiffs to Cohen's lewd, insulting and offensive conduct, all while casting Plaintiffs as racially intolerant. Unlike actors and actresses who are paid for their services and perform according to an agreed-upon role and script, Defendants defrauded Plaintiffs for their part in the film. Had Plaintiffs not been the subjects of Defendants' scheme, they would have never agreed to play any role in the *Borat* movie.

## Parties

1.    Plaintiff Cindy Streit ("Streit") is an individual over the age of 19 years and a resident of Jefferson County, Alabama.

2.    Plaintiff Sarah Moseley ("Moseley") is an individual over the age of 19 years and a resident of Shelby County, Alabama.

3.    Plaintiff Ben K. McKinnon ("McKinnon") is an individual over the age of 19 years and a resident of Jefferson County, Alabama.

4.    Plaintiff Michael M. Jared ("Michael Jared") is an individual over the age of 19 years and a resident of Shelby County, Alabama.

5.    Lynn S. Jared ("Lynn Jared") is an individual over the age of 19 years and a resident of Shelby County, Alabama.  Unless designated individually, Plaintiffs Streit, Moseley, McKinnon, Michael Jared and Lynn Jared are collectively referred to herein as "Plaintiffs."

6.    Defendant Twentieth Century Fox Film Corporation, a Delaware corporation with its principal place of business in Los Angeles County, California, filmed, produced and distributed the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

7.    Defendant One America Productions, Inc. ("One America"), a California corporation with its principal place of business in Los Angeles County, California, participated in the filming, production and/or distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

8.    Defendant Springland Films ("Springland"), a California corporation with its principal place of business in Los Angeles County, California, participated in the filming, production and/or distribution of the *Borat* movie and, for all allegations relevant hereto,

committed torts within the State of Alabama. Upon information and belief, Springland Films is a registered d/b/a of One America.

9.      Defendant Todd Lewis Schulman ("Schulman"), upon information and belief, resides in Los Angeles County, California and was at all times relevant hereto employed by One America as the Field Coordinator for the *Borat* movie, participated in its filming, production and/or distribution and, for the allegations relevant hereto, committed torts within the State of Alabama. At all times relevant, Schulman communicated and interacted with Plaintiffs under the alias "Todd Lewis."

10.     Upon information and belief, Defendant Monica Levenson is a resident of a state other than Alabama and participated in the filming, production and/or distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

11.     Upon information and belief, Defendant Julie Lynn Chounard is a resident of a state other than Alabama and participated in the filming, production and/or distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

12.     Defendant Sacha Baron Cohen ("Cohen") is a resident of a state other than Alabama and, at all times relevant hereto, was employed by One America as the feature actor in the *Borat* movie, as well as a writer and producer of the film. Cohen is alleged herein to have committed torts within the State of Alabama arising from his participation in the alleged scheme against the Plaintiffs.

13.     Defendant Everyman Pictures, a California corporation with its principal place of business in Los Angeles County, California, participated in the filming, production and/or distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

4

14.     Defendant Gold/Miller Productions, a California corporation with its principal place of business in Los Angeles County, California, participated in the filming, production and/or distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

15.     Defendant Major Studio Partners, Inc., a Delaware corporation with its principal place of business in Suffolk County, New York, participated in the filming, production and/or distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

16.     Defendant Dune Entertainment, LLC, a Delaware corporation with its principal place of business in Suffolk County, New York, participated in the filming, production and/or distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

17.     Defendant Four by Two Production Company is a California corporation that participated in the filming, production and/or distribution of the *Borat* Movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

18.     Upon information and belief, Defendant Peter Baynham is a resident of a state other than Alabama and was a writer for and participated in the filming, production, and distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

19.     Upon information and belief, Defendant Dan Mazer is a resident of a state other than Alabama and was a writer for and participated in the filming, production, and distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

20.    Upon information and belief, Defendant Anthony Hines is a resident of a state other than Alabama and was a writer for and participated in the filming, production, and distribution of the *Borat* movie and, for all allegations relevant hereto, committed torts within the State of Alabama.

## Amount in Controversy

21.    Plaintiffs, each and individually, seek relief in the form of monetary damages exceeding $75,000, exclusive of interest and costs.

## Jurisdiction

22.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 on the basis that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the jurisdictional minimum of $75,000, exclusive of interest and costs.

## Factual Allegations

23.    Plaintiff Streit is the owner of ETS, an etiquette training business. On or about October 21, 2005, Defendant Schulman, operating under the alias "Todd Lewis" of Springland Films, contacted Streit to request the services of Streit and ETS.

24.    Schulman represented that he was assisting Springland in filming an educational documentary for Belarus Television about a foreign dignitary's tour of the United States. Schulman stated that the dignitary needed etiquette and dining skills training and inquired whether Streit and ETS could provide such services. Schulman also explained that this portion of the documentary was designed to portray a Southern, in-home style dining experience and requested that Streit arrange for such a dinner. During all times relevant hereto, Schulman was acting as an agent for and in conspiracy with the other Defendants

01551242.2

25.     Streit agreed to perform the requested etiquette and dining skills training and to arrange a catered dinner complete with appropriate guests.

26.     On the evening of October 21st, Schulman requested to meet with Streit in order to finalize the arrangements and for Schulman to examine a potential training location. Schulman also requested to meet one of the guests that would be present at the dinner party.

27.     The following day, October 22nd, Schulman and Plaintiffs Streit and McKinnon met at a Birmingham, Alabama, restaurant to discuss the arrangements for the training and dinner.  During that meeting, Schulman provided further details about the "foreign dignitary," discussing the dignitary's home country of The Republic of Belarus, which he described as a small country in the former Soviet Union.  Schulman also stated that the dignitary worked with Belarus Television and this "educational documentary" was for the cultural enrichment of that country.  Schulman further represented that the documentary was to be in the nature of those shown by National Geographic and was being made to help build relations between the United States and Belarus.  Streit asked Schulman whether Belarus Television was similar to Alabama Public Television and he replied that it was very similar.  Schulman represented that Plaintiffs' role in the documentary was mainly for school children to learn cultural diversity and to learn about Southern traditional values and Southern-style living.  Plaintiff McKinnon asked whether Schulman knew the dignitary's name.  Schulman responded that he did, but was unsure how to pronounce it.  Schulman further stated that the dignitary spoke English so there would not be problems with communication.  Schulman repeatedly referred to the visiting guest (now known to be Defendant Cohen) as a "dignitary."

28.     During the same meeting, Schulman performed a short, filmed interview of Streit and filmed the training site.

29.     That evening, Schulman notified Streit that Springland had authorized Streit to perform the requested training and dinner services.   At that time, Schulman stated that the restaurant at which they met would not be appropriate for filming and, as such, requested that the dinner and training take place in a Southern home "with columns."   Schulman stated that he would pay $600 extra for an in-home setting.   Both the training and dinner were to take place on October 24, 2005.

30.     On the evening of October 22nd and on October 23rd, Streit arranged for the attendance of dinner guests, including Plaintiffs Moseley, McKinnon, Michael Jared and Lynn Jared, among others.   Streit also arranged for catering services and reserved a dining facility – a home with columns.

31.     In the hours prior to the training and dinner on October 24, 2005, Streit and Springland Films, by way of Springland Films representatives, Julie Lynn Chounard and Monica Levenson, negotiated a written contract for Streit's services.   At all times relevant hereto, Chounard and Levenson were acting as agents for and in conspiracy with the other Defendants. Consistent with the representations of Defendants Schulman, Levenson, Chounard and Springland, the contract contains the following provisions:

> **ETS will customize its "Business Etiquette and Leadership Programs" and Dining Tutorial Program and present a two-hour training session for an international guest from Belarus Television for Springland Films.   Additionally, ETS will plan, design, facilitate, coordinate and implement an in-home style atmosphere dining experience for the dignitary.**
>
> ***
>
> **These sessions will be filmed as part of a documentary for Belarus Television and for those purposes only.**
>
> ***

The purpose of this film session is to enable the dignitary to interact in a home-like setting of southern hospitality and comfort to learn about southern traditional values and southern-style living as part of the entire cultural experience in his travels throughout America. The portrayal of participants will be filmed and used for purposes only of the utmost dignity and class. There will not be any embarrassment to the participants or ETS.

32.    During the dinner later that evening, Defendant Cohen performed numerous offensive and outrageous acts, several of which, identified below, became part of the final, edited version of the *Borat* movie, its trailers and other promotional material.

33.    The scenes in the *Borat* movie leading up to the dinner include Cohen driving to the house where the dinner is scheduled to take place. At this point, the *Borat* movie flashes to the following road name: "Secession, Private Drive." The road on which the dinner facility was located does not bear this name, nor do any of the Plaintiffs live on or know of such a road. Upon information belief, Defendants scripted the "Secession Drive" scene to set the stage for Cohen's portrayal of Plaintiffs as being racially intolerant.

34.    During the dinner, Cohen referred to Plaintiff Michael Jared as "retarded" and then complimented the other guests on their willingness to let "retarded" persons dine with them.

35.    He asked the dinner guests whether they owned slaves.

36.    He made several derogatory and sexists comments to the women who were present.

37.    At one point, Cohen excused himself to the bathroom only to come back to the dinner table holding a plastic bag purportedly containing his own feces. Upon information and belief, a member of Springland films had defecated in the plastic bag prior to filming the dinner scenes.

38.    Plaintiff Streit was shocked at the site of the plastic bag, but assisted Cohen to the restroom, only to have Cohen falsely describe his own culture's bathroom etiquette. During this scene in the film, Cohen tells Streit that his understanding is that the host of the dinner is responsible for "wiping" him.

39.    Believing that Cohen was, as represented, a foreign dignitary unaccustomed to American ideals, Plaintiffs acted with benevolence toward Cohen and made all attempts to be tolerant of his conduct.

40.    After returning from the restroom, there was a knock at the door and Cohen presented an African-American female to the dinner guests as a prostitute he had asked to dine with them. Plaintiffs have since learned that this was professional actress Luenell Campbell (a.k.a. Jane Sanguinetti Luenell). The *Borat* movie depicts that, at this point in the dinner, certain of the guests chose to leave.

41.    Defendants purposely edited the scenes in which Ms. Campbell appeared to give the impression that Plaintiffs and others present at the dinner were intolerant of dining with members of another race and left as a result of her presence. What was filmed, but not shown in the *Borat* movie, however, was that Streit apologized to Ms. Campbell for what Streit believed was Campbell's involuntary participation in the Defendants' scheme. Plaintiffs at all times acted in goodwill towards Ms. Campbell.

42.    The scripting, filming and showing of the "Secession Drive" scene leading up to the dinner was designed to set the stage for this false portrayal.

43.    At the end of the dinner scenes, the film shows Cohen leaving and asking whether the cause of the commotion was that the "retard had gotten out of his cage."

10

44.    The scenes of the *Borat* movie following those in which Plaintiffs appeared show Cohen at an "antique" store that sells various civil war and Confederate items, including signage associating the Confederate, or "Rebel" flag, with "Secession."  Upon information and belief, Defendants' scripting, filming and showing of this portion of the *Borat* movie was made for the purpose of linking the scenes of the dinner with "Secession," its association with the Confederate flag and racial intolerance.

45.    Indeed, this is exactly how it has been interpreted by the viewing public.  One movie review describes the "dinner scenes" as follows: "You hear about people so racist they can't stand to be in the same room as one of 'them.'" Another says it this way: "The other guests try to excuse it all away up until Borat's dinner guest arrives, an overweight black prostitute. Not something that someone living on Secession Drive … can handle."

46.    Without Plaintiffs' consent, the Defendants revised, edited, formatted and distributed scenes from the Plaintiffs' dinner with Cohen into a segment for the *Borat* movie and have used these scenes in advertising and promotion for the movie in multiple media, including print, television and the Internet.  The dinner scenes are frequently depicted in trailers for the *Borat* movie and are among the most critical components to the popularity and financial success of the movie.

47.    The *Borat* movie was released in the United States on or about November 3, 2006.

48.    The movie carries an R-rating "for pervasive strong crude and sexual content including graphic nudity, and language" according to the Motion Pictures Association of America and the National Association of Theatre Owners.

49.    In its first ten days in the box office, the *Borat* movie grossed approximately $68,000,000.00. Upon information and belief, as of December 21, 2006, ticket sales for the *Borat* movie had grossed more than $227,613,553.00 worldwide. Upon information and belief, DVD sales and the sale of other movie-related items have dramatically increased the amount of total revenue generated by the film.

50.    Upon information and belief, the total production cost for the *Borat* movie was only $18 million. Defendants were able to keep such costs to a minimum by defrauding Plaintiffs and others into playing the roles that would otherwise be occupied by paid actors and actresses.

51.    Plaintiffs have been made the subjects of numerous newspaper and magazine articles, internet postings and television programs as a result of their involvement with the movie and their names, likenesses and images have been repeatedly associated with the acts performed by Defendant Cohen at the October 24, 2005, dinner.

52.    Contrary to Defendants' oral and written representations to the Plaintiffs, Defendants were not filming an educational documentary for a foreign dignitary to be shown on Belarus Television. There was no "foreign dignitary," but only Cohen, a paid actor who carried out this previously-scripted, outrageous conduct. There was no "educational documentary," but only a film memorializing the mockery, humiliation and degradation of unsuspecting participants.

53.    Not everyone involved in the filming of the *Borat* movie were victims of fraud. Defendants selectively disclosed the purpose and intent of the *Borat* movie to professional actors and actresses, including Defendant Cohen, Pamela Anderson and Luenell Campbell (aka Jane Sanguinetti Luenell).

01551242.2

54.     These individuals were given an opportunity to review and agree to the movie script and knowingly participate in the *Borat* movie.  Unlike the Plaintiffs, they had the option to decide whether or not to have their names, likenesses and images associated with a movie containing racism, child pornography, sexism, nudity, anti-Semitism and vulgarity.  And, unlike the Plaintiffs, they had the option to determine how their participation in the *Borat* movie would affect their personal, social and business lives.

55.     Plaintiffs did not authorize or consent to Defendants' use of their names, likenesses and images for a commercial purpose.

56.     Plaintiffs did not authorize or consent to Defendants' portrayal of Plaintiffs in a false light.

57.     Plaintiffs did not authorize or consent to be made involuntary participants in a film celebrating racism, child pornography, sexism, nudity, anti-Semitism and vulgarity.

58.     Plaintiffs have suffered extreme humiliation, embarrassment and ridicule as a result of Defendants' portrayal of them and their association with the *Borat* movie.

59.     To the extent the Defendants contend that the Plaintiffs are bound by a Standard Consent Agreement and/or Release of Liability, all terms therein are unenforceable against Plaintiffs under Alabama law.  They were fraudulently induced, made under duress, there was no consideration, there was no "meeting of the minds," one or more of their terms impose serious inconvenience, undue burden and duress upon Plaintiffs, Defendant Springland was not licensed or authorized to do business in the State of Alabama on October 24, 2005, and the persons who presented the Consent Agreement and/or Release of Liability were acting under fraudulent names and false pretenses.

60.    The Standard Consent Agreement and/or Release of Liability, and all terms therein, pose serious inconvenience on Plaintiffs because, among others, Plaintiff Moseley is a surviving cancer patient and Plaintiff McKinnon is eighty-five years old and under a doctor's orders not to travel due to his physical condition.

61.    All of the fraud and other misconduct, as described herein, towards the Plaintiffs occurred in the State of Alabama.  Moreover, the witnesses to the Defendants' misconduct towards the Plaintiffs reside within the State of Alabama.

62.    As a remedy for each cause of action plead herein, Plaintiffs seek an injunction against Defendants (1) barring the use of Plaintiffs' names, likenesses or images or any of the *Borat* movie's "dinner scenes" in any promotional material for the *Borat* movie, any future movie or in any book or financial endeavor; (2) barring the use of any and all filmed footage of Plaintiffs during the "dinner scenes" that did not appear in the final, edited version of the *Borat* movie; (3) barring the Defendants' use of any filming or depiction of Plaintiffs' names, likenesses and images; and (4) barring Defendants from selling, distributing or disseminating the *Borat* movie to the extent it contains scenes depicting Plaintiffs' names, likenesses or images.

## COUNT I: UNJUST ENRICHMENT

63.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

64.    Defendants defrauded Plaintiffs into becoming unwilling participants in the *Borat* movie, a film celebrating racism, child pornography, sexism, nudity, anti-Semitism and vulgarity.

65.    Because of Defendants' misconduct, Plaintiffs became unwilling participants in the *Borat* movie by mistake.

01551242.2

66.    Upon information and belief, the total production cost for the *Borat* movie was only $18 million.  Defendants were able to keep such costs to a minimum by defrauding Plaintiffs and others into playing the roles that would otherwise be occupied by paid actors and actresses.

67.    Defendants unjustly received the benefit of avoiding the costs of hiring a cast of professional actors and actresses by committing fraud upon the Plaintiffs.

68.    Defendants unjustly received the benefit of the Plaintiffs' participation in the *Borat* movie which resulted in the movie being an extremely profitable venture.

69.    Defendants, by exploiting the Plaintiffs, unjustly retained all benefits and profits of the *Borat* movie.  Defendants must disgorge their ill-gotten gains.

70.    The Defendants, therefore, have been unjustly enriched and, in equity and good conscience, should be required to disgorge their ill-gotten gain.

WHEREFORE, Plaintiffs seek relief against Defendants in the form of disgorgement, compensatory and punitive damages, interest, attorneys' fees and costs in an amount determined by the trier of fact and injunctive relief.

## COUNT II: FRAUD; FRAUDULENT INDUCEMENT

71.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

72.    On October 21, 22, 23 and 24, 2005, Defendants, through their authorized agents, Defendants Schulman, Chounard and Levenson made the following misrepresentations, both orally and in writing, as described above, to Plaintiffs with the intent to defraud:

(A)    Defendant Cohen was a "foreign dignitary" from The Republic of
       Belarus;

01551242.2

(B)     Defendant Springland was filming the dignitary's travels in the United States;

(C)     Defendants Springland was filming for a documentary to be shown on Belarus Television;

(D)     Defendants' filming of the Plaintiffs would be solely for the purpose of the purported documentary;

(E)     The documentary would only be shown on Belarus Television;

(F)     Defendants' filming for the documentary would not be for the purpose of embarrassment to the Plaintiffs;

(G)     The portrayal of the Plaintiffs would be with the utmost dignity and class;

(H)     Those misrepresentations more fully described in Paragraph 24, above.

73.     Each of these representations was a false representation of material fact made with the intent to defraud Plaintiffs into unknowingly participating in the *Borat* movie.

74.     Defendants knew these material misrepresentations were false when made and, in fact, planned, collaborated and scripted such misrepresentations with the intent to deceive the Plaintiffs.

75.     Plaintiff Streit reasonably relied on the foregoing fraudulent misrepresentations in agreeing to provide etiquette and dining skills training and to be filmed during the dinner made the subject of the *Borat* movie.

76. Plaintiffs Moseley, McKinnon, Michael Jared and Lynn Jared reasonably relied on the foregoing fraudulent misrepresentations in agreeing to be filmed at the dinner made the subject of the *Borat* movie.

77. The Standard Consent Agreement and/or Release of Liability were procured by the foregoing fraudulent representations and are void as a matter of law.

78. As a result of Defendants' material and fraudulent misrepresentations and Plaintiffs' reasonable reliance, Plaintiffs have suffered extreme emotional distress, anxiety, embarrassment, ridicule and humiliation due to their involvement and portrayal in the *Borat* movie.

WHEREFORE, Plaintiffs seek relief against Defendants in the form of disgorgement, compensatory and punitive damages, interest, attorneys' fees and costs in an amount determined by the trier of fact and injunctive relief.

## COUNT III: COMMERCIAL APPROPRIATION; INVASION OF PRIVACY; FALSE LIGHT

79. Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

80. Unbeknownst to Plaintiffs and without their permission or approval, Defendants misappropriated Plaintiffs' names, likenesses and images for their commercial benefit by fraudulently inducing Plaintiffs to play roles in the *Borat* movie, a commercial enterprise.

81. Defendants used Plaintiffs' names, likenesses and images in advertising and promotional material for the *Borat* movie.

82. Plaintiffs were not made aware that their names, likenesses, images and involvement in the purported "documentary" was actually for the *Borat* movie until they saw certain promotional material for the film.

17

83.    Certain dinner scenes depicted in the *Borat* movie are the result of Defendants' "creative" editing with the intent to portray Plaintiffs as racially intolerant.  Such scenes do not accurately depict the events at the dinner party, falsely associate Plaintiffs with "Secession," are improperly taken out of their original context and were designed to create a false portrayal of Plaintiffs' character.

84.    Defendants knew such portrayal was false, inaccurate and offensive at the time they scripted the storyline of the movie, filmed the various scenes, edited the film and distributed the *Borat* movie.

85.    Defendants have experienced substantial gains from their fraud by avoiding the need to pay professional actors and actresses for their roles in the *Borat* movie.

86.    Plaintiffs have suffered emotional distress, extreme anxiety, embarrassment, ridicule, invasion of their private, personal lives, and humiliation due to their involvement and portrayal in the *Borat* movie.

WHEREFORE, Plaintiffs seek relief against Defendants in the form of disgorgement, compensatory and punitive damages, interest, attorneys' fees and costs in an amount determined by the trier of fact and injunctive relief.

## COUNT IV: WANTONNESS

87.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

88.    Defendants' conduct, as described herein, constitutes wantonness.

89.    Plaintiffs have suffered emotional distress, anxiety, embarrassment, ridicule, invasion of their private, personal lives, and humiliation due to their involvement and portrayal in the *Borat* movie.

01551242.2

WHEREFORE, Plaintiffs seek relief against Defendants in the form of disgorgement, compensatory and punitive damages, interest, attorneys' fees and costs in an amount determined by the trier of fact and injunctive relief.

### COUNT V: SUPPRESSION / CONCEALMENT

90.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

91.    Defendants, both voluntarily and in response to inquiry by Plaintiffs, undertook to make various representations, as described herein, regarding the purpose for which they were filming, to what use such filming would be put, the nature of the film, and the identity of the "foreign dignitary."

92.    By making these representations to the Plaintiffs and because of the particular circumstances, the Defendants had a duty to not only to state the truth but also to disclose all material facts within their knowledge that related to the film and its use.

93.    Defendants breached their duty of full and fair disclosure by suppressing and concealing from the Plaintiffs, among other facts, that the film would be a highly offensive motion picture and would be released in theatres throughout the United States for the purpose of generating monetary profits.

94.    As a result of Defendants' suppression and concealment, Plaintiffs acted to their detriment by agreeing to be filmed and have suffered severe and irreparable damage.

WHEREFORE, Plaintiffs seek relief against Defendants in the form of disgorgement, compensatory and punitive damages, interest, attorneys' fees and costs in an amount determined by the trier of fact and injunctive relief.

01551242.2

## COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

95.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

96.    Defendants scripted and perpetrated a scheme to defraud Plaintiffs into appearing in the *Borat* movie, which is now the subject of fervent public debate due to its celebration of racism, sexism, vulgarity, child pornography, nudity and anti-Semitism.

97.    Defendants' actions in their dealings with Plaintiffs have been reckless, intentionally conducted in bad faith, extreme and outrageous, and cannot be justified in any respect in a civilized society.

98.    As a result of Defendants' fraud, exploitation and outrageous conduct, Plaintiffs have suffered emotional distress which Defendants knew or should have known would result from their intentional and outrageous conduct.

99.    The Defendants disregarded any and all concern for privacy, reputation and public image at the expense of Plaintiffs and have subjected Plaintiffs to extraordinary and extreme embarrassment, humiliation and emotional distress.

100.    Defendants were certain, or substantially certain, and intended that such distress would result from their conduct.

101.    Defendants' conduct was so extreme, repulsive and outrageous as to exceed all possible bounds of decency.

102.    Plaintiffs have suffered extreme emotional distress as a result of Defendants' conduct.

01551242.2

WHEREFORE, Plaintiffs seek relief against Defendants in the form of disgorgement, compensatory and punitive damages, interest, attorneys' fees and costs in an amount determined by the trier of fact and injunctive relief.

### COUNT VII: CIVIL CONSPIRACY

103.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

104.    Defendants engaged in a civil conspiracy designed to exploit and defraud Plaintiffs into appearing in the *Borat* movie. The Defendants knowingly combined, conspired and collaborated amongst and between themselves to defraud Plaintiffs into appearing in an R-rated movie celebrating anti-Semitism, sexism, racism, vulgarity, nudity and child pornography.

105.    Such conspiracy took the form of, among others, movie scripting, writing, collaboration, plotting, production, filming and editing with the intent to defraud unsuspecting members of the public, including Plaintiffs, into appearing in the *Borat* movie.

106.    Defendants further knowingly combined, conspired and collaborated amongst and between themselves to produce and distribute the *Borat* movie to the general public.

WHEREFORE, Plaintiffs seek relief against Defendants in the form of disgorgement, compensatory and punitive damages, interest, attorneys' fees and costs in an amount determined by the trier of fact and injunctive relief.

### COUNT VIII: DECLARATORY, INJUNCTIVE AND EQUITABLE RELIEF (28 U.S.C. § 2201, *et seq.*)

107.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

108.    Plaintiffs seek a declaration that Defendants knowingly made false representations regarding the purpose and use of their filming of the dinner scenes.

01551242.2

109.    Plaintiffs seek a declaration that the Standard Consent Agreement and/or Release of Liability were procured by fraud and/or fraudulently induced and are, therefore, void as a matter of law.

110.    Plaintiffs seek a declaration that it was inequitable, unconscionable, unlawful and illegal for Defendants to defraud Plaintiffs into becoming unwilling participants in the *Borat* movie.

111.    Plaintiffs seek a declaration that Defendants have been unjustly enriched by (1) accepting and retaining profits made through sales related to the *Borat* movie and (2) avoiding having to pay professional actors and actresses for roles in the *Borat* movie.

112.    Plaintiffs seek a declaration that Defendants are obligated to disgorge to Plaintiffs such ill-gotten gains and/or unjust enrichment.

113.    Plaintiffs seek a declaration that Defendants, having made voluntary, false representations to Plaintiffs regarding the purpose and use of the filming, were under a duty to speak truthfully and disclose all material information regarding the true purpose and use of the filming.

114.    Plaintiffs seek a declaration that Defendants engaged in a civil conspiracy to defraud Plaintiffs by, among others, scripting, discussing, preparing and rehearsing their scheme.

115.    Plaintiffs seek a declaration that Defendants intentionally inflicted extreme emotional distress upon Plaintiffs and that such emotional distress was an intended result of Defendants' fraud and/or was likely to result from Defendants' fraud.

116.    Plaintiffs seek a declaration that Defendants acted through fraud in procuring Plaintiffs' names, likenesses and images for a commercial purpose.

117.    Plaintiffs seek an injunction against Defendants (1) barring the use of Plaintiffs' names, likenesses or images or any of the *Borat* movie's "dinner scenes" in any promotional material for the *Borat* movie, any future movie or in any book or financial endeavor; (2) barring the use of any and all filmed footage of Plaintiffs that did not appear in the final, edited version of the *Borat* movie; (3) barring the Defendants' use of any filming or depiction of Plaintiffs' names, likenesses and images; and (4) barring Defendants from selling, distributing or disseminating the *Borat* movie to the extent it contains scenes depicting Plaintiffs' names, likenesses or images.

WHEREFORE, Plaintiffs request further and appropriate relief against Defendants in the form of disgorgement, compensatory and punitive damages, interest, attorneys' fees and costs in an amount determined by the trier of fact and injunctive relief.

---

**JURY DEMAND**
**PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY ON ALL CLAIMS ASSERTED HEREIN**

---

_____
One of the Attorneys for Plaintiffs

W. Percy Badham, III (BAD002)
Brannon J. Buck (BUC019)
Will A. Smith (SMI284)
MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Phone: (205) 254-1000

01551242.2

**PLEASE SERVE THE DEFENDANTS VIA CERTIFIED MAIL
AT THE FOLLOWING:**

Twentieth Century Fox Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA 90035

Major Studio Partners, Inc.
Attn: Howard Schuster
P.O. Box 2034
East Hampton, NY 11939

One America Productions
Agent: Benjamin R. Reder
421 S. Beverly Drive
8th Floor
Beverly Hills, CA 90212

Dune Entertainment, LLC
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

Everyman Pictures
Agent: Howard Abramson
2049 Century Park East
Suite 2690
Los Angeles, CA 90067

Sacha Baron Cohen
c/o Twentieth Century Fox
    Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA 90035

Gold.Miller Productions
Eric Gold
9200 Sunset Blvd., 10th Floor
Los Angeles, CA 90069

Monica Levenson
c/o One America Productions
Agent: Benjamin R. Reder
421 S. Beverly Drive
8th Floor
Beverly Hills, CA 90212

Springland Films
Todd Lewis Schulman
8023 Beverly Blvd.
Suite 5-503
Los Angeles, CA 90048-4523

Julie Lynn Chounard
c/o One America Productions
Agent: Benjamin R. Reder
421 S. Beverly Drive
8th Floor
Beverly Hills, CA 90212

Peter Baynham
c/o Twentieth Century Fox
    Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA 90035

Jan Mazer
c/o Twentieth Century Fox
    Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA 90035

01551242.2

Anthony Hines
c/o Twentieth Century Fox
    Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA 90035

Four by Two Production, Company
10201 West Pico Blvd.
Los Angeles, CA 90035

01551242.2

2007 Oct-29  PM 03:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | ) ) ) ) | <u>Summons</u><br>(Issued pursuant to Rule 4 of the Federal Rules of Civil Procedure or other appropriate law.) |
|     Plaintiffs, | ) ) | |
| v. | ) ) | |
| Twentieth Century Fox Film, et al. | ) ) | CIVIL ACTION NO. CV-07-J-1918-S |
|     Defendants. | ) | |

TO DEFENDANT:

**Twentieth Century Fox Film Corporation**
**Agent: Gary D. Roberts**
**10201 West Pico Blvd.**
**Los Angeles, CA 90035**

      You are hereby summoned and required to serve upon plaintiff's attorney(s):

          W. Percy Badham III
          Maynard, Cooper & Gale, P.C.
          1901 Sixth Avenue North
          2400 AmSouth/Harbert Plaza
          Birmingham, Alabama 35203-2618
          (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service.  IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.  A signed copy of your response MUST also be filed with the court.

DATE: 10 - 26 - 07

SHARON HARRIS, CLERK

By: *a. dangley*
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE:  A separate summons must be
prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL  35203

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | ) **Summons**<br>) **(Issued pursuant to Rule 4 of the Federal**<br>) **Rules of Civil Procedure or other**<br>) **appropriate law.)** |
| Plaintiffs, | ) |
| v. | ) |
| Twentieth Century Fox Film, et al. | ) **CIVIL ACTION NO. CV-07-J-1918-S** |
| Defendants. | ) |

TO DEFENDANT:

**One America Productions**
**Agent: Benjamin R. Reder**
**421 S. Beverly Drive**
**8th Floor**
**Beverly Hills, CA 90212**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

> W. Percy Badham III
> Maynard, Cooper & Gale, P.C.
> 1901 Sixth Avenue North
> 2400 AmSouth/Harbert Plaza
> Birmingham, Alabama 35203-2618
> (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10|26|07

SHARON HARRIS, CLERK

By: a dxangley
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be
prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | )     **Summons** <br> ) **(Issued pursuant to Rule 4 of the Federal** <br> )   **Rules of Civil Procedure or other** <br> )    **appropriate law.)** |
|     **Plaintiffs,** | ) <br> ) |
| **v.** | ) <br> ) |
| Twentieth Century Fox Film, et al. | )   **CIVIL ACTION NO. CV-07-J-1918-S** <br> ) |
|     **Defendants.** | ) |

TO DEFENDANT:

**Monica Levenson**
**c/o One America Productions**
**Agent: Benjamin R. Reder**
**421 S. Beverly Drive**
**8ᵗʰ Floor**
**Beverly Hills, CA 90212**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

W. Percy Badham III
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2618
(205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SHARON HARRIS, CLERK

By: *a. Langley*
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be
prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5ᵗʰ Avenue North
Birmingham, AL 35203

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | )         <u>Summons</u><br>) **(Issued pursuant to Rule 4 of the Federal**<br>   **Rules of Civil Procedure or other**<br>   **appropriate law.)** |
|      **Plaintiffs,** | ) |
| **v.** | ) |
| **Twentieth Century Fox Film, et al.** | )   **CIVIL ACTION NO. CV-07-J-1918-S** |
|      **Defendants.** | ) |

TO DEFENDANT:

**Julie Lynn Chounard
c/o One America Productions
Agent: Benjamin R. Reder
421 S. Beverly Drive
8ᵗʰ Floor
Beverly Hills, CA 90212**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

> W. Percy Badham III
> Maynard, Cooper & Gale, P.C.
> 1901 Sixth Avenue North
> 2400 AmSouth/Harbert Plaza
> Birmingham, Alabama 35203-2618
> (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: __10/26/07__

SHARON HARRIS, CLERK

By: _a Langley_
Deputy Clerk
(SEAL OF COURT)

**SEE REVERSE SIDE FOR RETURN**

NOTE: A separate summons must be prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5ᵗʰ Avenue North
Birmingham, AL 35203

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | ) **Summons** <br> ) **(Issued pursuant to Rule 4 of the Federal** <br> ) **Rules of Civil Procedure or other** <br> ) **appropriate law.)** |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Twentieth Century Fox Film, et al. | ) **CIVIL ACTION NO. CV-07-J-1918-S** |
| | ) |
| Defendants. | ) |

TO DEFENDANT:

**Sacha Baron Cohen**
**c/o Twentieth Century Fox**
**    Film Corporation**
**Agent: Gary D. Roberts**
**10201 West Pico Blvd.**
**Los Angeles, CA 90035**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

> W. Percy Badham III
> Maynard, Cooper & Gale, P.C.
> 1901 Sixth Avenue North
> 2400 AmSouth/Harbert Plaza
> Birmingham, Alabama 35203-2618
> (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be prepared for each defendant.

SHARON HARRIS, CLERK

By: A. Langley
Deputy Clerk
(SEAL OF COURT)

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. Mckinnon; Michael M. Jared; and Lynn S. Jared,<br><br>      Plaintiffs,<br><br>v.<br><br>Twentieth Century Fox Film, et al.<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Summons**
**(Issued pursuant to Rule 4 of the Federal**
   **Rules of Civil Procedure or other**
   **appropriate law.)**

**CIVIL ACTION NO. CV-07-J-1918-S**

TO DEFENDANT:

**Everyman Pictures**
**Agent: Howard Abramson**
**2049 Century Park East**
**Suite 2690**
**Los Angeles, CA 90067**

      You are hereby summoned and required to serve upon plaintiff's attorney(s):

          W. Percy Badham III
          Maynard, Cooper & Gale, P.C.
          1901 Sixth Avenue North
          2400 AmSouth/Harbert Plaza
          Birmingham, Alabama 35203-2618
          (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be prepared for each defendant.

SHARON HARRIS, CLERK

By: _a deangley_
Deputy Clerk
(SEAL OF COURT)

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. | )      **Summons** |
| McKinnon; Michael M. Jared; and Lynn | ) **(Issued pursuant to Rule 4 of the Federal** |
| S. Jared, | )   **Rules of Civil Procedure or other** |
| | )    **appropriate law.)** |
|      **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **Twentieth Century Fox Film, et al.** | )   **CIVIL ACTION NO. CV-07-J-1918-S** |
| | ) |
|      **Defendants.** | ) |

TO DEFENDANT:

**Gold.Miller Productions**
**Eric Gold**
**9200 Sunset Blvd., 10th Floor**
**Los Angeles, CA 90069**

      You are hereby summoned and required to serve upon plaintiff's attorney(s):

            W. Percy Badham III
            Maynard, Cooper & Gale, P.C.
            1901 Sixth Avenue North
            2400 AmSouth/Harbert Plaza
            Birmingham, Alabama 35203-2618
            (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SHARON HARRIS, CLERK

By: _A. deangley_
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be
prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | ) **Summons** ) **(Issued pursuant to Rule 4 of the Federal** )   **Rules of Civil Procedure or other** )   **appropriate law.)** |
| Plaintiffs, | ) ) |
| v. | ) ) |
| Twentieth Century Fox Film, et al. | ) **CIVIL ACTION NO. CV-07-J-1918-S** ) |
| Defendants. | ) |

TO DEFENDANT:

**Major Studio Partners, Inc.**
**Attn: Howard Schuster**
**P.O. Box 2034**
**East Hampton, NY 11939**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

W. Percy Badham III
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2618
(205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: **10-26-07**

SHARON HARRIS, CLERK

By: _a. dlangley_
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | )<br>)<br>)<br>) | 
| Plaintiffs, | ) |
| v. | ) |
| Twentieth Century Fox Film, et al. | ) |
| Defendants. | ) |

**Summons**
**(Issued pursuant to Rule 4 of the Federal Rules of Civil Procedure or other appropriate law.)**

**CIVIL ACTION NO. CV-07-J-1918-S**

TO DEFENDANT:

**Dune Entertainment, LLC**
**c/o CT Corporation System**
**111 Eighth Avenue**
**New York, NY 10011**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

> W. Percy Badham III
> Maynard, Cooper & Gale, P.C.
> 1901 Sixth Avenue North
> 2400 AmSouth/Harbert Plaza
> Birmingham, Alabama 35203-2618
> (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be prepared for each defendant.

SHARON HARRIS, CLERK

By: *Ac deangley*
Deputy Clerk
(SEAL OF COURT)

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. Mckinnon; Michael M. Jared; and Lynn S. Jared, | ) **Summons**<br>) **(Issued pursuant to Rule 4 of the Federal**<br>) **Rules of Civil Procedure or other**<br>) **appropriate law.)** |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Twentieth Century Fox Film, et al. | ) **CIVIL ACTION NO. CV-07-J-1918-S** |
| | ) |
|     Defendants. | ) |

TO DEFENDANT:

**Four by Two Production, Company**
**10201 West Pico Blvd.**
**Los Angeles, CA 90035**

       You are hereby summoned and required to serve upon plaintiff's attorney(s):

               W. Percy Badham III
               Maynard, Cooper & Gale, P.C.
               1901 Sixth Avenue North
               2400 AmSouth/Harbert Plaza
               Birmingham, Alabama 35203-2618
               (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be
prepared for each defendant.

SHARON HARRIS, CLERK

By: _A. Langley_
Deputy Clerk
(SEAL OF COURT)

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K.<br>McKinnon; Michael M. Jared; and Lynn<br>S. Jared,<br><br>     Plaintiffs,<br><br>v.<br><br>Twentieth Century Fox Film, et al.<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Summons**
**(Issued pursuant to Rule 4 of the Federal
Rules of Civil Procedure or other
appropriate law.)**

**CIVIL ACTION NO. CV-07-J-1918-S**

TO DEFENDANT:

**Peter Baynham
c/o Twentieth Century Fox
   Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA 90035**

      You are hereby summoned and required to serve upon plaintiff's attorney(s):

> W. Percy Badham III
> Maynard, Cooper & Gale, P.C.
> 1901 Sixth Avenue North
> 2400 AmSouth/Harbert Plaza
> Birmingham, Alabama 35203-2618
> (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SHARON HARRIS, CLERK

By: a dcangley
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be
prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | ) ) ) ) | **Summons** **(Issued pursuant to Rule 4 of the Federal Rules of Civil Procedure or other appropriate law.)** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Twentieth Century Fox Film, et al. | ) ) | **CIVIL ACTION NO. CV-07-J-1918-S** |
| Defendants. | ) | |

TO DEFENDANT:

**Springland Films**
~~Todd Lewis Schulman~~
**8023 Beverly Blvd.**
**Suite 5-503**
**Los Angeles, CA 90048-4523**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

W. Percy Badham III
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2618
(205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be prepared for each defendant.

SHARON HARRIS, CLERK

By: a Langley
Deputy Clerk
(SEAL OF COURT)

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | )      **Summons**<br>) **(Issued pursuant to Rule 4 of the Federal**<br>)    **Rules of Civil Procedure or other**<br>)     **appropriate law.)** |
|      **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **Twentieth Century Fox Film, et al.** | )   **CIVIL ACTION NO. CV-07-J-1918-S** |
| | ) |
|      **Defendants.** | ) |

TO DEFENDANT:

**Jan Mazer
c/o Twentieth Century Fox
   Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA 90035**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

> W. Percy Badham III
> Maynard, Cooper & Gale, P.C.
> 1901 Sixth Avenue North
> 2400 AmSouth/Harbert Plaza
> Birmingham, Alabama 35203-2618
> (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SHARON HARRIS, CLERK

By: _a. langley_
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be
prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared, | ) <u>Summons</u><br>) **(Issued pursuant to Rule 4 of the Federal**<br>) **Rules of Civil Procedure or other**<br>) **appropriate law.)** |
| Plaintiffs, | ) |
| v. | ) |
| Twentieth Century Fox Film, et al. | ) **CIVIL ACTION NO. CV-07-J-1918-S** |
| Defendants. | ) |

TO DEFENDANT:

**Anthony Hines**
**c/o Twentieth Century Fox**
   **Film Corporation**
**Agent: Gary D. Roberts**
**10201 West Pico Blvd.**
**Los Angeles, CA 90035**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

W. Percy Badham III
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2618
(205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT. A signed copy of your response MUST also be filed with the court.

DATE: 10/26/07

SHARON HARRIS, CLERK

By: *a Langley*
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE: A separate summons must be prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL 35203

FILED
2007 Oct-30 AM 10:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K. McKinnon; Michael M. Jared; and Lynn S. Jared,<br><br>Plaintiffs,<br><br>v.<br><br>Twentieth Century Fox Film, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Summons**
**(Issued pursuant to Rule 4 of the Federal Rules of Civil Procedure or other appropriate law.)**

**CIVIL ACTION NO. CV-07-J-1918-S**

TO DEFENDANT:

**Todd Lewis Schulman**
**c/o One America Productions**
**Agent:  Benjamin R. Reder**
**421 S. Beverly Drive, 8th Floor**
**Beverly Hills, CA  90212**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

> W. Percy Badham III
> Maynard, Cooper & Gale, P.C.
> 1901 Sixth Avenue North
> 2400 AmSouth/Harbert Plaza
> Birmingham, Alabama 35203-2618
> (205) 254-1000

a response to the complaint which is herewith served upon you, within 20 days after service of the summons upon you, exclusive of the day of service.  IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.  A signed copy of your response MUST also be filed with the court.

DATE: 10/30/07

SHARON HARRIS, CLERK

By: _A. Langley_
Deputy Clerk
(SEAL OF COURT)

SEE REVERSE SIDE FOR RETURN

NOTE:  A separate summons must be prepared for each defendant.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, AL  35203

FILED

2007 Nov-06  AM 08:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**One America Productions**
**Agent: Benjamin R. Reder**
**421 S. Beverly Drive**
**8th Floor**
**Beverly Hills, CA 90212**

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____  ☐ Agent
                    ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
Sharon Lewis                      11/2/07

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

CV-07-J-1918-S

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7006 0810 0000 1814 6617

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X ☐ Agent
☐ Addressee

B. Received by ( *Printed Name* )   C. Date of Delivery

1. Article Addressed to:

**Todd Lewis Schulman
c/o One America Productions
Agent: Benjamin R. Reder
421 S. Beverly Drive, 8th Floor
Beverly Hills, CA  90212**

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

CV07 J 1918 S

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)   ☐ Yes

2. Article Number
(*Transfer from service label*)

7006 0810 0080 1814 6747

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

FILED

**SENDER: COMPLETE *THIS SECTION***

- ■ **Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.**
- ■ **Print your name and address on the reverse so that we can return the card to you.**
- ■ **Attach this card to the back of the mailpiece, or on the front if space permits.**

1. Article Addressed to:

**Gold.Miller Productions
Eric Gold
9200 Sunset Blvd., 10th Floor
Los Angeles, CA 90069**

CV-07-J-1918-S

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____    ☐ Agent
                             ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☒ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*    ☐ Yes

2. Article Number
   *(Transfer from service label)*    7006 0810 0000 1814 6631

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

FILED
2007 Nov-06  AM 08:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Signature

X ☐ Agent ☐ Addressee

B. Received by ( Printed Name)  C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

CV-07-J-1918-S

1. Article Addressed to:

**Julie Lynn Chounard**
**c/o One America Productions**
**Agent: Benjamin R. Reder**
**421 S. Beverly Drive**
**8th Floor**
**Beverly Hills, CA 9021**

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7006 0810 0000 1814 6693

Domestic Return Receipt   102595-02-M-1540

FILED

2007 Nov-06  AM 08:55
U.S. DISTRICT COURT
N.D. OF ALABAMA



■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature
X
☐ Agent
☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
7/2/07

1. Article Addressed to:

Monica Levenson
c/o One America Productions
Agent: Benjamin R. Reder
421 S. Beverly Drive
8th Floor
Beverly Hills, CA 90212

CV-07-J-1918-S

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
☒ Certified Mail       ☐ Express Mail
☐ Registered           ☐ Return Receipt for Merchandise
☐ Insured Mail         ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)              ☐ Yes

2. Article Number     7006 0810 0000 1814 6686

102595-02-M-1540

PS Form 3811, February 2004    Domestic Return Receipt

FILED

2007 Nov-07  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Signature

X                                    ☐ Agent
                                     ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

1. Article Addressed to:

**Twentieth Century Fox Film Corporation**
**Agent: Gary D. Roberts**
**10201 West Pico Blvd.**
 **Los Angeles, CA 90035**

CV-07-J-1918-S

3. Service Type
☒ Certified Mail      ☐ Express Mail
☐ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)        ☐ Yes

2. Article Number
   (Transfer from service label)

7006 0810 0000 1814 6600

Domestic Return Receipt                      102595-02-M-1540

FILED

2007 Nov-07 PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

CV-07-J-

1. Article Addressed to:

Peter Baynham
c/o Twentieth Century Fox
    Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA 90035

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article N

95-02-M-1540

FILED

2007 Nov-07 PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA



■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Signature

X                                    □ Agent
                                     □ Addressee

B. Received by ( Printed Name)       C. Date of Delivery

D. Is delivery address different from item 4?  □ Yes
   If YES, enter delivery address below:       □ No

CV-07-J-1918-SO

1. Article Addressed to:

**Four by Two Production, Company**
**10201 West Pico Blvd.**
**Los Angeles, CA 90035**

I. Service Type
   ☑ Certified Mail    □ Express Mail
   □ Registered        □ Return Receipt for Merchandise
   □ Insured Mail      □ C.O.D.

4. Restricted Delivery? (Extra Fee)    □ Yes

7006 0810 0000 1814 6730

102595-02-M-1540

...cle Number          ...ce label)

Domestic Return Receipt

FILED

2007 Nov-07 PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA



Jan Mazer
c/o Twentieth Century Fox
Film Corporation
Agent: Gary D. Roberts
10201 West Pico Blvd.
Los Angeles. CA 90035



Marcy Studio Partners, Inc.
Attn: Howard Schuster
P.O. Box 2034
East Hampton, NY 11939

CV-07-1418-S

PS Form 3811, February 2004

Domestic Return Receipt

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X ☐ Agent ☐ Addressee<br>B. Received by (Printed Name)  C. Date of Delivery |
| 1. Article Addressed to:<br><br>**Anthony Hines**<br>**c/o Twentieth Century Fox**<br>**Film Corporation**<br>**Agent: Gary D. Roberts**<br>**10201 West Pico Blvd.**<br>**Los Angeles, CA 90035**<br><br>2007 NOV -8<br>U.S. DISTRICT COURT<br>N.D. OF ALABAMA<br><br>CV-07-J-1918-S | D. Is delivery address different from item 1? ☐ Yes<br>   If YES, enter delivery address below: ☐ No<br><br>3. Service Type<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label)  7006 0810 0000 1814 6716 | |
| PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540 | |

FILED

2007 Nov-15  AM 10:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Sacha Baron Cohen**
**c/o Twentieth Century Fox**
**Film Corporation**
**Agent: Gary D. Roberts**
**10201 West Pico Blvd.**
**Los Angeles. CA 90035**

CV-07-J-1918-S

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7006 0810 0000 1814 6679

PS Form **3811**, February 2004    Domestic Return Receipt    102595-02-M-1540

FILED
2007 Nov-19  AM 10:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

COMPLETE THIS SECTION ON DELIVERY

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Everyman Theatre**
**Agent Howard Abramson**
**2049 Century Park East**
**Suite 2690**
**Los Angeles, CA 90067**

A. Signature

X                                      ☐ Agent
                                       ☐ Addressee

B. Received by ( Printed Name )     C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

CV-07-J-1918-S

3. Service Type
   ☒ Certified Mail       ☐ Express Mail
   ☐ Registered           ☐ Return Receipt for Merchandise
   ☐ Insured Mail         ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)              ☐ Yes

2. Article Number
   (Transfer from service label)

7006 0810 0000 1814 6624

2004          Domestic Return Receipt                102595-02-M-1540

FILED

2007 Nov-19  AM 10:08
U.S. DISTRICT COURT
N.D. OF ALABAMA



COMPLETE THIS SECTION ON DELIVERY

- Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse
  so that we can return the card to you.
- Attach this card to the back of the mailpiece,
  or on the front if space permits.

A. Signature

X ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:         ☐ No

1. Article Addressed to:

'07 NOV 16  AM 11: 52

U.S. DISTRICT COURT
N.D. OF ALABAMA

Dune Entertainment, LLC
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

CV-07-J-1918-S

3. Service Type
   ☒ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number       7006 0810 0000 1814 6662
   (Transfer from service label)

PS Form 3811  Domestic Return Receipt      102595-02-M-1540

FILED

2007 Nov-21 PM 02:11
U.S. DISTRICT COURT
N.D. OF ALABAMA







FILED
2007 Dec-05 PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY STREIT; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-07-J-1918-S |
| | ) | |
| TWENTIETH CENTURY FOX FILM | ) | |
| CORPORATION; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CORPORATE DISCLOSURE STATEMENT

Defendant, Twentieth Century Fox Film Corporation, pursuant to Rule

7.1(a) of the Federal Rules of Civil Procedure, hereby submits the following

corporate Disclosure Statement:

Twentieth Century Fox Film Corporation is a wholly owned subsidiary of

News Corporation, a Delaware corporation whose shares are issued to the public

and traded on the New York Stock Exchange. Liberty Media Corporation, which

itself issues shares to the public that are traded on the New York Stock Exchange,

has an approximately 19% interest in the voting stock of News Corporation.

Attorneys for Defendants
Twentieth Century Fox Film Corporation;
One America Productions, Inc., d/b/a

Springland Films; Dune Entertainment,
LLC; Everyman Pictures; Todd Lewis
Schulman; Monica Levinson
and Julie Lynn Chouinard

OF COUNSEL:

J. Banks Sewell, III
William H. Brooks
Gray M. Borden
LIGHTFOOT, FRANKLIN & WHITE,
L.L.C.
400 North 20th Street
Birmingham, Alabama  35203
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2007, a true and correct copy of the foregoing was served through the Court's CM/ECF system, which will provide electronic notice to:

> W. Percy Badham, III, Esq.
> Brannon J. Buck, Esq.
> Will A. Smith, Esq.
> **MAYNARD, COOPER & GALE, P.C.**
> 1901 Sixth Avenue North
> Suite 2400
> Birmingham, AL 35203

_____
Of Counsel

FILED
2007 Dec-05  PM 03:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY STREIT; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-07-J-1918-S |
| | ) | |
| TWENTIETH CENTURY FOX FILM | ) | |
| CORPORATION; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CORPORATE DISCLOSURE STATEMENT

Defendant, Dune Entertainment, LLC, pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, hereby submits the following corporate Disclosure Statement:

Dune Entertainment, LLC has no parent corporation and no publicly held corporation owns stock in Dune Entertainment, LLC.

_____
Attorneys for Defendants
Twentieth Century Fox Film Corporation;
One America Productions, Inc., d/b/a
Springland Films; Dune Entertainment,
LLC; Everyman Pictures; Todd Lewis
Schulman; Monica Levinson
and Julie Lynn Chouinard

OF COUNSEL:

J. Banks Sewell, III
William H. Brooks
Gray M. Borden
LIGHTFOOT, FRANKLIN & WHITE,
L.L.C.
400 North 20th Street
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2007, a true and correct copy of the foregoing was served through the Court's CM/ECF system, which will provide electronic notice to:

W. Percy Badham, III, Esq.
Brannon J. Buck, Esq.
Will A. Smith, Esq.
**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
Suite 2400
Birmingham, AL 35203

Of Counsel

FILED
2007 Dec-05  PM 03:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY STREIT; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-07-J-1918-S |
| | ) | |
| TWENTIETH CENTURY FOX FILM | ) | |
| CORPORATION; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CORPORATE DISCLOSURE STATEMENT

Defendant, One America Productions, Inc. d/b/a Springland Films ("One America"), pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, hereby submits the following corporate Disclosure Statement:

One America has no parent company and no publicly held corporation owns stock in One America.  Springland Films is a registered d/b/a of One America.

_____
Attorneys for Defendants
Twentieth Century Fox Film Corporation;
One America Productions, Inc., d/b/a
Springland Films; Dune Entertainment,
LLC; Everyman Pictures; Todd Lewis
Schulman; Monica Levinson
and Julie Lynn Chouinard

OF COUNSEL:

J. Banks Sewell, III
William H. Brooks
Gray M. Borden
LIGHTFOOT, FRANKLIN & WHITE,
L.L.C.
400 North 20th Street
Birmingham, Alabama  35203
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2007, a true and correct copy of the foregoing was served through the Court's CM/ECF system, which will provide electronic notice to:

> W. Percy Badham, III, Esq.
> Brannon J. Buck, Esq.
> Will A. Smith, Esq.
> **MAYNARD, COOPER & GALE, P.C.**
> 1901 Sixth Avenue North
> Suite 2400
> Birmingham, AL 35203

_____
Of Counsel

2007 Dec-05  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY STREIT; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-07-J-1918-S |
| | ) | |
| TWENTIETH CENTURY FOX FILM | ) | |
| CORPORATION; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CORPORATE DISCLOSURE STATEMENT

Defendant, Everyman Pictures, pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, hereby submits the following corporate Disclosure Statement:

Everyman Pictures has no parent company and no publicly held corporation owns stock in Everyman Pictures.

_____
Attorneys for Defendants
Twentieth Century Fox Film Corporation;
One America Productions, Inc., d/b/a
Springland Films; Dune Entertainment,
LLC; Everyman Pictures; Todd Lewis
Schulman; Monica Levinson
and Julie Lynn Chouinard

OF COUNSEL:

J. Banks Sewell, III
William H. Brooks
Gray M. Borden
LIGHTFOOT, FRANKLIN & WHITE,
L.L.C.
400 North 20th Street
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2007, a true and correct copy of the foregoing was served through the Court's CM/ECF system, which will provide electronic notice to:

W. Percy Badham, III, Esq.
Brannon J. Buck, Esq.
Will A. Smith, Esq.
**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
Suite 2400
Birmingham, AL 35203

Of Counsel

FILED

2007 Dec-13  PM 03:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CINDY STREIT; SARAH MOSELEY; BEN K. MCKINNON; MICHAEL M. JARED; AND LYNN S. JARED, | ) ) ) ) |
| PLAINTIFFS, | ) ) |
| VS. | ) CIVIL ACTION NO.: CV-07-J-1918-S ) |
| TWENTIETH CENTURY FOX FILM CORPORATION, ET AL., | ) ) ) |
| DEFENDANTS. | ) ) |

### PLAINTIFFS' MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO MOTION TO TRANSFER (UNOPPOSED)

Come now Plaintiffs Cindy Streit, Sarah Mosely, Ben K. McKinnon, Michael M. Jared, and Lynn S. Jared ("Plaintiffs") and hereby move this Honorable Court for a fourteen (14) day extension of time within which to file a response to the Defendants' Motion to Transfer, or in the Alternative, to Dismiss for Improper Venue. As grounds for said motion, Plaintiffs state as follows:

1. On December 5, 2007, the Defendants filed a Motion to Transfer, or in the Alternative, to Dismiss for Improper Venue in this case. On December 6, this Court entered an Order requiring the Plaintiffs to respond to the Motion within twenty-one (21) days from the entry of the Order. Therefore, the Plaintiffs' response to the Motion to Transfer is currently due on or before December 27, 2007.

2. The Defendants' Motion to Transfer raises factual and legal issues to which the Plaintiffs must respond with both testimony and documentary evidence.

01579048.1

3.      Due to the holiday travel schedules of the Plaintiffs and their counsel, the Plaintiffs need additional time to gather the testimony and documents needed to adequately respond to the Defendants' Motion.  Therefore, the Plaintiffs are respectfully seeking a fourteen (14) day extension to the respond to the Motion.  Such an extension would make the Plaintiffs' response due on or before January 10, 2008.

4.      The Defendants, through their counsel, have consented to the fourteen (14) day extension of time.

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order granting the Plaintiffs an extension to respond to the Defendants' Motion to Transfer and making such response due on or before January 10, 2008.


_____/s/_____
One of the Attorneys for Plaintiffs


OF COUNSEL:

W. Percy Badham, III (BAD002)
Brannon J. Buck (BUC019)
Will A. Smith (SMI284)
MAYNARD, COOPER & GALE, P.C.
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Phone: (205) 254-1000
Fax:    (205) 254-1999

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on the following via CM/ECF on December 13, 2007:

J. Banks Sewell, III
William H. Brooks
Gray M. Borden
Lightfoot, Franklin & White, L.L.C.
400 20th Street North
Birmingham, AL  35203

_____/s/_____
Of Counsel

01579048.1

FILED

2007 Dec-06  PM 01:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

CINDY STREIT, et al.,                    )

       Plaintiffs,               )

vs.                                      )          CV 07-J-1918-S

TWENTIETH CENTURY FOX                    )
FILM CORPORATION, et al.,
                                         )
       Defendants.
                                         )

## ORDER

Defendants having filed motion to transfer, or in the alternative, to dismiss

for improper venue (doc. 19),

It is hereby ORDERED that plaintiffs respond to said motion within twenty-

one (21) days from entry of this order.

**DONE** and **ORDERED** this 6th day of December 2007.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

FILED
2007 Dec-18  PM 02:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CINDY STREIT, et al.,            )

   Plaintiffs,            )

vs.            )  CV 07-J-1918-S

TWENTIETH CENTURY FOX            )
FILM CORPORATION, et al.,
          )

   Defendants.            )

          )

## ORDER

Plaintiffs having filed unopposed motion for extension of time to file response (doc. 25), and the court having considered said motion and being of the opinion it is due to be granted,

It is therefore ORDERED that said motion is GRANTED.  Plaintiffs' response to the motion to transfer shall be filed on or before January 10, 2008.

**DONE** and **ORDERED** this 18th day of December 2007.

_____

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| CINDY STREIT; et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   CIVIL ACTION NO. CV-07-J-1918-S |
| | ) |
| TWENTIETH CENTURY FOX FILM | ) |
| CORPORATION; et al., | ) |
| | ) |
|     Defendants. | ) |

## DEFENDANTS' SUBMISSION OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION TO TRANSFER, OR IN THE ALTERNATIVE, TO DISMISS FOR IMPROPER VENUE

Defendants, Twentieth Century Fox Film Corporation; One America

Productions, Inc., d/b/a Springland Films; Dune Entertainment, LLC; Everyman

Pictures; Todd Lewis Schulman; Monica Levinson and Julie Lynn Chouinard,

submit the attached opinion from the Alabama Supreme Court released on January

18, 2007 in *Ex parte Sacha Baron Cohen*, No. 1061288 in support of Defendants'

Motion To Transfer, Or In The Alternative, To Dismiss For Improper Venue.  In

that opinion, the Alabama Supreme Court held that Alabama's door-closing

statute, Ala. Code § 10-2B-15.02, did not serve as a bar to the enforcement of the

outbound forum selection clause contained in the same Standard Consent

Agreement entered into by the Plaintiffs in this case.  The Court held that the

primary purpose of the transaction evidenced by the Standard Consent Agreement

1

was interstate, rather than intrastate, in nature. Therefore, the Commerce Clause of

the United States Constitution, ART. 1, § 8, cl. 3, preempted enforcement of

Alabama's door-closing statute. The Court issued a writ of mandamus directing

the trial court to vacate its prior order holding that the agreement was void and

unenforceable.


s/ William H. Brooks
Attorney for Defendants


OF COUNSEL:

J. Banks Sewell, III
William H. Brooks
Gray M. Borden
**LIGHTFOOT, FRANKLIN & WHITE, L.L.C.**
400 North 20th Street
Birmingham, AL 35203
(205) 581-0700
(205) 581-0799 (fax)

# CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 2008, a true and correct copy of the foregoing was served through the Court's CM/ECF system, which will provide electronic notice to:

W. Percy Badham, III, Esq.
Brannon J. Buck, Esq.
Will A. Smith, Esq.
**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
Suite 2400
Birmingham, AL 35203

s/ William H. Brooks
Of Counsel

RELEASED

JAN 18 2008

CLERK
SUPREME COURT OF ALABAMA

Notice: This opinion is subject to formal revision before publication in the advance sheets of Southern Reporter. Readers are requested to notify the Reporter of Decisions, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in Southern Reporter.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2007-2008

---

### 1061288

---

**Ex parte Sacha Baron Cohen et al.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Kathie Martin**

**v.**

**Sacha Baron Cohen et al.)**

**(Jefferson Circuit Court, CV-06-7333)**

BOLIN, Justice.

Sacha Baron Cohen; Twentieth Century Fox Film Corporation; One America Productions, Inc., d/b/a Springland Films; Everyman Pictures; Dune Entertainment, L.L.C.; MTV

1061288

Networks; Comedy Central; Dakota North Entertainment, Inc.; and Four by Two Production Company (hereinafter collectively referred to as "the petitioners"), the defendants in an action filed in the Jefferson Circuit Court by Kathie Martin, moved the trial court to dismiss Martin's claims against them on the basis of a forum-selection clause in the contract between Martin and Springland Films that provides that New York County, New York, is the exclusive venue for Martin's claims. The trial court denied the petitioners' motion. The petitioners now seek mandamus relief from this Court. We grant their petition and issue the writ.

I.

Kathie Martin owns and operates the Etiquette School of Birmingham, which provides etiquette training to individuals and corporate groups.    Sometime in October 2005, Todd Schulman, an employee of One America Productions, contacted Martin via telephone to inquire about her business and to assess her interest in participating in what he described as a documentary being filmed for Belarusian television about the experiences of a foreign reporter traveling in the United

2

States.[1]   Martin agreed to give the reporter a lesson on dining etiquette, and, on October 24, 2005, she traveled to the Tutwiler Hotel in Birmingham for the filming of the lesson.   Upon arriving at the Tutwiler Hotel, Martin was presented with a document entitled "Standard Consent Agreement," which she signed.   That document (hereinafter referred to as "the consent agreement") provided, in pertinent part:

"This is an agreement between Springland Films (the 'Producer') and the undersigned participant (the 'Participant').  In exchange for the Producer's obligation to pay a participation fee in the amount of $350 (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

"1.   The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the 'Film').  It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

"2.   The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign

---

[1]In all his dealings with Martin, Schulman identified himself as "Todd Lewis" and the company he was working for as Springland Films.

3

1061288

or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability to the Participant, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

        "....

        "4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, that include assertions of (a) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (b) damages caused by 'acts of God' (such as, but not limited to, injuries from natural disasters), (c) damages caused by acts of terrorism or war, (d) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (e) false light (such as any allegedly false or misleading portrayal of the Participant), (f) infliction of emotional distress (whether allegedly intentional or negligent), (g) trespass (to property or person), (h) breach of any alleged contract

4

1061288

> (whether the alleged contract is verbal or in writing), (i) allegedly deceptive business or trade practices, (j) copyright or trademark infringement, (k) defamation (such as any allegedly false statements made on the Film), (l) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (m) prima facie tort (such as alleged intentional harm to the Participant), (n) fraud (such as any alleged deception or surprise about the Film or this consent agreement), (o) breach of alleged moral rights, or (p) tortious or wrongful interference with any contracts or business of the Participant, or any claim arising out of the Participant's viewing of any sexually-oriented materials or activities.

> " . . . .

> "6.    Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State of New York and County of New York, under the laws of the State of New York."

After signing the consent agreement, Martin was introduced to the alleged foreign reporter who was the subject of the film, and they proceeded to begin filming the dining-etiquette lesson. It is sufficient to say that an eventful meal ensued

5

1061288

during which the alleged reporter engaged in behavior that would generally be considered boorish and offensive.

After the lesson concluded, Martin telephoned her husband and related what had occurred. After hearing Martin's description of what had happened and being suspicious of the alleged reporter, Martin's husband sent to Martin's office pictures of two characters played by comedian and actor Sacha Baron Cohen on his HBO television series "Da Ali G Show," Ali G and Borat, which he had gotten off the Internet. Martin then learned for the first time that the alleged foreign reporter was in fact Cohen in character as Borat, a fictitious journalist from Kazakhstan.

Unbeknownst to Martin, her lesson with Borat had in fact been filmed not for use in a Belarusian television documentary, but for inclusion in a major Hollywood motion picture, Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan (hereinafter referred to as "the Borat movie"), distributed by Twentieth Century Fox Film Corporation. The Borat movie, which was assigned an R-rating by the ratings board based on strong crude and sexual content and graphic nudity and language, was released in the United

6

1061288

States on approximately November 3, 2006, and went on to gross more than $200 million worldwide. Martin was identified by name in the film, which included portions of her etiquette lesson with Borat. Segments of Martin's initial meeting with Borat were also used in the film's advertising and promotion.

On December 22, 2006, Martin, claiming that she had been embarrassed and humiliated by her encounter with Borat and her inclusion in and association with the Borat movie, sued Cohen, the production companies associated with the Borat movie, and other parties related to the film, in the Jefferson Circuit Court, stating claims alleging fraud and deceit, quasi-contract and unjust enrichment, commercial appropriation and invasion of privacy, and intentional infliction of emotional distress. The petitioners responded by filing, pursuant to Rule 12(b)(3), Ala. R. Civ. P., a motion to dismiss for improper venue, based on the forum-selection clause in the consent agreement naming New York as the proper venue for any claims arising out of that agreement.[2]  In her response to the motion to dismiss, Martin argued, among other things, that the

---

[2]Cohen was not initially included in the motion to dismiss because he had not yet been served when it was filed. However, after being served, Cohen filed a motion adopting and joining in the previously filed motion to dismiss.

7

consent agreement that included the forum-selection clause was void because the only defendant that was a signatory to that agreement -- Springland Films -- was not qualified to do business in Alabama and that, pursuant to Alabama's door-closing statute, § 10-2B-15.02(a), Ala. Code 1975, the consent agreement was therefore void.[3] The petitioners filed a reply, arguing that they were engaged in interstate commerce in making the film and that the Commerce Clause in the United States Constitution accordingly shielded them from § 10-2B-15.02(a). See <u>North Alabama Marine, Inc. v. Sea Ray Boats, Inc.</u>, 533 So. 2d 598, 601 (Ala. 1988) (stating that the United States Constitution bars Alabama from preventing a foreign corporation that has not qualified to do business in Alabama "from enforcing its contracts in Alabama when its activities within this state are incidental to the transaction of interstate business").

---

[3]Section 10-2B-15.02(a) provides, in pertinent part:

"All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void at the action of the foreign corporation or by any person claiming through or under the foreign corporation by virtue of the contract or agreement ...."

8

On April 26, 2007, after receiving further briefing on the issue and holding a hearing, the trial court denied the petitioners' motion to dismiss on the basis that the consent agreement was void and unenforceable under § 10-2B-15.02(a) because Springland Films was not qualified to do business in Alabama. On June 7, 2007, the petitioners timely petitioned this Court for a writ of mandamus directing the trial court to vacate its April 26, 2007, order and to grant their motion to dismiss.

II.

> "'[A] petition for a writ of mandamus is the proper vehicle for obtaining review of an order denying enforcement of an "outbound" forum-selection clause when it is presented in a motion to dismiss.' Ex parte D.M. White Constr. Co., 806 So. 2d 370, 372 (Ala. 2001); see Ex parte CTB, Inc., 782 So. 2d 188, 190 (Ala. 2000). '[A] writ of mandamus is an extraordinary remedy, which requires the petitioner to demonstrate a clear, legal right to the relief sought, or an abuse of discretion.' Ex parte Palm Harbor Homes, Inc., 798 So. 2d 656, 660 (Ala. 2001). '[T]he review of a trial court's ruling on the question of enforcing a forum-selection clause is for an abuse of discretion.' Ex parte D.M. White Constr. Co., 806 So. 2d at 372."

Ex parte Leasecomm Corp., 886 So. 2d 58, 62 (Ala. 2003). Thus, we review the trial court's April 26, 2007, order to determine whether the trial court exceeded its discretion in

9

concluding that the consent agreement was void because Springland Films failed to register to do business in Alabama.

## III.

We first note that at the trial court level there was some question as to whether the relevant test for determining whether the Commerce Clause barred the application of § 10-2B-15.02(a) in this case was: 1) whether the primary purpose of the transaction between Martin and Springland Films was interstate commerce, or 2) whether the transaction between Martin and Springland Films merely affected interstate commerce. Our opinion in Briarcliff Nursing Home, Inc. v. Turcotte, 894 So. 2d 661, 667 (Ala. 2004), issued after the Supreme Court of the United States decided Citizens Bank v. Alafabco, Inc., 539 U.S. 52 (2003), makes clear that the test in cases involving § 10-2B-15.02(a) remains whether the primary purpose of the transaction constitutes an interstate activity:

> "[I]n Community Care [of America of Alabama, Inc. v. Davis, 850 So. 2d 283 (Ala. 2002)], this Court also stated:
>
>> "'The test of the enforceability of the arbitration clause in the Admission Contract in this case is not, as Community Care contends, whether the transaction

10

1061288

> substantially affects interstate commerce
> -- which is the proper analysis in cases
> not involving § 10-2B-15.02, see Sisters of
> the Visitation v. Cochran Plastering Co.,
> 775 So. 2d 759 (Ala. 2000) -- but "whether
> the main or primary purpose of the
> [transaction] constitutes an interstate or
> intrastate activity." Competitive Edge,
> Inc. v. Tony Moore Buick-GMC, Inc., 490 So.
> 2d 1242, 1244-45 (Ala. Civ. App. 1986).'

"Community Care, 850 So. 2d at 287. In Community
Care, Community Care was attempting to enforce a
contract (specifically an arbitration provision in
the admission contract); however, it was not
qualified to do business in Alabama at the time it
entered into the admission contract. This Court
held that the penalty of § 10-2B-15.02(a), Ala. Code
1975, extends to the enforcement of arbitration
provisions. Id. at 286. Section 10-2B-15.02(a) is
a 'door closing' statute that '"bars a foreign
corporation not qualified to do business in Alabama
from enforcing in an Alabama court a contract it
made in Alabama."' Community Care, 850 So. 2d at
286 (quoting Hays Corp. v. Bunge Corp., 777 So. 2d
62, 64 (Ala. 2000)). Therefore, this Court held
that § 10-2B-15.02(a) voided the admission contract
and changed the test of the enforceability of the
arbitration provision from whether it substantially
affects interstate commerce to '"whether the main or
primary purpose of the [transaction] constitutes an
interstate or intrastate activity."' 850 So. 2d at
287 (quoting Competitive Edge, Inc. v. Tony Moore
Buick-GMC, Inc., 490 So. 2d 1242, 1244-45 (Ala. Civ.
App. 1986)). The present case does not involve §
10-2B-15.02(a); therefore, the proper test is
whether the activity substantially affects
interstate commerce."

894 So. 2d at 667. Because this case does involve
10-2B-15.02(a), the proper test is accordingly whether the

11

main or primary purpose of the transaction between Martin and Springland Films constitutes an interstate, or an intrastate, activity. That, in turn, depends on how the purpose of the transaction is defined.

The petitioners argue that "[t]he purpose of the [consent] agreement between [Martin] and One America [d/b/a Springland Films] was to provide for [Martin]'s appearance in an internationally distributed motion picture." (Petition at p. 2.) Martin, however, argues that the purpose of the consent agreement "was for Mrs. Martin to provide dining etiquette services for filming in the State of Alabama" and that "[n]o mention was ever made about Mrs. Martin participating in any production or distribution of a 'motion picture' or, for that matter, any activities outside of Alabama." (Response to petition at p. 6.) For the reasons that follow, we agree with the petitioners.

When attempting to discern the purpose of a contract, "this Court must first look to the plain language of the contract." Turner v. West Ridge Apartments, Inc., 893 So. 2d 332, 335 (Ala. 2004). The plain language of the consent agreement makes clear that the transaction between Martin and

12

1061288

Springland Films was not, as Martin attempts to portray it, a simple exchange pursuant to which Martin was to provide one filmed etiquette lesson in return for $350. Indeed, the consent agreement makes no mention of Martin's providing <u>any</u> services in exchange for the $350 payment. Rather, pursuant to the terms of the consent agreement, Martin was given the $350 payment "and the opportunity for [Martin] to appear in a motion picture" in exchange for her agreement, among other things, "to be filmed and audiotaped by [Springland Films] for a documentary-style film" and to assign to Springland Films any rights she may have in the recorded material so as to allow Springland Films to use the material "without restriction in any media throughout the universe in perpetuity."

Thus, although Martin has characterized the primary purpose of the transaction as "the provision of local labor by Mrs. Martin" (response to petition at p. 24), which, under Alabama caselaw, would clearly be an intrastate activity, see <u>Building Maintenance Personnel, Inc. v. International Shipbuilding, Inc.</u>, 621 So. 2d 1303, 1305 (Ala. 1993) (noting that labor is not an article of commerce and "'is quite

13

clearly defined as intrastate, rather than interstate, activity'" (quoting Green Tree Acceptance, Inc. v. Blalock, 525 So. 2d 1366, 1370 (Ala. 1988))), the transaction here clearly encompassed more than Martin's providing labor. The plain language of the consent agreement indicates that any provision of services by Martin was incidental to the actual purpose of the transaction -- to provide for Martin's appearance in recorded footage that might be used "without restriction in any media throughout the universe."[4] Accordingly, we hold that the primary purpose of the transaction between Martin and Springland Films constituted an interstate activity. This is true notwithstanding the fact that the filming, the execution of the consent agreement (along with the assignment of rights therein), and Springland Films' payment to Martin all took place in Alabama.

We further note that Martin's argument that the petitioners failed to make their current argument to the trial

---

[4]Although this Court is not bound by the label parties may attach to a document, the fact that the contract at the center of this dispute was prominently labeled "Standard Consent Agreement" further supports our conclusion that obtaining Martin's consent was an integral part of the transaction, which was not a transaction characterized by the simple exchange of money for Martin's services.

14

court and that their petition should now be denied on that basis is without merit. Citing Kingvision Pay-Per-View, Ltd. v. Ayers, 886 So. 2d 45 (Ala. 2003), Martin argues that the petitioners argued below only that the transaction with Martin affected interstate commerce -- not that its primary purpose was interstate commerce -- and that because the petitioners did not make the latter argument in the trial court the argument was waived and cannot now be made. See Smith v. Equifax Servs., Inc., 537 So. 2d 463, 465 (Ala. 1988) (stating that "this Court will not reverse the trial court's judgment on a ground raised for the first time on appeal"). The appellant in Kingvision sought to have a default judgment against it vacated. In the trial court, the appellant had argued that it had a meritorious defense to the plaintiff's claims; however, the appellant apparently did not at that time address the other two elements of the three-factor test this Court first enunciated in Kirtland v. Fort Morgan Authority Sewer Service, Inc., 520 So. 2d 600 (Ala. 1988), for challenging a default judgment -- whether the plaintiff would be prejudiced if the judgment was set aside and whether the default judgment was the result of the appellant's own

15

1061288

culpable conduct. Thus, because the appellant did not argue

to the trial court that its case met the three-part test, this

Court did not allow it to make that argument on appeal.

In the present case, the petitioners did first argue to

the trial court that the Commerce Clause barred the

application of § 10-2B-15.02(a) because their transaction with

Martin merely affected interstate commerce. However, after

Martin argued that the proper test was whether the primary

purpose of the transaction was interstate, the petitioners

responded by arguing that they were entitled to relief under

the test advocated by Martin as well. At the April 26, 2007,

hearing on this matter, the petitioners' counsel argued:

> "What [an affidavit filed by a Springland Films
> official] establishes more clearly I think is the
> interstate nature of the transaction at issue, that
> is, the making of this and distribution of this
> film.    Which I think even without the affidavit,
> Judge, the result from our perspective should be the
> same, that is, that this is plainly an interstate
> commerce transaction no matter how one articulates
> the test.    Whether it be an [Citizens Bank v.]
> Alafabco[, 539 U.S. 52 (2003),] type test of
> substantially affect[ing] interstate commerce or
> whether it be a test of plaintiff -- excuse me --
> plaintiff now argues that you have to look to see
> whether the main or primary purpose of the
> transaction was intrastate or interstate."

16

1061288

Thus, unlike the appellant in Kingvision, the petitioners did argue to the trial court that their case met the entirety of the relevant test, and they accordingly preserved their argument for appeal.

IV.

The petitioners have established that the primary purpose of the transaction between Springland Films and Martin was interstate commerce, specifically, to provide for Martin's appearance in a film that might be used "without restriction in any media throughout the universe." Because the purpose of that transaction was interstate commerce, the Commerce Clause of the United States Constitution precludes the courts of this State from applying § 10-2B-15.02(a) to prevent the petitioners from enforcing the consent agreement. Because the petitioners have a clear, legal right to the relief they seek -- an order directing the Jefferson Circuit Court to vacate its order holding the consent agreement void and unenforceable -- their petition for the writ of mandamus is granted. The trial court is directed to vacate its April 26, 2007, order and to conduct further proceedings consistent with this opinion.

17

1061288

PETITION GRANTED; WRIT ISSUED.

Cobb, C.J., and Lyons and Stuart, JJ., concur.

Murdock, J., concurs specially.

18

1061288

MURDOCK, Justice (concurring specially).

The main opinion concludes that the subject of the contract at issue is sufficiently interstate in nature that § 10-2B-15.02, Ala. Code 1975, may not be used against the petitioners by Martin. I concur in this rationale. In so doing, I note that this is the only ground argued by the petitioners as to why § 10-2B-15.02, which is commonly referred to as Alabama's door-closing statute because it bars nonqualified foreign corporations from accessing Alabama courts to enforce their contracts, does not prevent the petitioners from using provisions of their contract with Martin to defend against the lawsuit she initiated.

19

FILED

2008 Jan-24  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CINDY STREIT, ET AL.,

       Plaintiffs,

v.                                                        CV 07-J-1918-S

TWENTIETH CENTURY FOX
FILM CORPORATION, ET AL.,

       Defendants.

## <u>MEMORANDUM ORDER AND OPINION</u>

Pending before the court is the defendants' Motion to Transfer, or in the alternative to Dismiss for Improper Venue (doc. 19). In their motion, the defendants seek to have this case transferred to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a) or, in the alternative, dismissed pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure for improper venue.

Having considered the parties' submissions, the court is of the opinion for the reasons that follow that the defendants' motion is due to be **GRANTED**

1

**Factual Background**

The facts in this case arise out of the filming, production, and distribution of a scene from the major motion picture *Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan* (the "Borat movie").  Plaintiff Cindy Streit is the owner of ETS, an etiquette training business located in Birmingham, Alabama.  Compl. ¶ 23.  At the request of the defendants, Streit agreed to organize an etiquette training class and a formal southern-style dinner for a "foreign dignitary" from the Republic of Belarus.  *Id*., ¶¶ 24-25.  The other plaintiffs, Ben McKinnon, Michael Jared, Lynn Jared, and Sarah Moseley, attended the dinner as guests.  *Id*., ¶ 30.  All of the plaintiffs believed that they were being filmed as part of an educational documentary about the foreign dignitary's travels through America which would be shown on Belarus Television.  *Id*., ¶¶ 24, 27.

As part of their participation in the film, each plaintiff signed a document entitled Standard Consent Agreement.  *See* Exhibits 1-5 to Exhibit A of Defendants' Motion to dismiss (doc. 19).  The Standard Consent Agreement states that any claim brought by a participant "must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York."  *Id*.

At the dinner, defendant Cohen behaved in an outlandish and offensive

2

manner.  Compl. ¶ 32, 34-40.  The plaintiffs did not realize until later that they had

been filmed as part of a scene for the Borat movie.  *Id.* at p. 2.  The Borat movie

carries an R-rating "for pervasive strong crude and sexual content including

graphic nudity, and language."  *Id.*, ¶ 48.  Since its release, the Borat movie has

grossed over $200 million.  *Id.*, ¶ 49.

## Discussion

Forum selection clauses in contracts are enforceable in federal court.  *See

e.g. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).  The district

court's decision about whether to transfer a case pursuant to a forum selection

clause that requires litigation in a domestic forum is governed by 28 U.S.C. §

1404(a).  *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988).

Under Section 1404(a), a court may transfer a civil action to any other

district where it could have been brought "[f]or the convenience of  parties and

witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  Generally, a valid

forum selection clause is "a significant factor that figures centrally in the district

court's calculus," *Stewart Organization, Inc.*, 487 U.S. at 29, and will rarely be

outweighed by other 1404(a) factors because it is, in effect, the intent of both

parties to proceed in the selected forum.  *In re Ricoh Corp.*, 870 F.2d 570, 573

(11th Cir. 1989).   Forum selection clauses are valid and enforceable if they are

"freely and fairly negotiated by experienced business professionals." *In re Ricoh Corp.*, 870 F.2d at 573. However, proof of "fraud, duress, misrepresentation, or other misconduct" in negotiation can bar a forum selection clause's enforcement. *Id.* at 573-74.

In this case, the plaintiffs argue that the forum selection clause is unenforceable because it was not "freely and fairly negotiated by experienced business professionals" and because the contract was entered into based on the fraudulent representations made by the defendants. The United States Court of Appeals for the Eleventh Circuit has held that a forum selection clause is not rendered unenforceable every time there is an allegation of fraud. *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1296 (11th Cir. 1998) (citing *Scherk v. Alberto-Culver & Co.*, 417 U.S. 506, 519 n. 14 (1974)). Rather, the test is whether "the inclusion of that clause in the contract was the product of fraud or coercion." *Id.*; *see also Ex parte Leasecomm Communication,* 879 So. 2d 1156, 1159 (Ala. 2003) ("the proper inquiry is whether the forum-selection clause is the result of fraud in the inducement in the negotiation or inclusion in the agreement of the forum-selection clause itself.")

The court finds that the plaintiffs have failed to allege that the inclusion of the forum selection clause itself in the Standard Consent Agreement was the

4

product of fraud or coercion.  Therefore, even if all of the plaintiffs' allegations

are accepted as true, the forum selection clause is due to be enforced.

The plaintiffs also argue that the defendants' motion to transfer is due to be

denied because Springland Films is barred from enforcing the Standard Consent

Agreement under Alabama Code § 10-2B-15.02.  Alabama Code § 10-2B-15.02

renders a foreign corporation's contracts void where the foreign corporation does

not have a registered agent within the state and has not filed its articles of

incorporation with the secretary of state.  However, application of § 10-2B-15.02

is barred by the Commerce Clause of the United States Constitution where the

primary purpose of the transaction constitutes an interstate activity.  *Kathie Martin*

*v. Sacha Baron Cohen, et al.*, 2008 WL 162598 at *5 (Ala.).  In *Martin*, another

case arising out of the Borat movie involving the same Standard Consent

Agreement, the Alabama Supreme Court held that the plaintiff's "appearance in

recorded footage that might be used 'without restriction in any media throughout

the universe'" constituted an interstate activity.  *Id*.  Therefore, the Alabama

Supreme Court held that § 10-2B-15.02 did not render the forum selection clause

unenforceable.  *Id*. at * 7.  Since application of § 10-2B-15.02 is a matter of state

law, this court is bound by the *Martin* holding.  As such, the court is of the opinion

that the defendants' motion to transfer is due to be granted.

For the above reasons, the defendants' motion to transfer is hereby

**GRANTED**.  It is therefore **ORDERED** that this case is **TRANSFERRED** to the

United States District Court for the Southern District of New York pursuant to this

court's discretion under 28 U.S.C. § 1404(a).

**DONE** and **ORDERED** this the 24th day of January 2008.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

FILED
2008 Jan-25  AM 10:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **CINDY STREIT; SARAH MOSELEY;** ) | |
| **BEN K. MCKINNON; MICHAEL M.** ) | |
| **JARED; AND LYNN S. JARED,** ) | |
| ) | |
| **PLAINTIFFS,** ) | |
| ) | |
| **VS.** ) | **CIVIL ACTION NO.:** |
| ) | **CV-07-J-1918-S** |
| ) | |
| **TWENTIETH CENTURY FOX FILM** ) | |
| **CORPORATION, ET AL.,** ) | |
| ) | |
| **DEFENDANTS.** ) | |

**NOTICE OF CHANGE OF ADDRESS**

COME NOW W. Percy Badham and Brannon J. Buck, attorneys for Plaintiffs, and notify the Court of the change of their address to Badham & Buck, LLC, 2585 Wachovia Tower, 420 20th Street North, Birmingham, Alabama 35203.   Counsel respectfully requests that all correspondence, pleadings, motions, etc. in the above-styled cause be directed to the aforementioned address.

Respectfully submitted,

 s/ Percy Badham
W. Percy Badham, III

 s/ Brannon J. Buck
Brannon J. Buck
Attorneys for Plaintiffs

OF COUNSEL:
Badham & Buck, LLC
2585 Wachovia Tower
420 20th Street North
Birmingham, Alabama  35203
Phone: (205) 521-0036
Facsimile: (205) 521-0037

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on the following via electronic filing on the 25th day of January, 2008:

cc:
J. Banks Sewell, III
William H. Brooks
Gray M. Borden
Lightfoot, Franklin & White, L.L.C.
400 20th Street North
Birmingham, AL  35203


  s/ Percy Badham
OF COUNSEL

FILED

2008 Jan-29  PM 05:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| CINDY STREIT; SARAH MOSELEY; | ) | |
| BEN K. MCKINNON; MICHAEL M. | ) | |
| JARED; AND LYNN S. JARED, | ) | |
| | ) | |
|     PLAINTIFFS, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO.: |
| | ) | CV-07-J-1918-S |
| | ) | |
| TWENTIETH CENTURY FOX FILM | ) | |
| CORPORATION, ET AL., | ) | |
| | ) | |
|     DEFENDANTS. | ) | |

**MOTION FOR RELIEF FROM ORDER**

COME NOW the Plaintiffs in the above-styled case and, pursuant to Rule 60 of the Federal Rules of Civil Procedure, move this Court for relief from its Order dated January 24, 2008 transferring this case to the United States District Court for the Southern District of New York.  As grounds for said motion, Plaintiffs aver the following:

1.       Plaintiffs filed this Complaint on October 19, 2007.

2.       Defendants filed a Motion to Transfer the case to the United States District Court for the Southern District of New York pursuant to a forum selection clause.

3.       Plaintiffs filed an opposition to said motion supported by accompanying declarations from the Plaintiffs.

4.       On January 24, 2008, this court granted Defendants' motion and ordered the case to be transferred to New York.

5.    In its Order, this Court finds "that the plaintiffs have failed to allege that the inclusion of the forum selection clause itself in the Standard Consent Agreement was the product of fraud or coercion." *See* January 24, 2008 Order at ¶¶ 4-5.

6.    Plaintiffs respectfully submit that they have in fact alleged that the inclusion of the forum selection clause itself in the Standard Consent Agreement was procured by fraud or coercion and that they have presented substantial evidence to support that allegation.

7.    At page 19 of Plaintiffs' Opposition to Defendants' Motion to Transfer, Plaintiffs clearly state:

> There was "fraud, duress, misrepresentation, and other misconduct" committed by the Defendants in connection with the forum selection clause itself. In hindsight, it is clear that the Defendants meticulously planned how they would defraud the Plaintiffs into accepting the forum selection clause. They started by placing the clause in the final paragraph of the document. They then waited until the last possible moment to present the document and rushed the Plaintiffs to sign, even though they could have presented it two days earlier to Streit and McKinnon or during the hour and a half wait. The Defendants devised the placement of the forum selection clause in the document and the timing of the presentation with the intent of preventing the Plaintiffs from being able to thoughtfully consider the venue provision. Moreover, the Defendants used the word "standard" in the title of the document to mislead the Plaintiffs about the forum selection provision, even though it is far from standard. All of these tactics followed Lewis's monumental misrepresentations about the nature of the film – calling it an educational documentary for Belarus television.

8.    Furthermore, at page 6 of Plaintiffs' Opposition, Plaintiffs contend:

> Streit specifically asked Lewis if the "Standard Consent Agreement" changed any of the terms in the ETS Agreement. Lewis assured Streit and Plaintiff Michael Jared that the "Standard Consent Agreement" did not change the ETS Agreement and that there was nothing in it that would harm the guests. *Id.* at ¶ 12. Lewis misled the Plaintiffs about the contents of the "Standard Consent Agreement," particularly the term requiring that claims be filed in New York. He accomplished this deception, first, by handing out the "Standard Consent Agreements" at the very last

2

moment before the filming began even though the Plaintiffs had been waiting for one and a half hours. Second, the Plaintiffs were misled by the word "Standard" in the title of the document. They do not believe it is "standard" to require a person to travel thousands of miles to a foreign state to file a claim. Third, Lewis misled the Plaintiffs by encouraging them to quickly sign the "Standard Consent Agreement" since it was, in his words, just a "standard" form. Fourth, by placing the provision requiring claims to be filed in New York at the very end of the document and by hurrying the Plaintiffs through the process, Lewis caused them not to fully appreciate or thoughtfully consider the forum selection clause. Finally, none of the Plaintiffs had a lawyer present to review the agreement. *Id.* at ¶ 13.

9.    Paragraphs 12 and 13 of the Declaration of the Plaintiff Cindy Streit state as follows:

12.    I specifically asked Lewis if the "Standard Consent Agreement" changed any of the terms in the ETS Agreement. Lewis assured me that the "Standard Consent Agreement" did not change the ETS Agreement and that there was nothing in it that would harm me, my company, or the guests.

13.    Lewis misled me about the contents of the "Standard Consent Agreement," particularly the term requiring me to file a claim in New York. He accomplished this deception, first, by handing out the "Standard Consent Agreement" at the very last moment before the filming began even though he could have presented it to me on October 22 or to me and the other guests while we waited for the "dignitary" to arrive for the dinner party. Second, I was misled by the word "Standard" in the title of the document. To me, it is not "standard" to require a person to travel thousands of miles to a different state to file a claim. Third, Lewis misled me by encouraging me and the other participants to quickly sign the "Standard Consent Agreement" since it was, in their words, just a "standard" form. Fourth, Lewis misled me by saying that the "Standard Consent Agreement" was neither harmful to me, my business, or my guests nor inconsistent with the ETS Agreement. Fifth, by placing the provision requiring me to file a claim in New York at the very end and by hurrying me and the other guests through the process, Lewis caused me not to fully appreciate or thoughtfully consider the last paragraph requiring lawsuits to be filed in New York. Finally, I did not have a lawyer present at the time that this "Standard Consent Agreement" was presented for signing.

3

10.     Paragraph 8 of the Declaration of the Plaintiff Ben McKinnon states as follows:

8.     In the rush to have me and the other dinner party guests sign the "Standard Consent Agreement" and quickly begin the filming, Lewis stated that the "Standard Consent Agreement" was "just a formality" necessary to begin the filming.  The title of the agreement is misleading because some of the terms are not "standard."  In particular, the requirement that I have to pursue any claim in New York is not "standard" to me.  Also, the requirement that I file any lawsuit in New York was placed at the end of the "Standard Consent Agreement."  In the rush to sign and begin the filming, I did not have time to closely review or understand the implications of that provision.

11.     Paragraph 6 of the Declaration of the Plaintiff Sarah Moseley stats as follows:

6.     The paragraph in the "Standard Consent Agreement" requiring that any lawsuit be filed in New York was placed at the very end of the document.  Because of the rush to sign the "Standard Consent Agreement," I did not have time to thoroughly review it, particularly the last paragraph about filing lawsuits in New York.  In addition, I did not have an attorney present to review the "Standard Consent Agreement" and advise me about its terms.  The word "standard" in the title is misleading to me.  I do not consider having to travel to New York to file a claim to be "standard" in any agreement.

12.     Paragraphs 6 and 7 of the Declaration of the Plaintiff Michael Jared state as follows:

6.     I did not have sufficient time to thoroughly review and comprehend the "Standard Consent Agreement."  Todd Lewis, a representative of Springland Films, assured me that it was just a standard contract and a formality for beginning the filming.  He also stated that the "Standard Consent Agreement" did not change the contract between Springland Films and Etiquette Training Services.

7.     Todd Lewis rushed me and the other dinner guests to sign the "Standard Consent Agreement" in order to begin the filming upon the arrival of the "dignitary."  I am not an attorney, and I did not have a lawyer present to review the "Standard Consent Agreement" with me.  By rushing me and the other dinner guests to sign, the Springland Films representative encouraged me to

4

overlook some of the requirements of the "Standard Consent Agreement," particularly the requirement that any lawsuit be brought in the State of New York. That requirement is inconsistent with the title of the agreement because it is not "standard" in contracts based on my experience.

13.    Paragraph 6 of the Declaration of the Plaintiff Lynn Jared states as follows:

6.    I did not have sufficient time to thoroughly review and comprehend the "Standard Consent Agreement." The representative of Springland Films rushed me and the other dinner guests to sign the "Standard Consent Agreement" in order to begin the filming. I am not an attorney, and I did not have a lawyer present to review the "Standard Consent Agreement" with me. By rushing me and the other dinner guests to sign, the Springland Films representatives encouraged me to overlook some of the requirements of the "Standard Consent Agreement," particularly the requirement in the last paragraph that any lawsuit be brought in the State of New York. That requirement does not seem to be "standard." As a result, the title of the document is misleading.

14.    Plaintiffs have not simply <u>alleged</u> fraud and coercion relating to the inclusion of the forum selection clause; they have, in fact, presented substantial <u>evidence</u> to support the allegation. At a minimum, plaintiffs contend that they have presented enough evidence to create a jury issue as to whether the forum selection clause itself was procured by fraud.

15.    Drawing from decisions on arbitration, a jury should decide whether the Plaintiffs here were fraudulently induced to agree to the forum selection clause. *See Blue Cross and Blue Shield of Alabama v. Woodruff*, 803 So.2d 519, 527 (Ala. 2001) (holding that fraud in the inducement of an arbitration clause "would be determined by a jury") (quoting *Ex parte Shelton*, 738 So.2d 864, 870-71 (Ala. 1999).

16.    Finally, the Court's Order does not address the Plaintiffs' arguments, serious concerns and issues based on the Eleventh Circuit criteria, that they "effectively would be deprived of [their] day in court because of the inconvenience or unfairness of the chosen forum." In fact, the Eleventh Circuit has instructed courts to "consider 'the convenience of the parties and

witnesses' and 'the interests of justice'" in determining whether to enforce a forum selection clause. *See P & S Business Machines*, 331 F.3d at 807.

17.    Plaintiff Ben McKinnon is 85 years old and has severe spinal stenosis.  Mr. McKinnon is under doctor's orders not to travel.  This Court's ruling transferring the case to New York will almost assuredly deprive Mr. McKinnon of his day in court.  *See* Declaration of Ben McKinnon at ¶¶ 11-12 and the attached doctor's letter.

18.    Plaintiff Sarah Moseley has stage 3-C ovarian cancer, which is fortunately in remission.  However, her previous chemotherapy treatments have taken a toll on her health and make it very difficult for her to travel, not to mention that her condition could change at any time.  *See* Declaration of Sarah Moseley at ¶ 9.

19.    There is no evidence in the record that New York has any connection to this case whatsoever.  There is no evidence that any of the Defendants are headquartered or reside there. The record is completely void of any connection by any party to New York.

20.    Given the facts and circumstances of this case, to enforce this forum selection clause against these particular Plaintiffs would be a grave injustice and an unwarranted denial of access to the court system.  These individuals are not big corporations with unlimited resources to pursue litigation in New York.  They are elderly individuals, some with serious health issues, who are being denied the right to pursue their claims in their home state of Alabama – the state where every single event giving rise to this case occurred.

21.    28 U.S.C. § 1404(a) requires courts to consider "the interests of justice."  Clearly justice weighs against a transfer of this case.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that this Honorable Court vacate its January 24, 2008 Order and deny Defendants' Motion to Transfer, or

in the alternative, allow the issue of whether the forum selection paragraph was procured by fraud to be tried before a jury.

Respectfully submitted,

_s/  Brannon J. Buck _____
W. Percy Badham, III
Brannon J. Buck
Attorneys for Plaintiffs

OF COUNSEL:
Badham & Buck, LLC
2585 Wachovia Tower
420 20th Street North
Birmingham, Alabama  35203
Phone: (205) 521-0036
Facsimile: (205) 521-0037

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on the following via electronic filing on the 29th day of January, 2008:

cc
Banks Sewell, III
William H. Brooks
Gray M. Borden
Lightfoot, Franklin & White, L.L.C.
400 20th Street North
Birmingham, AL  35203

_s/  Brannon J. Buck _____
OF COUNSEL

FILED
2008 Jan-30  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

CINDY STREIT, ET AL.,

       Plaintiffs,

v.                                       CV 07-J-1918-S

TWENTIETH CENTURY FOX
FILM CORPORATION, ET AL.,

       Defendants.

## ORDER

Pending before the court is the plaintiffs' Motion for Relief from Order (doc. 31). In their motion, the plaintiffs request the court to vacate its Order of January 24, 2008, transferring this case to the Southern District of New York (doc. 29). Having considered the motion and being of the opinion that it is due to be denied for the reasons that follow, it is hereby **ORDERED** that the plaintiffs' motion is **DENIED**.

The plaintiffs contend that they have presented enough evidence of fraud relating to the inclusion of the forum selection clause to, at a minimum, create a jury issue. Plaintiff's motion at 5. In support of this argument, the plaintiffs cite *Blue Cross and Blue Shield of Alabama v. Woodruff*, 803 So.2d 519 (Ala. 2001),

1

for its holding that fraud in the inducement of an arbitration clause "would be determined by a jury." Plaintiff's motion at 5. Despite the plaintiffs' best efforts to the contrary, *Woodruff* provides no support for their argument. In *Woodruff*, the defendant filed a motion to compel arbitration pursuant to an arbitration clause in the plaintiff's insurance policy. *Id*. at 520-21. The plaintiff advanced "numerous 'defenses' and arguments" including fraud in the inducement as to why the case should not be submitted to arbitration. *Id*. at 523. However, the critical issue was "whether Blue Cross complied with the procedures specified in its contract for amending that contract." *Id*. at 527. The Alabama Supreme Court held that "the evidence before the trial judge was insufficient to establish that Blue Cross effectively amended the 1991 contract to add the arbitration provision." *Id.* at 528. The Court never considered nor discussed the plaintiff's allegation of fraud in the inducement.

As this court stated in its Order of January 24, 2008, the law of the Eleventh Circuit Court of Appeals is that an allegation of fraud renders a forum selection clause unenforceable solely when "the inclusion of that clause in the contract was the product of fraud or coercion." *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1296 (11th Cir. 1998) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n. 14 (1974)); *see also Ex parte Leasecomm Communication,* 879 So. 2d

2

1156, 1159 (Ala. 2003) ("the proper inquiry is whether the forum-selection clause is the result of fraud in the inducement in the negotiation or inclusion in the agreement of the forum-selection clause itself . . . if the claim of fraud in the inducement is directed toward the entire contract, the fraud exception to enforcement of the forum-selection clause does not apply").  In *Scherk*, the Court specifically stated that this "does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable."  *Scherk*, 417 U.S. at 519 n. 14.

The fraud that the plaintiffs have asserted is that they did not thoroughly read the Standard Consent Agreement because the defendants did not allow them enough time and that they were misled by the use of the term "Standard" in the title of the contract.  Plaintiff's motion at 2-5.  Under Alabama law, "a person who signs a contract is on notice of the terms therein and is bound thereby even if he or she fails to read the document."  *Locklear Dodge City, Inc. v. Kimbrell*, 703 So.2d 303, 306 (Ala. 1997).  Had the plaintiffs read the Standard Consent Agreement, it would have been apparent from the clear and unambiguous language in the forum selection clause that all claims must be brought in the State and County of New York.

The plaintiffs' argument that they were rushed into signing the Standard

3

Consent Agreement also does not render the forum selection clause unenforceable. In *Ex parte Perry*, 744 So.2d 859 (Ala. 1999), the Alabama Supreme Court was faced with a similar set of facts in which the plaintiff argued that an arbitration provision should not be enforced because the defendant automobile dealer "hurried her through the purchase of her new Hyundai automobile and did not give her an opportunity to read the purchase-agreement form before she signed it." *Id*. at 862. The Court noted that a party is responsible for reading a contract before signing it, regardless of whether the party felt "hurried." *Id*. at 863 (noting that if the plaintiff felt hurried "she could have slowed the process down or could have refused to sign the contract until she had had time to read it in its entirety").

In regard to the use of the term "Standard" in the title of the contract, the court is of the opinion that the term "Standard" is not so misleading as to render the forum selection clause unenforceable.

The plaintiffs' final argument is that the court failed to address plaintiff McKinnon and plaintiff Moseley's health problems in its Order of January 24, 2008. The Eleventh Circuit has held that a forum selection clause will rarely "be outweighed by other 1404(a) factors." *In re Ricoh Corp*., 870 F.2d 570, 573 (11th Cir. 1989). While the plaintiffs' health is a factor to be considered under 1404(a) which weighs in favor of the plaintiffs, it is not enough to overcome the

4

presumption in favor of enforcing the valid forum selection clause.

## Conclusion

For the above reasons, the plaintiffs' Motion for Relief from Order is hereby

**DENIED**.

**DONE** and **ORDERED** this the 30th day of January 2008.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

FILED
2007 Dec-05  PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY STREIT; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-07-J-1918-S |
| | ) | |
| TWENTIETH CENTURY FOX FILM | ) | |
| CORPORATION; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO TRANSFER, OR IN THE ALTERNATIVE, TO DISMISS FOR IMPROPER VENUE

Defendants, Twentieth Century Fox Film Corporation; One America

Productions, Inc., d/b/a Springland Films;[1] Dune Entertainment, LLC; Everyman

Pictures; Todd Lewis Schulman; Monica Levinson[2] and Julie Lynn Chouinard,[3]

hereby move the Court to transfer this action to the United States District Court for

the Southern District of New York pursuant to 28 U.S.C. § 1404(a), or in the

alternative, to dismiss this action pursuant to Rule 12(b)(3) of the Federal Rules of

---

[1] Plaintiffs' Complaint incorrectly designates One America Productions, Inc. and Springland Films as separate entities. Springland Films is a registered d/b/a of One America Productions, Inc.

[2] Plaintiffs' Complaint spells Monica Levinson's last name incorrectly. The corrected spelling will be used in Defendants' pleadings.

[3] Plaintiffs' Complaint spells Julie Lynn Chouinard's last name incorrectly. The corrected spelling will be used in Defendants' pleadings.

Civil Procedure for improper venue.[4]  Each of the five (5) Plaintiffs entered into a written agreement with defendants containing a valid and enforceable outbound forum selection clause that requires Plaintiffs to pursue their claims in the State of New York.  In support of this motion, Defendants show unto the Court as follows:

  1. Plaintiffs, Cindy Streit, Sarah Moseley, Ben K. McKinnon, Michael M. Jared and Lynn S. Jared, appeared in the motion picture titled "*Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan*" (the "Film").  According to the Complaint, the Film has been shown worldwide generating millions of dollars in revenue.  *See* Complaint, ¶¶ 46-49.  Now, Plaintiffs allege that they were portrayed in an unfavorable light in the Film, and would not have agreed to appear in the Film had they known how they would be portrayed.  Plaintiffs have named a host of out-of-state individual and corporate defendants all of which are alleged to have been involved in the creation, production and/or distribution of the Film.  Complaint, ¶¶ 6-20.  Plaintiffs assert claims against all Defendants collectively for unjust enrichment, fraud, fraudulent inducement, commercial appropriation, invasion of privacy, false light, wantonness, suppression/concealment, intentional infliction of emotional distress

---

[4] Defendants appear specially and for the limited purpose of filing this Motion. Defendants reserve the right to assert all applicable affirmative defenses, including lack of personal jurisdiction, in the appropriate Court following disposition of this motion. To these Defendants' knowledge, no other named defendants have been properly served.

2

and civil conspiracy.  Plaintiffs seek monetary, declaratory, injunctive and

equitable relief.

2.      Before Plaintiffs were filmed, they each signed a document titled

Standard Consent Agreement ("Consent Agreement").  The following outbound

forum selection clause appears in paragraph 6 immediately above the signature line

of the one-page Consent Agreement:

> Although the Participant agrees not to bring any claim in
> connection with the Film or its production, if any claim
> nevertheless is made, the Participant agrees that any such claim
> must be brought before, and adjudicated by, only a competent
> court located in the State of New York and County of New
> York, under the laws of the State of New York.

Consent Agreement, ¶ 6 (attached as Exhibits 1-5 to the Affidavit of Joan Hansen,

attached hereto as Exhibit A).

3.      After the Consent Agreements were executed, Plaintiffs were filmed

on October 24, 2005, in Alabama and portions of that footage were included in the

Film.  Each plaintiff was paid pursuant to the Consent Agreement with funds that

came from outside the State of Alabama. *See* Hansen Affidavit.  In addition to

Alabama, footage for the Film was shot in Romania, Mexico, New York, New

Jersey, Maryland, Oklahoma, Louisiana, Massachusetts, Washington D.C.,

Virginia, West Virginia, South Carolina, Mississippi, Texas and California. *Id.*

The Film was edited in California and has been exhibited in theaters in all 50

states, in addition to various foreign countries.[5] *Id.* The DVD of the Film was released in all 50 states and numerous foreign countries beginning in or shortly after March 2007. *Id.*

3.    By signing the Consent Agreement, each Plaintiff agreed that the proper venue for any claims "in connection with the Film or its production" would be the courts of the State of New York. Accordingly, this case should either be transferred to the United States District Court for the Southern District of New York or dismissed without prejudice for improper venue.[6]

4.    "Forum selection clauses in contracts are enforceable in federal courts." *P & S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003). Moreover, "[c]onsideration of whether to enforce a forum selection clause in a diversity jurisdiction case is governed by federal law . . . not state law." *Id.*[7] In a diversity case in which a forum selection clause designates a domestic forum, the

---

[5] The Film was nominated for a Golden Globe Award by the Hollywood Foreign Press Association in the category for Best Motion Picture – Musical or Comedy. Sacha Baron Cohen received the 2007 Golden Globe Award for Best Performance by an Actor in a Motion Picture – Musical or Comedy for his appearance in the Film. *See* http://www.hfpa.org.

[6] The County of New York is located within the Southern District of New York. 28 U.S.C. § 112(b).

[7] Outbound forum selection clauses also are enforceable under Alabama state law. *See, e.g., Ex parte Bad Toys Holdings, Inc.*, 958 So. 2d 852 (Ala. 2006); *Ex parte Soprema, Inc.*, 949 So. 2d 907 (Ala. 2006); *Ex parte Procom Servs., Inc.*, 884 So. 2d 827 (Ala. 2003); *Ex parte Leasecomm Corp.*, 879 So. 2d 1156 (Ala. 2003); *Ex parte D.M. White Constr. Co. Inc.*, 806 So. 2d 370 (Ala. 2001); *Ex parte Northern Capital Res. Corp.*, 751 So. 2d 12 (Ala. 1999); *Professional Ins. Corp. v. Sutherland*, 700 So. 2d 347 (Ala. 1997).

appropriate procedure for seeking enforcement of the clause is via a motion to

transfer venue pursuant to 28 U.S.C. § 1404(a). *See, e.g., Stewart Org., Inc. v.*

*Ricoh Corp.*, 487 U.S. 22, 28-29 (1988); *P & S Bus. Machs., Inc.*, 331 F.3d at 807;

*Stewart v. Dean-Michaels Corp.*, 716 F.Supp. 1400 (N.D. Ala. 1989) (transferring

case to New York pursuant to forum selection clause). [8]

    5.    Section 1404(a) provides:

> For the convenience of the parties and witnesses, in the interest of
> justice, a district court may transfer any civil action to any district or
> division where it might have been brought.

28 U.S.C. § 1404(a). The Eleventh Circuit has made clear that "the venue

mandated by a choice of forum clause rarely will be outweighed by other

1404(a) factors." *In re Ricoh*, 870 F.2d at 573; *see also P&S Bus. Machs.*,

331 F. 3d at 807 (same).

    6.    Plaintiffs' allegations of fraudulent inducement do not preclude

enforcement of the forum-selection clause in this case. Even in cases where fraud

is alleged, a forum-selection clause is enforceable where the plaintiff cannot

demonstrate that the *inclusion of the forum selection clause itself,* as distinguished

from the contract as a whole, was the product of fraud or coercion. *Scherk v.*

---

[8] The nominal party to the contract, Defendant Springland Films, a registered d/b/a of One America Productions, Inc., and any nonsignatories "closely related to the contractual relationship," such as the remaining defendants, have the right to enforce a forum-selection clause. *Ex parte Procom Servs., Inc.*, 884 So. 2d at 834. Furthermore, the Consent Agreement clearly contemplates that the forum-selection clause will be enforceable as to all claims related to the film, and does not distinguish between claims "against the Producer, or . . . any of its assignees or licensee or anyone associated with the Film." Consent Agreement, ¶ 4.

*Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974); *Lipcon v. Underwriters at*

*Lloyd's, London*, 148 F.3d 1285, 1296 (11th Cir. 1998). Stated differently, the

relevant question is whether or not Plaintiffs allege that they were induced into

including the forum-selection clause in the contract, not into signing the contract as

a whole:

> [T]he proper inquiry is whether the forum-selection clause is
> the result of fraud in the inducement in the negotiation or
> inclusion in the agreement of the forum-selection clause itself.
> If the forum-selection clause is the result of fraud in the
> inducement, then the fraud exception to the enforceability of the
> clause applies. However, **if the claim of fraud in the**
> **inducement is directed toward the entire contract, the fraud**
> **exception to enforcement of the forum-selection clause does**
> **not apply.**

*Ex parte Leasecomm*, 879 So. 2d at 1159 (emphasis added). Plaintiffs make no

allegation that they were induced to include the forum-selection clause in the

Consent Agreement. Instead, Plaintiffs' fraudulent inducement claim is directed to

the entire Consent Agreement. *See* Complaint, ¶ 77. Therefore, even if Plaintiffs'

allegations of fraudulent inducement are accepted as true, the enforceability of the

forum-selection clause is not impacted.

      7.     Similarly, Plaintiffs may not escape the forum selection clause to

which they agreed by arguing that the entire agreement, including the forum

selection clause, is unenforceable under Alabama's "door-closing" statute, Ala.

Code § 10-2B-15.02, because One America, a foreign corporation, was not

qualified to do business in Alabama.  The door-closing statute does not apply in this instance, because One America is engaged in interstate commerce.

8.      The Commerce Clause of the United States Constitution, ART. 1, § 8, cl. 3, precludes application of Alabama's door-closing statute against a foreign corporation transacting primarily interstate commerce. *Community Care of America of Ala., Inc. v. Davis*, 850 So. 2d 283, 287 (Ala. 2002); *SGB Constr. Svcs., Inc. v. Ray Sumlin Constr. Co., Inc.*, 644 So. 2d 892, 894 (Ala. 1994) ("When the activities of a foreign corporation are interstate in nature, then its doing business here is protected by the United States Constitution, and Alabama's non-qualifying laws, which otherwise might interfere with or prohibit the business, are inapplicable."); *Wise v. Grumman Credit Corp.*, 603 So. 2d 952, 953 (Ala. 1992) ("These laws do not come into play, however, unless the business conducted here by nonqualified corporations is considered "intrastate" in nature."); *Stewart Machine & Eng'g Co., Inc. v. Checkers Drive In Restaurants of North America, Inc.*, 575 So. 2d 1072, 1074 (Ala. 1991) ("However, businesses engaged in interstate commerce are protected by the commerce clause in the United States Constitution . . . and are therefore immune from the effects of the 'door-closing' statutes.").

9.      In this case, the fact that One America was not qualified to do business in Alabama does not render the Consent Agreement void because One

America was, in fact, engaged in interstate commerce.[9]  One America did not

"localize" its business in Alabama, and to the extent any activities occurred within

Alabama, those activities were "merely incidental" to a transaction of interstate

business and are immune from the effects of the door-closing statute. *See, e.g.*,

Consent Agreement, p. 1 (stating that the purpose of the agreement is for the

participants "to appear in a motion picture" which may be distributed "throughout

the universe").

    10.    Commerce such as that found in this transaction is a classic example

of interstate commerce. *Boynton v. Fox West Coast Theatres Corp.*, 60 F.2d 851

(10th Cir. 1932) ("It is well settled that a producer or manufacturer, who ships

motion picture films from one state to lessees in another state to be exhibited by

the lessees, is engaged in interstate commerce.") (citing *Binderup v. Pathe*

*Exchange, Inc.*, 263 U.S. 291 (1923); *Fox Film Corp. v. Trumbull*, 7 F.2d 715 (D.

C. Conn. 1925); *Fox Film Corp. v. Federal Trade Comm.*, 296 F. 353 (2d Cir.

1924)); *see also Allen B. Dumont Laboratories v. Carroll*, 184 F.2d 153 (3d Cir.

1950) ("There is no doubt but that television broadcasting is in interstate

commerce. This is inherent in its very nature."), *cert. denied*, 340 U.S. 929 (1951).

---

[9] In another case brought by a participant in the Film, the Circuit Court of Jefferson County, Alabama ruled that the door-closing statute precluded enforcement of the Consent Agreement because the transaction at issue did not involve interstate commerce. *Kathie Martin v. Sacha Baron Cohen; et al.*, Case No. CV-2006-7333.  On June 7, 2007, Defendants filed a Petition for a Writ of Mandamus with the Alabama Supreme Court. *Ex parte Sacha Baron Cohen; et al.*, Alabama Supreme Court Case No. 1061288.  The Court ordered full briefing. Such briefing has been submitted by both parties, and the Petition remains pending.

11.    The fact that the filming of Plaintiffs took place only in Alabama does not destroy the obvious interstate nature of the transaction. In fact, the United States Supreme Court rejected a similar argument in *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20 (1974). There, a cotton merchant in Memphis contracted to purchase cotton from a Mississippi farmer who delivered cotton to a Mississippi warehouse and had no further involvement with its disposition. The merchant brought suit against the farmer in a Mississippi state court seeking to enforce its contract. The farmer contended that the contract was unenforceable under Mississippi's door-closing statute because the merchant did not have a certificate of authority to transact business in Mississippi. The Mississippi Supreme Court agreed, holding that the transaction was wholly intrastate in nature.

12.    The U.S. Supreme Court reversed, holding that "Mississippi's refusal to honor and enforce contracts made for interstate or foreign commerce is repugnant to the Commerce Clause." *Id*. at 34. The Court found that, while delivery of the cotton to a warehouse, "taken in isolation, is an intrastate transaction," its "delivery is also essential for the completion of the interstate transaction." *Id*. at 30. The Court looked to the entirety of the transaction rather than the isolated activity of one party. *See also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003) (upholding an expansive view of interstate commerce as appropriate in connection with application of Federal Arbitration Act).

13.    Similarly, in this case, to the extent that any activities associated with the Consent Agreement have intrastate aspects, they all clearly are "a part of interstate commerce." *Allenberg*, 419 U.S. at 30 (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 292 (1921)).  While Plaintiffs were filmed only in Alabama, that isolated activity was part and parcel of their agreement to appear in the Film, and of a much larger project involving production and worldwide distribution of the Film, which undeniably involved interstate commerce.  In other words, the transaction as expressed in the Consent Agreement neither began nor ended with Plaintiff's filming.

**WHEREFORE**,  Defendants respectfully request that the Court transfer this case to the Southern District of New York in accordance with the forum selection clause, or alternatively, to dismiss this action without prejudice for improper venue.

Attorneys for Defendants
Twentieth Century Fox Film Corporation;
One America Productions, Inc., d/b/a
Springland Films; Dune Entertainment,
LLC; Everyman Pictures; Todd Lewis
Schulman; Monica Levinson
and Julie Lynn Chouinard

OF COUNSEL:
J. Banks Sewell, III
William H. Brooks
Gray M. Borden
LIGHTFOOT, FRANKLIN & WHITE,
L.L.C.
400 North 20th Street
Birmingham, Alabama  35203
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2007, a true and correct copy of the foregoing was served through the Court's CM/ECF system, which will provide electronic notice to:

> W. Percy Badham, III, Esq.
> Brannon J. Buck, Esq.
> Will A. Smith, Esq.
> **MAYNARD, COOPER & GALE, P.C.**
> 1901 Sixth Avenue North
> Suite 2400
> Birmingham, AL 35203

Of Counsel

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY STREIT; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-07-J-1918-S |
| | ) | |
| TWENTIETH CENTURY FOX FILM | ) | |
| CORPORATION; et al., | ) | |
| | ) | |
| Defendants. | ) | |

### AFFIDAVIT OF JOAN HANSEN

In person appeared Joan Hansen, who, after being duly sworn, deposes and says upon her oath that the facts and recitals of facts set forth in the Affidavit are true and correct to the best of her knowledge and belief.

1.    I am over the age of eighteen years, I am not laboring under any disability, and I am giving this affidavit of my own free will and accord.

2.    I make this affidavit on the basis of personal knowledge, with the knowledge that it may be used in legal proceedings. I will testify in person and under oath if called upon to do so.

3.    I am the current Assistant Secretary and Production Counsel of One America Productions, Inc. ("One America"). My office is located at 2121 Avenue



EXHIBIT
A

of the Stars, Suite 308, Los Angeles, CA 90067. One America's current office

headquarters is c/o The Law Offices of Joan Hansen, 2121 Avenue of the Stars,

Suite 308, Los Angeles, CA 90067. Springland Films ("Springland") is a

registered d/b/a of One America.

4.     One America produced the movie *Borat: Cultural Learnings of*

*America for Make Benefit Glorious Nation of Kazahkstan.* Some of One

America's contractual agreements were through its d/b/a Springland. Cindy Streit,

Sarah Moseley, Ben K. McKinnon, Michael M. Jared and Lynn S. Jared

(collectively "plaintiffs") contracted with One America d/b/a Springland for the

purpose of appearing in the *Borat* movie. A true and correct copy of each

plaintiffs' executed consent agreement is attached hereto as Exhibits 1-5.

5.     In addition to Alabama, the *Borat* movie was filmed in Romania,

Mexico, New York, New Jersey, Maryland, Oklahoma, Louisiana, Massachusetts,

Washington D.C., Virginia, West Virginia, South Carolina, Mississippi, Texas and

California; edited in California; and has been exhibited in theaters in all 50 states,

in addition to various foreign countries. The DVD has been released in all 50

states and numerous foreign countries beginning in March 2007.

2

6.     The motion pictures produced by the American movie industry are
typically filmed, edited, broadcasted, shown and distributed throughout the United
States and in various foreign countries.

7.     The bank account which supplied all money paid to the plaintiffs for
their participation in the film is located in California.

8.     Todd Lewis Schulman ("Schulman") was employed by One America
as the Field Coordinator for the *Borat* movie, and was an employee throughout
principal photography and production on the movie, including the period when
plaintiffs contracted to appear in the film. In his capacity as an agent of One
America, Schulman was authorized to negotiate and execute contracts connected
with the *Borat* movie through its d/b/a Springland. Schulman was specifically
authorized to negotiate and execute contracts on behalf of One America d/b/a
Springland using the name "Todd Lewis."

9.     Julie Lynn Chouinard ("Chouinard") was employed by One America
as a Field Coordinator for the *Borat* movie, and was an employee throughout
principal photography and production on the movie, including the period when
plaintiffs contracted to appear in the film. In her capacity as an agent of One
America, Chouinard was authorized to negotiate and execute contracts connected
with the *Borat* movie through its d/b/a Springland. Chouinard at no time rendered

3

services related to the film in Alabama. She was in California when she conducted all communications at issue in this lawsuit.

10.    Monica Levinson ("Levinson") was employed by One America as a Line Producer for the *Borat* movie, and was an employee throughout principal photography and production on the movie, including the period when plaintiffs contracted to appear in the film. In her capacity as an agent of One America, Levinson was authorized to negotiate and execute contracts connected with the *Borat* movie through its d/b/a Springland. Levinson at no time rendered services related to the film in Alabama. She was in California when she conducted all communications at issue in this lawsuit.

11.    Twentieth Century Fox Film Corporation ("Fox") is the distributor for the *Borat* movie. Fox entered into a distribution agreement with One America to produce and distribute the film prior to plaintiffs' contracting to appear in the film, and Fox has handled the nationwide and international distribution of the *Borat* movie.

12.    Dune Entertainment, LLC ("Dune") was a passive investor in the *Borat* movie, and it entered into the investment agreement prior to plaintiffs' contracting to appear in the film.

4

13.    Everyman Pictures is the loan-out company through which Jay Roach, one of the producers for the *Borat* movie, was employed by One America. Jay Roach, through Everyman Pictures, was an employee throughout principal photography and production on the movie, including the period when plaintiffs contracted to appear in the film.

FURTHER AFFIANT SAYETH NOT.

_____
Joan Hansen

Sworn to and subscribed before me
This 5th day of Dec. , 2007.

_____
NOTARY PUBLIC, State of California
My Commission Expires: July 19, 2009

DODIE I. CASTALDO
Commission # 1589983
Notary Public - California
Los Angeles County
My Comm. Expires Jul 19, 2009

5

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ 100 (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

    1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

    2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

    3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

    4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading inappropriate portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

    5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

    6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:

_____

[please sign above line and print name below]

Dated: __10/24/05__
[date to be filled in by Participant]

Springland Films

By: _____

[please sign above line and print name below]

EXHIBIT
1

Name: _Cindy Shu_

Address: _1236 Stone crest Dr._

Phone Number: _856 3221_

Social Security Number: _____

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ _100_ (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED: _Sarah Mosley_

_Sarah Mosley_

[please sign above line and print name below]

Dated: _10-24-05_
[date to be filled in by Participant]

Springland Films

By: _____

[please sign above line and print name below]

EXHIBIT
2

Name: Sarah Mosley

Address: 4976 Heather Point, Bham, AL

Phone Number: 205-991-0403

Social Security Number: _____

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ _100_ (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:

_Ben K. McKinnon_
Ben K. Mckinnon
[please sign above line and print name below]

Dated: _10/24/05_
[date to be filled in by Participant]

Springland Films

By: _John Ho_

[please sign above line and print name below]

EXHIBIT
3

Name: _Ben K. McKenna_

Address: _3912 Asbury Park Circle_

Phone Number: _(305) 970-0160_

Social Security Number:_____

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ 1.00 (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:

_____

[please sign above line and print name below]

Dated: 10/24/05
[date to be filled in by Participant]

Springland Films

By: _____

[please sign above line and print name below]

EXHIBIT
4

Name: _____ MICHAEL M. JARED

Address: ___ 245 BREAM COVE ROAD    COLUMBIANA AL 35051

Phone Number: _____ (205) 665-2250

Social Security Number:_____

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ _1 0 0_ (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1.  The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2.  The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3.  The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4.  The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5.  This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6.  Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:

_[signature]_

[please sign above line and print name below]

Dated: _10/24/05_
[date to be filled in by Participant]

Springland Films

By: _[signature]_

[please sign above line and print name below]

EXHIBIT
5

Name: _Lynn S. Jared_____

Address: __245  Bream Cove Rd_____ Columbiana AL 35051

Phone Number: ____205  669-2250_____

Social Security Number:_____

FILED

2008 Jan-10 PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| CINDY STREIT; SARAH MOSELEY; BEN K. MCKINNON; MICHAEL M. JARED; AND LYNN S. JARED,<br><br>　　　PLAINTIFFS,<br><br>VS.<br><br><br>TWENTIETH CENTURY FOX FILM CORPORATION, ET AL.,<br><br>　　　DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)　　CIVIL ACTION NO.:<br>)　　　CV-07-J-1918-S<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER , OR IN THE ALTERNATIVE, TO DISMISS FOR IMPROPER VENUE**

Plaintiffs Cindy Streit, Sarah Moseley, Ben K. McKinnon, Michael M. Jared, and Lynn S. Jared (the "Plaintiffs") hereby oppose the Defendants' Motion to Transfer, or in the Alternative, to Dismiss for Improper Venue.

## I.   INTRODUCTION

Five Birmingham-area residents between the ages of fifty-five and eighty-five with a desire to bridge cultural divides agreed to be a part of what they were told would be an educational documentary featuring a dignitary from Belarus experiencing Southern culture.  They knew that a film production company had signed a written contract with an etiquette training service, operated by one of the five, stating that the film would be used only for the educational documentary on Belarus Television.

The five unsuspecting individuals arrived at Magnolia Springs Manor, the site of the to-be-filmed "dinner party," at the designated time ready to begin the filming with the

dignitary. One and a half hours passed before the dignitary arrived. During this long wait, the film production company had wine served to the guests who would drink it. Although representatives of the film company were present nearly one full hour of the wait, they did not mention to the five individuals that they would be required to sign a "consent agreement" in order to participate.

At the last minute before the filming commenced (and after the one and a half hour wait), a representative of the film company hurriedly thrust a document on the dinner party guests entitled "Standard Consent Agreement." The representative did not explain any terms of the agreement but simply called it a standard form that would not change any of the terms of the agreement with the etiquette training service. He rushed the five guests to sign the agreement in order to begin filming. None of the five had a lawyer present to review the agreement. All five signed the "Standard Consent Agreement" without having an opportunity to thoroughly consider its terms.

The dignitary's behavior deteriorated throughout the evening until it became unacceptably vulgar and truly offensive. He made a series of offensive remarks, and, as desert was served, he brought a bag of human feces to the table. He then invited a woman who appeared to be a prostitute into the house. The events turned so strange and offensive that the dinner party guests became concerned for their own safety and called the police. When the police arrived, the "dignitary" quickly left the scene, leaving the guests frightened and without any explanation of what had happened to them.

Several days passed before the dinner party guests learned that they had been victims in a Sacha Baron Cohen "mockumentary." It was several months before they discovered that the film footage was to be part of a Hollywood movie with worldwide

release. Not until they watched the *Borat* film did the guests realize that they will forever be portrayed as racists in an R-rated major motion picture containing graphic nudity, masturbation, shocking vulgarity, pornography, racist stereotyping, and anti-Semitism. The dinner party guests would never have suspected as they arrived at the Magnolia Springs Manor that they would play a crucial role in the success of a film called *Borat* which would gross hundreds of millions of dollars in profits.

The five Birmingham-area dinner party guests are, of course, the Plaintiffs in this lawsuit. They are seeking to hold Twentieth Century Fox, Sacha Baron Cohen, and the other perpetrators of the fraud accountable for their misconduct. Their attendance at the dinner party and their execution of the "Standard Consent Agreement" was based entirely on false pretenses. The "film company" that perpetrated the fraud operated under an alias, as did its representative. Nothing about the events that occurred the night of the "dinner party" was legitimate.

Defendants Twentieth Century Fox Film Corporation, One America Productions, Inc. d/b/a Springland Films, Dune Entertainment, LLC, Everyman Pictures, Todd Lewis Schulman, Monica Levinson, and Julie Chounard (the "Defendants")[1] have moved to transfer this case to the United States District Court for the Southern District of New York by attempting to enforce a "forum selection clause" in the "Standard Consent Agreements" signed by the Plaintiffs. The forum selection clause is, however, unenforceable for several reasons. First, the Standard Consent Agreements were executed by "Springland Films" and the Plaintiffs. Because One America Productions, Inc., which was using the Springland Films alias in its dealings with the Plaintiffs, has

---

[1] There are other Defendants, including Sacha Baron Cohen, who appear to have been served but who have not entered an appearance or joined in this motion.

3

never qualified to do business in the State of Alabama, it cannot enforce contracts here under Alabama Code section 10-2B-15.02 (1975).    Second, the Standard Consent Agreements were invalidly executed using false and fraudulent names.    Third, the forum selection clause contained in the Standard Consent Agreements is unenforceable under the standards established by the United States Court of Appeals for the Eleventh Circuit. Finally, none of the Defendants, except One America d/b/a Springland Films, are parties to the Standard Consent Agreements.    As a result, they cannot enforce the forum selection clause.

## II.    STATEMENT OF FACTS

Although the Complaint sets forth the basic facts supporting the Plaintiffs' claims, the Defendants calculated and executed their fraudulent scheme so carefully that there is much more to be said.    The facts relating to the enforceability of the forum selection clause in the "Standard Consent Agreement" are, by themselves, extensive.

On October 22, 2005, a representative of "Springland Films," who identified himself as Todd Lewis, met with Plaintiffs Streit and McKinnon at the Bottega Restaurant in Birmingham, Alabama.    Lewis told Streit and McKinnon that Springland Films was working on an educational documentary for Belarus Television.    He explained that a dignitary from Belarus was traveling throughout the United States filming the documentary on American cultural experiences.    *See* Ex. 1, Dec. of Cindy Streit at ¶¶ 2-3; Ex. 2, Dec. of Ben McKinnon at ¶¶ 2-3.

Lewis requested that Streit, on behalf of her business, Etiquette Training Services, conduct a training session with the dignitary on dining and social skills.    He also requested that Streit plan and coordinate a dinner party in honor of the dignitary, to be

held immediately after the training session that would allow the dignitary to experience Southern hospitality and a Southern meal. Ex. 1 at ¶4. Lewis represented that the dinner party would be filmed as part of the educational documentary to be shown on Belarus Television to promote cultural awareness. *Id;* Ex. 2 at ¶4.

After the meeting, Streit began planning the dinner party for the "dignitary." Streit prepared a written agreement between Etiquette Training Services ("ETS") and Springland Films relating to the dinner party which contained many of the representations made by Lewis during the meeting held October 22 at Bottega Restaurant. The agreement was executed by both ETS and Springland Films on October 24, 2005 ("the ETS Agreement"). *Id.* at ¶5 and attached ETS Agreement.

Springland Films requested that, in addition to the dinner party, Streit provide an etiquette training session to the Belarus dignitary. The ETS Agreement sets forth the topics to be covered in the etiquette training session. The etiquette training session with the dignitary was to last from 4:00 p.m. until 6:00 p.m. on October 24, 2005. The dinner party was to begin shortly thereafter and run until 9:00 p.m. *Id.* at ¶6.

Streit arranged for the etiquette training and the dinner party to take place at the Magnolia Springs Manor in Helena, Alabama. *Id.* at ¶7. In reliance on the representations of Lewis and the additional representations set forth in the ETS Agreement, Streit arranged for the Plaintiffs, and three other individuals, to attend the dinner party as guests. Streit explained to the guests the circumstances surrounding the dinner party as had been represented by Lewis. *Id.* at ¶8; Ex. 2 at ¶5.

The "dignitary" did not show up for the etiquette training session at 4:00 p.m. as originally planned. Instead, he arrived at approximately 7:30 p.m. The Plaintiffs had

been waiting for approximately one and a half hours before the "dignitary" arrived. During the one and a half hour delay, representatives of Springland Films requested that the wait staff of the Magnolia Springs Manor serve wine to the Plaintiffs. *Id.*

Despite the long delay, neither Lewis nor the film crew of Springland Films presented the "Standard Consent Agreement" to the Plaintiffs until just before the "dignitary" arrived. Lewis waited until the last possible moment to present the "Standard Consent Agreements" for review and signature and only after several of the guests had been drinking wine for nearly an hour. Once he handed out the "Standard Consent Agreements," Lewis repeatedly stated that the Plaintiffs needed to "hurry up" and sign them so that filming could commence. Lewis quickly collected the "Standard Consent Agreements." The whole process of handing out the "Standard Consent Agreements," having them signed, and retrieving them lasted only a few minutes. *Id.* at ¶ 11.

Streit specifically asked Lewis if the "Standard Consent Agreement" changed any of the terms in the ETS Agreement. Lewis assured Streit and Plaintiff Michael Jared that the "Standard Consent Agreement" did not change the ETS Agreement and that there was nothing in it that would harm the guests. *Id.* at ¶ 12. Lewis misled the Plaintiffs about the contents of the "Standard Consent Agreement," particularly the term requiring that claims be filed in New York. He accomplished this deception, first, by handing out the "Standard Consent Agreements" at the very last moment before the filming began even though the Plaintiffs had been waiting for one and a half hours. Second, the Plaintiffs were misled by the word "Standard" in the title of the document. They do not believe it is "standard" to require a person to travel thousands of miles to a foreign state to file a claim. Third, Lewis misled the Plaintiffs by encouraging them to quickly sign the

"Standard Consent Agreement" since it was, in his words, just a "standard" form. Fourth, by placing the provision requiring claims to be filed in New York at the very end of the document and by hurrying the Plaintiffs through the process, Lewis caused them not to fully appreciate or thoughtfully consider the forum selection clause. Finally, none of the Plaintiffs had a lawyer present to review the agreement. *Id.* at ¶ 13.

Lewis could have provided Streit and McKinnon with a copy of the "Standard Consent Agreement" at the Bottega meeting two days before the dinner party. Instead, he made no mention of it. Likewise, no one from Springland Films mentioned the "Standard Consent Agreement" during the negotiation of the ETS Agreement. Instead Springland Films waited to present the "Standard Consent Agreement" until the very last moment. *Id.* at ¶ 14.

It was not until days after the dinner party that Streit learned that the "dignitary" from Belarus was actually a professional actor named Sacha Baron Cohen. She did not learn until the spring of 2006 that the footage of the dinner party was part of a movie to be released in the United States. At no point after the filming of the dinner party did anyone from Springland Films request Streit's permission or consent to use the footage in a motion picture to be released in the United States. Not until the Plaintiffs saw the *Borat* film in the movie theater did they know they had been included as part of an R-rated movie carrying graphic nudity, pornography, anti-Semitic remarks, racist stereotyping, and other highly offensive material. *Id.* at ¶ 16.

All of the filming of the dinner party occurred in Alabama. All of the Plaintiffs and the other dinner party guests are residents of Alabama. None of the Plaintiffs performed any activities outside of the State of Alabama relating to the dinner party or

the filming. *Id.* at ¶ 17. There are no known witnesses from the dinner party in the State of New York. In addition, the other witnesses who are not involved in this lawsuit also reside in the Birmingham area. Among those individuals are three other dinner guests, the owner of the Magnolia Springs Manor, the waiter for the dinner party, the chef who prepared the food for the dinner party in the Magnolia Springs kitchen, and the police officers from the Helena Police Department who came to the scene at the end of the evening. *Id.* at ¶ 18.

The individual who identified himself as "Todd Lewis" is actually Todd Schulman. He did not use his legal name in his dealings with the Plaintiffs on behalf of Springland Films. In addition, at no point in time did "Lewis" or anyone else disclose that Springland Films is affiliated with Twentieth Century Fox. *Id.* at ¶ 20.

The "Standard Consent Agreement" was signed with two false names. Todd Schulman identified himself and appears to have signed the agreement as Todd Lewis. In addition, Springland Films is an alias for One America Productions, Inc. In other words, neither of the signers used their real name and at no point did anyone disclose that there was any relationship between Springland Films and Twentieth Century Fox Film Corporation. *Id.* at ¶ 21.

All of the dinner guests were paid $100 as an "honorarium" to appear in what they believed was a legitimate documentary for Belarus Television. This money was paid in cash. *Id.* at ¶¶ 9-10,15.

The attached declarations of each the Plaintiffs substantiate these facts. *See Id.*; Ex. 3, Dec. of Sarah Mosely; Ex. 2, Dec. of Ben McKinnon; Ex. 4, Dec. of Michael Jared; Ex. 5, Dec. of Lynn Jared.

In addition, McKinnon, who is eighty-five (85) years old, has testified that, due to severe spinal stenosis, he is under doctors' orders not to travel outside the state of Alabama. Ex. 2, McKinnon Dec. at ¶¶ 10-11. Furthermore, Sarah Moseley has had Stage 3-C ovarian cancer, which is fortunately in remission. Because of physical ailments related to her chemotherapy, traveling long distances is extremely difficult for her. Ex. 3, Moseley Dec. at ¶ 9. All of the Plaintiffs have testified that traveling to New York to pursue this case would be a financial burden.

### III.   STANDARD OF REVIEW

Federal courts evaluate motions to enforce forum selection clauses under 28 U.S.C. § 1404(a). *Se In re Ricoh Corp.*, 870 F.2d 570 (11th Cir. 1989). District courts have broad discretion in deciding such motions. In fact, the Eleventh Circuit has stated that it "may reverse the district court's decision [under section 1404(a)] only if the court clearly abused its discretion." *Id.* at 573, n.5. Therefore, this Court has wide latitude in deciding whether to grant or deny the Defendants' venue motion.

### IV.   ALABAMA CODE § 10-2B-15.02 BARS ENFORCEMENT OF THE STANDARD CONSENT AGREEMENT

#### A.    Alabama's Business Qualification Requirement

Article Twelve, Section 232 of the Alabama Constitution states, in part, that:

> No foreign corporation shall do business in this state
> without having at least one known place of business and an
> authorized agent or agents therein, and without filing with
> the secretary of state a certified copy of its articles of
> incorporation or association.

Ala. Const. art. XII, § 232. Alabama lawmakers enacted sections 10-2B-15.01[2] and 15.02 of the Alabama Code to enforce this constitutional provision. Section 10-2B-15.02

---

[2] Section 10-2B-15.01 states that a "foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State." Ala. Code § 10-2B-15.01 (1975).

of the Alabama Code provides that:

> A foreign corporation transacting business in this state without a certificate of authority or without complying with Chapter 14A of Title 40 **may not maintain a proceeding in this state without a certificate of authority. All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void** at the action of the foreign corporation or by any person claiming through or under the foreign corporation by virtue of the contract or agreement . . . .

Ala. Code § 10-2B-15.02 (1975) (emphasis added).

**B.    Springland Films Was Not Qualified to do Business in Alabama**

It is undisputed that One America d/b/a "Springland Films" did not register or qualify to do business in Alabama prior to entering into the Standard Consent Agreement with the Plaintiffs.   *See* Defs' Motion to Transfer at pp. 6-7 (acknowledging that "One America, a foreign corporation, was not qualified to do business in Alabama"); Ex. 6, Certifications of Alabama Secretary of State.  As a result, the Defendants cannot enforce the forum selection clause or any other provision in those "agreements."

It is not surprising that Springland Films failed to register to do business in Alabama.  Doing so might have made it more difficult or even impossible for Springland Films to perpetrate the fraud on the Plaintiffs and the other Alabama residents who were victimized in the movie and its making.

**C.    Federal Courts Enforce Ala. Code § 10-2B-15.02**

The United States Supreme Court has established that if a company engages in intrastate as well as interstate aspects of doing business, states may require such companies to obtain a certificate of authority to do business. *See, e.g. Eli Lilly & Co. v. Sav-On-Drugs, Inc.* 366 U.S. 276, 279 (1961) (holding that Eli Lilly "could not escape

state regulation merely because it is also engaged in interstate commerce" and that the Court must look to the record to determine whether a foreign corporation is engaged in intrastate commerce).

Alabama Code section 10-2B-15.02 (1975) constitutes "substantive" state law that must be applied by federal courts in diversity cases. *Aim Leasing Corp. v. Helicopter Medical Evaluation, Inc.*, 687 F.2d 354, 357 (11th Cir. 1982). Indeed, federal courts apply a two-step test to determine whether Section 10-2B-15.02 requires Alabama registration. *See S&H Contractors, Inc. v. A.J. Taft Coal Comp., Inc.*, 906 F.2d 1507, 1509-1510 (11th Cir. 1990). First, the court must determine whether Alabama courts would refuse to enforce the contract at issue under Section 10-2B-15.02. *Id.* If Alabama courts would apply section 10-2B-15.02, the federal district court must then ensure that such application would not unduly burden interstate commerce. *Id.* at 1510. Interstate commerce is not burdened when the foreign corporation has localized its business in Alabama. *Id.* at 1511.

Here, the Defendants brought numerous employees/agents to Alabama for, what appears to be, an extended period of time to shoot several scenes of the movie. *See infra.* In other words, the Defendants "localized" their business activities in Alabama. Although the *Borat* film was ultimately shown throughout the world, all of the shooting of the "dinner party" scene and the "agreements" entered into with the Plaintiffs involved work performed solely in Alabama.[3]

---

[3] Discovery would be required to explore the true extent of the Defendants' work in Alabama. From all appearances, the Defendants' representatives spent an extensive amount of time working on the film in this state. If there is any doubt that the Defendants "localized" their business in Alabama, then the Court should order discovery on the issue.

**D.    Merely Engaging in Interstate Commerce Does Not Exempt a Foreign Corporation from Ala. Code § 10-2B-15.02**

The Defendants mistakenly contend that they are exempt from Alabama's business qualification requirement simply because Springland Films "is engaged in interstate commerce." *See* Defs' Motion at p. 7.  This assertion directly conflicts with clear precedent from the United States Supreme Court and the Alabama Supreme Court.

**Every** case in which the Alabama Supreme Court has voided a contract pursuant to section 10-2B-15.02 or its predecessor involves some degree of interstate commerce because the statute is applied to a foreign (non-qualified) corporation doing business in Alabama.  The question is *not* whether there are some interstate aspects, but rather whether the activity is so totally and exclusively interstate as to be lacking any local aspects beyond local delivery.

Both the U.S. Supreme Court and the Alabama Supreme Court have expressly held that interstate commerce does not foreclose application of door-closing statutes. Considering New Jersey's door-closing statute, the Supreme Court ruled that where a foreign corporation "engaged in intrastate as well as interstate" commerce, New Jersey "could require it to get a certificate of authority to do business" and that the foreign corporation "could not escape state regulation merely because it is also engaged in interstate commerce." *See Eli Lilly & Co. v. Sav-On-Drugs, Inc.*, 366 U.S. 276, 279 (1961). *See also Community Care of America v. Davis*, 850 So. 2d 283, 287 (Ala. 2002).

In a 2002 case, the Alabama Supreme Court applied the door-closing statute where the foreign company's business was entirely interstate, except for the one transaction at issue in the lawsuit. In *Brown v. Pool Depot,* 853 So. 2d 181 (Ala. 2002), a foreign non-qualified corporation based in Georgia came into Alabama to solicit a

customer and to install *one* swimming pool that was shipped preassembled from Georgia

— activity that would take only "one or more days." *Id.* at 187. When a dispute arose

with the Alabama customer, the court held that Pool Depot could not enforce the contract,

even the arbitration clause, under section 10-2B-15.02. *Id.* In deciding whether Pool

Depot had engaged in intrastate commerce, the court noted:

> Where the contract is to be performed in Alabama,
> regardless of where entered into, and in the performance of
> the contract the foreign corporation must engage in
> business in this state, our courts refuse to aid the
> nonqualified corporation in the enforcement of such
> contract.

*Id.* at 185 (quoting *Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc.* 490 So. 2d

1242, 1244-45 (Ala. Civ. App. 1986)).

The Alabama Supreme Court also instructed that "[a]n isolated contract by an

unqualified foreign corporation to do localized intrastate business within Alabama is

subject to Alabama's door-closing statute even though that contract may require the use

of materials and equipment shipped into Alabama from out of state." *Id.* at 186. *See also*

*Community Care of America v. Davis,* 850 So. 2d 283, 286 (Ala. 2002) (applying the

door-closing statute to void an arbitration agreement and observing that "Alabama law

may prohibit the enforcement of an arbitration clause — even one in a contract

evidencing a transaction that substantially affects interstate commerce").

Similarly, in *Stewart Machine and Engineering Co., Inc. v. Checker's Drive In*

*Restaurants of North America, Inc.,* 575 So. 2d 1072 (Ala. 1991), the Alabama Supreme

Court found that a foreign, non-qualified corporation was subject to section 10-25-15.02

where it sent a crew into Alabama to install a machine, a process that took "four or five

days." The court, therefore, refused to allow the non-qualified corporation to enforce the

contract. 575 So. 2d at 1075 (invalidating contract).

Alabama courts are clear that even isolated transactions, if done pursuant to the corporate function of the nonresident corporation, constitute "doing business" under the statute. *Eg.*, *Vines v. Romar Beach, Inc.*, 670 So. 2d 901 (Ala. 1995) (holding that where defendant's sole corporate function was to redeem a piece of Alabama property and defendant carried out that redemption in Alabama, this single, isolated transaction constituted doing business in Alabama); *see also Greentree Acceptance, Inc. v. Blalock*, 525 So. 2d 1366, 1370 (Ala. 1988) (holding that "a single act of business is sufficient to bring a foreign corporation within the purview of 'doing business' in Alabama. . . .").[4]

### D.     Contracts Relating to Labor or Services Performed in Alabama are Clearly Intrastate

In other cases involving the door-closing statute, Alabama courts have consistently held that contracts relating to the provision of labor or services to be performed in Alabama are clearly intrastate in nature. In *Community Care of America v. Davis*, 850 So. 2d 283 (Ala. 2002), the Alabama Supreme Court ruled that a nonqualified, foreign corporation operating a nursing home in Alabama could not enforce an arbitration agreement under the door-closing statute even though the nursing home's operations may have substantially affected interstate commerce. Emphasizing that the "essence" of the nursing home's dealings with the plaintiff were nursing "labor," the court found the activity to be intrastate. *Id.* at 288. Regarding labor or services, the court observed:

---

[4] The Alabama Court of Civil Appeals has expounded on the parties' burdens of proof with respect to the non-qualification defense. In *Casa Investments. Co. v. Boles*, 931 So. 2d 53 (Ala. Civ. App. 2005), the court explained that the party asserting the defense bears the burden of proof on the issue. *Id.* at 58. However, once the party presents evidence that a foreign company is not qualified, "the burden shifts to the nonqualified corporation to present evidence establishing that it is exempt from § 10-2B-15.02(a)." *Id.* Under this reasoning, Springland Films clearly bears the burden to establish that it is exempt from Alabama's door closing statute.

> One area of business is quite clearly defined as intrastate, rather than interstate, activity. This Court has previously held that "labor is not an article of commerce, nor is the agreement to supply it, nor the execution of the agreement, an act of commerce."

*Id.* (quoting *Building Maint. Pers., Inc. v. International Shipbuilding, Inc.*, 621 So. 2d 1303, 1305 (Ala. 1993)). Because the nursing home's services were intrastate in nature, the door-closing statute barred its enforcement of an arbitration agreement with the plaintiff. *See also Wise v. Grumman Credit Corp.*, 603 So. 2d 952, 953 (Ala. 1992) (stating that "[i]n **almost every instance where the courts have applied [the door-closing statute] to bar an action, the case has involved the performance of some type of service or labor within the state**").

In addition, the Eleventh circuit has followed Alabama Supreme Court precedent holding that "a foreign corporation doing construction work within a state is held to be doing business in that state and is not exempted from local regulation by the fact that it brings materials or laborers into the state." *S & H Contractors*, 906 F. 2d at 1510 (quoting *Sanwa Business Credit Corp. v. G. B. "Boots" Smith Corp.*, 548 So. 2d 1336, 1337 (Ala. 1989)).

### E.    One America/Springland Films Engaged in Intrastate Commerce in Alabama

Springland Films clearly engaged in intrastate commerce subjecting it to the door-closing statute. As set forth above, when a foreign corporation performs some type of "labor" or "service" within Alabama, it engages in intrastate commerce and, thus, subjects itself to Alabama's business registration requirements. No doubt, shooting a movie is a "labor intensive" endeavor.

Springland Films brought numerous representatives to Alabama to film scenes in the *Borat* movie. The "labor" or "services" were performed by actors, productions crews, film crews, and probably countless others who labored in the production process. Springland Films even used the Plaintiffs to provide a form of "labor" or "service" by having them participate in the *Borat* film. Indeed, the Standard Consent Agreement was, according to Springland Films, necessary to allow the Plaintiffs to provide the service of appearing in the film (which the Plaintiffs thought would be a documentary).

The dinner party scene was not the only portion of the *Borat* film shot in Alabama. Springland Films filmed a scene with another etiquette trainer in Birmingham which was also in the movie.[5] There appear to have been other scenes shot in Alabama, including one involving a Civil War re-enactment. Springland Films representatives were undoubtedly in Alabama for many days, and possibly many weeks, preparing for and shooting these various scenes. To be sure, Alabama plays a prominent role in the *Borat* movie.

Given its activities here, Springland Films cannot realistically argue that it did not perform labor or services in Alabama. The whole purpose of shooting the dinner party and other scenes in Alabama was to capitalize on what the movie writers and producers perceived to be a culture that would make the movie more entertaining. The movie work in Alabama was not merely "incidental" to an interstate transaction. On the contrary, Springland Films made a deliberate decision to shoot critical movie scenes in this state. In doing so, it sent representatives to Alabama to plan and meet with the Plaintiffs and other victims of its fraud; it presented "contracts" to Alabama residents for execution in

---

[5] See Ex. 7, Complaint styled *Kathie Martin v. Sacha Baron Cohen, et al.*; Circuit Court of Jefferson County; CV-2006-7333 (referencing a different scene shot with another etiquette trainer in Birmingham).

Alabama; it filmed movie scenes in Alabama; it "paid" the Plaintiffs an "honorarium" in Alabama; and it engaged in an untold number of other business transactions in Alabama of which the Plaintiffs have no information.

Under the *Community Care* and *Grumman Credit* cases, Springland Films is subject to Alabama's business registration requirements and its door-closing statute. Likewise, as compared to the Georgia corporation in the *Pool Depot* case, Springland Films clearly established a sufficient presence here. Because it failed to register to do business in Alabama, Springland Films is barred from enforcing the Standard Consent Agreement under Alabama Code § 10-2B-15.02.

**V.  THE EXECUTION OF THE "STANDARD CONSENT AGREEMENTS" BY "LEWIS" AND "SPRINGLAND FILMS" RENDER THEM VOID**

In order to prevent the Plaintiffs from discovering their fraud, Defendants One America and Schulman executed the "Standard Consent Agreements" using false names. Although, One America contends that "Springland Films" is a registered d/b/a, it has produced no documentary evidence establishing this fact. It is undisputed that One America did not register "Springland Films" as a d/b/a in Alabama. Moreover, Schulman, did not use his legal name when executing the agreements on behalf of Springland. Instead, he used "Lewis" as his last name. The use of these false names should render the agreements void. *See, e.g., Rogers v. Securities America, Inc.*, 850 So. 2d. 1252 (Ala. 2002).

**VI.  THE FORUM SELECTION CLAUSE IS UNENFORCEABLE UNDER ELEVENTH CIRCUIT PRECEDENT**

The forum selection clause in the Standard Consent Agreements is unenforceable under the standards established by the Eleventh Circuit. In 2003, the Eleventh Circuit set

forth the principles for considering whether a forum selection may be enforced.  *See P&S Business Machines, Inc. v. Canon USA, Inc.*, 331 F.3d 804 (11th Cir. 2003).  Two of those "principles" preclude enforcement of the forum selection clause in this case.

### A.    The "Freely and Fairly Negotiated" Principle

The Eleventh Circuit instructed district courts to consider the validity of clauses "under the usual rules governing the enforcement of contracts in general. . . . considering **whether the clause was 'freely and fairly negotiated by experienced business professionals' and whether there was any fraud, duress, misrepresentation, or other misconduct in connection with the agreement to the forum selection clause."** *Id.* at 807 (quoting *In re Ricoh Corp.*, 870 F. 2d 570, 573-74 (11th Cir. 1989))(emphasis added).

Without a doubt, the clause in this case was not "freely and fairly negotiated." The Defendants went to great lengths to prevent any negotiations, much less free and fair ones, from occurring by (1) waiting literally hours to present the adhesion contracts to the Plaintiffs and (2) then rushing the Plaintiffs to execute the agreements with verbal assurances that they are "standard" and mere "formalities."  Moreover, the Defendants had wine served to the Plaintiffs who would drink it for nearly hour before presenting the "Standard Consent Agreements," clearly an effort to reduce scrutiny of the document. The Defendants could have provided a copy of the agreement to Plaintiffs Streit and McKinnon two days earlier at their Bottega meeting.  By doing so, the Defendants would have allowed Streit to review and negotiate the terms, just as she did with the ETS Agreement.  Instead, the Defendants concealed the fact that the Plaintiffs would have to sign consent agreements until the last possible moment when there were no lawyers present to review the agreements on the Plaintiffs' behalf.

There was "fraud, duress, misrepresentation, and other misconduct" committed by the Defendants in connection with the forum selection clause itself. In hindsight, it is clear that the Defendants meticulously planned how they would defraud the Plaintiffs into accepting the forum selection clause. They started by placing the clause in the final paragraph of the document. They then waited until the last possible moment to present the document and rushed the Plaintiffs to sign, even though they could have presented it two days earlier to Streit and McKinnon or during the hour and a half wait. The Defendants devised the placement of the forum selection clause in the document and the timing of the presentation with the intent of preventing the Plaintiffs from being able to thoughtfully consider the venue provision. Moreover, the Defendants used the word "standard" in the title of the document to mislead the Plaintiffs about the forum selection provision, even though it is far from standard. All of these tactics followed Lewis's monumental misrepresentations about the nature of the film – calling it an educational documentary for Belarus television.

In cases where courts in this circuit have enforced forum selection clauses, they have specifically noted that there was no evidence of fraud, duress, misrepresentation, or other misconduct. *See In re Ricoh*, 870 F. 2d at 573-74 (noting "that the instant contract was freely and fairly negotiated by experience business professionals" and that neither party had "shown the presence of fraud, duress, misrepresentation, or other misconduct"); *E&H Steel Contracting, Inc. v. Turner Constr. Co.*, 2006 WL 1731153 (M.D. Ala. June 23, 2006) (making the same findings). If the "freely and fairly negotiated" principle is ever going to preclude enforcement of a forum selection clause, it must do so in this case. There could hardly be circumstances where there was more fraud and less fairness.

**B.    The Convenience of the Parties and the Witnesses and the Interest of Justice**

Although it has cautioned that a choice of forum will "rarely be outweighed" by other factors under 28 U.S.C. § 1404(a), the Eleventh Circuit has instructed courts to "consider 'the convenience of the parties and witnesses' and 'the interests of justice'" in determining whether to enforce a forum selection clause. *See P&S Business Machines,* 331 F.3d at 807.  Here, both factors weigh against enforcement.

All of the Plaintiffs and the other witnesses to the "dinner party," other than the Defendants and their employees, live in the Birmingham area.  See Ex. 1, Streit Dec. at ¶ 18.  Moreover, there are no known witnesses who reside in New York.  The Defendants have not even suggested that New York has any connection to this case whatsoever.  In fact, it appears the Defendants selected New York as a forum for their adhesion contract for the sole purpose of making litigation inconvenient and expensive.  New York clearly poses a serious inconvenience to virtually everyone involved in this litigation.  Generally speaking, when federal courts enforce forum selection clauses, one of the parties has some connection to the chosen forum.  *See, e.g., P&S Business Machines,* 331 F.3d at 808 (finding that "the choice of a California venue is entirely reasonable given that [one of the defendants] was a California corporation and its headquarters and principal place of business were and are still located in California").  Not so in this case.

In addition to the serious inconvenience, litigation in New York would, for all practical purposes, preclude Plaintiff McKinnon, and possibly Plaintiff Moseley, from having their day in court.  McKinnon has severe spinal stenosis and has been ordered by his doctors not to travel outside of Alabama.  *See* Ex. 2, McKinnon Dec. at ¶¶ 11-12.

His spinal condition coupled with other physical ailments will not allow McKinnon to travel to New York to prosecute his claims. *Id.*

Plaintiff Moseley also has serious health problems that impact her ability to travel. She has stage 3-C ovarian cancer, which is fortunately in remission. Her previous chemotherapy treatments have, however, taken a toll on her health and have made it difficult for Moseley to travel. *See* Ex. 3, Moseley Dec. at ¶ 9. Moseley fears that the stress of prosecuting this case in New York could have a serious negative impact on her health. *Id.*

If the forum selection clause is unenforceable as to McKinnon or Moseley, then it should be unenforceable as to all the Plaintiffs. The Alabama Supreme Court has denied enforcement of forum selection clauses when enforcement would result in claims being split into two jurisdictions. *See Ex parte Leasecomm Corp.*, 886 So. 2d 58 (Ala. 2003). The inconvenience to all the testifying witnesses would be extraordinary were this case to be tried in New York for some Plaintiffs and in Alabama for others.

The convenience and interest of justice factors weigh heavily against enforcement of the forum selection clause. There would be no justice in forcing these five Plaintiffs, who were clearly and unequivocally the victims of a massive fraud, to prosecute their claims in New York. The Defendants came to Alabama to shoot their movie. They defrauded Alabama residents and made hundreds of millions of dollars as a result. The forum selection clause was a product of fraud. They should be forced to stand trial in Alabama.

## VII.  THE NON-SIGNATORY DEFENDANTS ARE NOT ENTITLED TO ENFORCE THE STANDARD CONSENT AGREEMENTS

Even if Springland Films were legally entitled to enforce the forum selection clause in the "Standard Consent Agreement," the remaining Defendants are not.  None of the other Defendants signed the "Standard Consent Agreements," nor are they mentioned in them as third-party beneficiaries.  The agreements vaguely mention that Springland Films may "assign or license to others the rights to use" the film (not the agreements).  Moreover, although the agreements provide that "the Producer and its assignees or licensees are relying upon this consent agreement," they do not expressly state that the **actual agreements** may be assigned to a third-party.  *See* Affidavit of Joan Hansen and attached agreements filed by Defendants (Doc. 19-2).

Under Alabama law, "[a] party claiming to be a third-party beneficiary of a contract must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental, benefit upon the third-party." *See Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co.*, 619 So. 2d 1328 (Ala. 1993).  The Defendants' fraud and deception certainly preclude a finding that the Plaintiffs intended to bestow a direct benefit upon the non-signatories.  Indeed, Springland Films and Lewis went to such great lengths to mislead the Plaintiffs about the nature of the film and to conceal their own identities and the identities of the other Defendants that they could not have possibly been "intended beneficiaries."

## VIII.  CONCLUSION

For the foregoing reasons, The Defendants' Motion to Transfer, or in the Alternative, to Dismiss for Improper Venue should be denied.

Brannon J. Buck /s/_____
One of the Attorneys for Plaintiffs

OF COUNSEL:

W. Percy Badham, III (BAD002)
Brannon J. Buck (BUC019)
Will A. Smith (SMI284)
MAYNARD, COOPER & GALE, P.C.
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Phone: (205) 254-1000
Fax:    (205) 254-1999

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on the following via CM/ECF on December 13, 2007:

J. Banks Sewell, III
William H. Brooks
Gray M. Borden
Lightfoot, Franklin & White, L.L.C.
400 20th Street North
Birmingham, AL  35203

_____/s/_____
Of Counsel

FILED
2008 Jan-10  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY STREIT; SARAH MOSELEY; BEN K. MCKINNON; MICHAEL M. JARED; AND LYNN S. JARED, | ) ) ) ) | |
| PLAINTIFFS, | ) ) | |
| VS. | ) ) | CIVIL ACTION NO.:  CV-07-J-1918-S |
| TWENTIETH CENTURY FOX FILM CORPORATION, ET AL., | ) ) ) | |
| DEFENDANTS. | ) ) | |

## DECLARATION OF CINDY STREIT

Cindy Streit declares as follows:

1.     My name is Cindy Streit.  I am sixty (60) years old, and I have personal knowledge of the facts and information contained in this declaration.

2.     On October 22, 2005, I met with a representative of Springland Films Production Company who identified himself as Todd Lewis.  Ben McKinnon was also present at this meeting.  The meeting occurred at the Bottega Restaurant in Birmingham, Alabama.

3.     At the Bottega meeting, Lewis explained that Springland Films was working on an educational documentary for Belarus Television.  He explained that a dignitary from The Republic of Belarus was traveling throughout the United States filming the documentary on American cultural experiences.

4.     Lewis requested that I, on behalf of my business, Etiquette Training Services, conduct a training session with the dignitary on dining and social skills.  He also requested that I plan and coordinate a dinner party, to be held immediately after the training session, in honor of the dignitary and that would allow the dignitary to experience Southern hospitality and a

Southern meal. Lewis represented that the dinner party would be filmed for the purpose of promoting cultural awareness in the educational documentary to be shown on Belarus Television.

5.    After the meeting with Lewis, I began planning for and coordinating the dinner party for what I thought was a dignitary. After consulting with other representatives of Springland Films by phone on October 24, I prepared a written contract between Etiquette Training Services ("ETS") and Springland Films relating to the services to be rendered for an etiquette training session and the dinner party and which contained many of the representations made by Lewis during the meeting held October 22 at Bottega Restaurant. The agreement was executed by both ETS and Springland Films on October 24, 2005 ("the ETS Agreement"). A copy of the ETS Agreement is attached as Exhibit 1 to this Declaration.

6.    Following Springland Films' request that, in addition to the dinner party, I provide an etiquette training session to the Belarus dignitary, I set forth in the ETS Agreement the topics to be covered in the training session. The etiquette training session with the dignitary was to last from 4:00 p.m. until 6:00 p.m. on October 24, 2005. The dinner party was to begin shortly thereafter and run until 9:00 p.m.

7.    I arranged for the etiquette training and the dinner party to take place at the Magnolia Springs Manor in Helena, Alabama.

8.    In reliance on the representations of Lewis and the additional representations set forth in the ETS Agreement, I arranged for several guests to attend the dinner party. I explained to the guests the circumstances surrounding the dinner party as had been represented to me by Lewis and by the other Springland Films representatives.

9.      I was informed by Todd Lewis by phone at 3:30 p.m. that the dignitary from Belarus was delayed and could not show up for the etiquette training session at 4:00 p.m. and that we should all meet at the Magnolia Springs Manor at 6:00 p.m.  Although my other dinner guests arrived on time at around 6:00 p.m., Todd Lewis and the Springland Films crew did not arrive until about 6:30 p.m.  The "dignitary" arrived about an hour later.

10.     While we waited for the "dignitary" to arrive, Todd Lewis, as Springland Films' representative, asked that I have the wait staff of the Magnolia Springs Manor serve wine to the dinner guests.  At approximately 7:30 p.m., Lewis received a phone call and then told us "the man is on his way!"

11.     Despite the long delay, Lewis and the other representatives (the film director and camera crew) of Springland Films did not present the "Standard Consent Agreement" to me or to any of the other dinner guests until just before the "dignitary" arrived.  Lewis waited until the last possible moment to present the "Standard Consent Agreements" for the review and signature of the dinner party participants.  By the time Lewis presented the "Standard Consent Agreements," several of the guests had been drinking wine for nearly an hour.  Once he handed out the "Standard Consent Agreements," Lewis repeatedly stated to me and the other guests that we needed to "hurry up" and sign them so that filming could begin as soon as the dignitary arrived.  Then Lewis quickly collected the "Standard Consent Agreements," telling us he was going to go have them copied for us.  He left the premises and immediately the "dignitary" entered by the side door.  Lewis did not return to the dinner party at all.  The whole process of handing out the "Standard Consent Agreements," having them signed, and retrieving them lasted only a few minutes.

12.    I specifically asked Lewis if the "Standard Consent Agreement" changed any of the terms in the ETS Agreement. Lewis assured me that the "Standard Consent Agreement" did not change the ETS Agreement and that there was nothing in it that would harm me, my company, or the guests.

13.    Lewis misled me about the contents of the "Standard Consent Agreement," particularly the term requiring me to file a claim in New York. He accomplished this deception, first, by handing out the "Standard Consent Agreement" at the very last moment before the filming began even though he could have presented it to me on October 22 or to me and the other guests while we waited for the "dignitary" to arrive for the dinner party. Second, I was misled by the word "Standard" in the title of the document. To me, it is not "standard" to require a person to travel thousands of miles to a different state to file a claim. Third, Lewis misled me by encouraging me and the other participants to quickly sign the "Standard Consent Agreement" since it was, in their words, just a "standard" form. Fourth, Lewis misled me by saying that the "Standard Consent Agreement" was neither harmful to me, my business, or my guests nor inconsistent with the ETS Agreement. Fifth, by placing the provision requiring me to file a claim in New York at the very end and by hurrying me and the other guests through the process, Lewis caused me not to fully appreciate or thoughtfully consider the last paragraph requiring lawsuits to be filed in New York. Finally, I did not have a lawyer present at the time that this "Standard Consent Agreement" was presented for signing.

14.    Lewis could have provided me with a copy of the "Standard Consent Agreement" at the Bottega meeting two days before the dinner party. He made no mention of the "Standard Consent Agreement" at the Bottega meeting. Likewise, no one from Springland Films mentioned the "Standard Consent Agreement" during the negotiation of the ETS Agreement,

nor did they bring it up during the pre-dinner delay — a longer time period in which we could have more closely read, discussed, and considered the agreement's contents. Instead, Lewis suggested that we have wine, and he waited to present the "Standard Consent Agreement" until the very last moment and rushed me and the other guests to sign it.

15.    As per the ETS Agreement Springland Films paid each dinner guest $100 as an "honorarium" for their on-camera appearance in the educational documentary. This money was paid in cash.

16.    It was not until days after the dinner party that I learned that the "dignitary" from Belarus was actually a professional actor named Sacha Baron Cohen. It was not until the spring of 2006 that I learned the footage of the dinner party was part of a movie to be released in the United States. At no point after the filming of the dinner party did anyone from Springland Films request my permission or consent to use the footage in a motion picture to be released in the United States. Not until I saw the *Borat* film in the movie theater did I know that my dinner party would be included as part of an R-rated movie, with worldwide release, carrying graphic nudity, pornography, anti-Semitic remarks, racist stereotyping, and other highly offensive material.

17.    All of the filming of the dinner party occurred in Alabama. All of the dinner party guests are residents of Alabama. I did not perform any activities outside of the State of Alabama relating to the dinner party or the filming.

18.    To my knowledge, there are no witnesses from the dinner party in the State of New York. All of the dinner party guests live in either Jefferson County or Shelby County, Alabama. In addition, the other witnesses to the dinner party who are not involved in this law suit also reside in the Birmingham, Alabama, area. Among those individuals are three other

dinner guests, the owner of the Magnolia Springs Manor, the waiter for the dinner party, the chef who prepared the food for the dinner party in the Magnolia Springs kitchen, and the police officers from the Helena Police Department who came to the scene at the end of the evening.

19.     If I were required to pursue this case in New York, it would place a significant financial burden on me. In addition, it would be severely inconvenient for me and, most likely, for the other dinner party guests and witnesses to appear in New York to testify in this case.

20.     It was not until a few months ago that I learned that the individual who identified himself as "Todd Lewis" is actually Todd Schulman and that he was not using his real name in his dealings with me on behalf of Springland Films. In addition, at no point in time did "Lewis" or anyone else from Springland Films disclose to me that Springland Films is affiliated with Twentieth Century Fox.

21.     To me, the "Standard Consent Agreement" was signed with two false names. Todd Schulman identified himself and appears to have signed the agreement as Todd Lewis. In addition, Springland Films has now been identified as an alias for One America Productions, Inc. In other words, neither of the signers used their real name and at no point did anyone disclose that there was any relationship between Springland Films and Twentieth Century Fox Film Corporation. The entire process and event was a fraud, and I signed the "Standard Consent Agreement" under false pretenses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___/- 9___, 2008.

Cindy Streit

# EXHIBIT 1

*Final
Completed
Contract*   p. 1

Oct 24 05 01:24p

October 24, 2005

Facsimile # 323 850-3112
Email: Julie@SpringlandFilms.com

To:   Julie Lynn Chounard
      Monica Levenson
      Springland Films
      8023 Beverly Boulevard Suite 5-505
      Los Angeles, California 90048

      From:  Cindy Streit     Fax: (205) 836-3221)    Email: Charmnlady@hotmail.com
      Etiquette Training Services (ETS)
      1236 Stonecrest Drive
      Birmingham, AL 35235

**Regarding:** Letter of commitment for ETS to conduct an etiquette and dining training session *plus* plan and implement a three-course formal dining dinner for Springland Films Production Company. The purpose of this writing is to provide a letter of agreement (contract) setting forth the services, and the rates for those services, that Etiquette Training Services Inc., (ETS) will provide.

ETS will customize its "Business Etiquette and Leadership Programe" and Dining Tutorial Program and present a two-hour training session for an international guest from Belarus Television for Springland Films. Additionally, ETS will plan, design, facilitate, coordinate and implement an in-home style atmosphere dining experience for the dignitary.

This will be two separate consulting and training sessions. The training sessions will be held at a place to be determined by ETS. Planning, coordinating, facilitating and set up will conducted on Sunday and Monday October 23 and 24. These sessions will be held on October 24, 2005 from 4:00pm until approximately 9:00pm. These sessions will be filmed as part of a documentary for Belarus Television and for those purposes only. A copy of the film will be given to ETS.

**Session 1:** Will consist of training this individual in social skills and dining etiquette as part of the documentary. The social skills training will be approximately two-hours in length. (Starting at approximately 4:00pm until 6:00pm (CST). The purpose of this film session is to train the international guest in dining skills and social interactive skills.

**Session 2:** For the second session, ETS will plan, organize, coordinate and facilitate a dinner party conducted in honor of this dignitary. This will be at a place to be determined by ETS. The purpose of this film session is to enable the dignitary to interact in a home-like setting of southern hospitality and comfort to learn about southern traditional values and southern-style living as part of the entire cultural experience in his travels throughout America. The portrayal of participants will be filmed and used for purposes only of the utmost dignity and class. There will not be any embarrassment to the participants or ETS.

**Cost:** For session one, ETS will charge a basic minimum fee of $350 for the two-hour dining tutorial and social graces skills training. Additionally, catering service, food, wait staff service and gratuities, facilitation of set up, room fees and any other additional service charges will be at the expense of Springland Films Company. For session two, the consultant fee will be charged at a rate of $150 per hour for planning, facilitating, coordinating and implementing all of the functions stated in session two -- not to exceed $1800 *per day (for Sunday & Monday)* -- for said consulting fees. Overtime ETS fees and expenses will be extra.

All expenses will be paid in advance to the catering service and in advance for all other expenses and additional services rendered. A down payment of $1500 shall be paid to ETS (Etiquette Training Services) in

advance through the catering service and the balance will be charged at the completion of the meal and tutorial. Furthermore, as agreed, an honorarium of $100 per participant for on-camera appearance plus an additional $600 for the host in-home facility will be an additional expense paid by Springland Films.

Springland Films has authorized ETS to charge all fees, expenses and cost involved in this undertaking to a Visa Card in the name of Monica Levenson, a producer with the company. (Visa # 4778133660011462 Expiration date 11/06.) This Visa card will be used as *method of payment* (US currency) for all expenses, services and consultant fees. The signed return of this facsimile will authorize ETS to use this card to pay for these aforementioned services, expenses and fees. Please fill in credit card mailing address and code digit on the back of the card.  Signed                                      Monica Levenson              5 2 6

Please initial your confirmation and agreement of the contract and scheduled time for the sessions and return by facsimile at (205) 856-3221.

Monica Levenson, Springland Films                    ml                    date 10/24/05
Julie LynnHoward, Representative Springland Films    jlh                   date 10-24-05
Cindy Streit, ETS                                    cs                    date 10/24/05

Menu of topics covered in the one-on-one training session is:
Introductions and Greetings
Business Manners and Social Skills
Dining Etiquette
Proper Dress and Grooming
Conversation Skills

Julie, if you wish to add to this "menu of skills" that you want covered please add any subject or topic as you deem necessary. Also, I will need this returned A.S.A.P. because I cannot make definite catering reservations until this is signed, authorized and returned. Please make sure the authorization code, appropriate signature and credit card mailing address is included above because the caterer cannot process and prepare this event without those items. We are on an extreme timeline now.
Thanks,
Cindy Streit

FILED
2008 Jan-10  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| CINDY STREIT; SARAH MOSELEY; BEN K. MCKINNON; MICHAEL M. JARED; AND LYNN S. JARED, | ) ) ) ) |
| PLAINTIFFS, | ) ) |
| VS. | ) CIVIL ACTION NO.:  CV-07-J-1918-S ) |
| TWENTIETH CENTURY FOX FILM CORPORATION, ET AL., | ) ) ) |
| DEFENDANTS. | ) ) |

## DECLARATION OF BEN K. MCKINNON

Ben K. McKinnon declares as follows:

1.      My name is Ben K. McKinnon.  I am eighty-five (85) years old, and I have personal knowledge of the facts and information contained in this Declaration.

2.      On October 22, 2005, I accompanied Cindy Streit to a meeting at Bottega Restaurant in Birmingham, Alabama, with a man who identified himself as Todd Lewis.  Lewis stated that he was a representative of Springland Films Production Company.

3.      Lewis explained to Cindy Streit and me that Springland Films was working on an educational documentary to be shown on Belarus Television.  Lewis said that a dignitary from Belarus was traveling around the United States filming the documentary on American cultural experiences.  As part of the documentary, Lewis stated that Springland Films wanted the dignitary to experience Southern hospitality at a Southern-style dinner party.

4.      Lewis stated that the footage of the dinner party would be used only for the educational documentary and would be shown only on Belarus Television.  Lewis never informed Cindy Streit or me that the footage would be used as part of a motion picture to be

1

released in the United States.  He did not disclose that Twentieth Century Fox, a well-known American movie production company, was involved in the project.  At no point during the meeting at Bottega Restaurant did Lewis mention or present a copy of the "Standard Consent Agreement" or mention any of the terms in the "Standard Consent Agreement."

5.      Based upon Lewis's representations, I agreed to be part of the dinner party and to be filmed in what I believed would be an educational documentary to be shown only on Belarus Television.

6.      On October 24, 2005, I arrived at Magnolia Springs Manor, the site of the dinner party at approximately 6:00 pm.  Lewis and other representatives of Springland Films arrived on site about one half hour later.  However, the person who we thought was a dignitary did not arrive for approximately one and a half hours, during which extended time we were given wine and snacks.

7.      Even though all of the dinner party guests were waiting at Magnolia Springs Manor for approximately one and a half hours, Lewis did not present the "Standard Consent Agreement" until just before the "dignitary" arrived and the filming was almost ready to start.  After handing out the "Standard Consent Agreements," Lewis hurried me and the other dinner guests to sign the agreements so that filming could begin.  As a result, I did not have much time to review the "Standard Consent Agreement."  In addition, I did not have a lawyer present to review the "Standard Consent Agreement."

8.      In the rush to have me and the other dinner party guests sign the "Standard Consent Agreement" and quickly begin the filming, Lewis stated that the "Standard Consent Agreement" was "just a formality" necessary to begin the filming.  The title of the agreement is misleading because some of the terms are not "standard."  In particular, the requirement that I

2

have to pursue any claim in New York is not "standard" to me. Also, the requirement that I file any lawsuit in New York was placed at the end of the "Standard Consent Agreement." In the rush to sign and begin the filming, I did not have time to closely review or understand the implications of that provision.

9.    The $100 "honorarium" that Springland Films paid me for my participation at the dinner party for the educational documentary was in cash.

10.    While I had no idea at the time that the film would be anything other than an educational documentary or that legal action was a possibility, had I had an opportunity to fully comprehend the term of the "Standard Consent Agreement" possibly requiring me to travel to New York, I would have not have signed it. I am under orders from my doctor not to travel outside of Alabama. As a result, I am physically unable to travel to New York to pursue any claims.

11.    I have been diagnosed with spinal stenosis, which threatens my spinal cord. I receive treatment, including "spinal taps," for this condition from Dr. Walter Brandner and Dr. Stan Faulkner. I have been instructed by Dr. Brandner not to travel outside of Alabama because of my spine problems. Attached as Exhibit 1 is a copy of a letter from Dr. Walter Brandner relating to my diagnosis and travel restrictions. I have not traveled outside of Alabama in over three years. Because of my age, my spine problem, and other medical ailments, I will not be able to pursue any claims in this case if I am required to travel to New York.

12.    I was completely misled about the nature of the film being made at the Magnolia Springs Manor. I did not learn that the footage of the dinner party would be used in a motion picture in the United States until some months after the dinner party. Virtually every statement made by the Springland Films' representatives, including Lewis, was false and fraudulent.

13.     All of the filming of the dinner party occurred in Alabama.  I and all of the other guests at the dinner party are residents of Alabama.  I did not perform any activities or services outside of Alabama relating to the dinner party.  To my knowledge, there are no witnesses to the dinner party or the events that occurred on the evening in question who reside in the State of New York.  In fact, most of the witnesses, including all of the dinner party guests, are residents of the State of Alabama.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _January 9_, 2008.

_Ben K. McKinnon_
Ben K. McKinnon

01584748.1

# EXHIBIT 1

**ABROMS & BRANDNER, M.D., P.C.**
1817 Oxmoor Road
Birmingham, Alabama 35209

James M. Abroms, M.D.
Walter Brandner, M.D.

TEL (205) 870-4030
FAX  (205) 870-4083

September 8, 2007

Southwest Airline Refunds Department
6RF P.O. Box 36649
Dallas, Texas 75235-1649

RE:     Ben McKinnon
DOB:  July 25, 1922

Dear Sir or Madam:

Mr. McKinnon is a patient in our practice for a number of years. He recently had a trip planned for a convention in Reno, Nevada for a Veterans of Foreign War Conference in which he is a captain. He resides in Birmingham and had planned reservations with your airlines. Since about mid August of this year he has continued to have progressive right flank pain, which was difficult to diagnosis. Shortly before his scheduled flight to Reno we did discover on MRI of the thoracic and lumbar spine that he had significant spinal stenosis which appeared to threaten the spinal cord at the lower thoracic level. I thought it was dangerous for him to travel and advised him not to fly. This being the case, I agreed to support his effort to get a refund on his ticket even though he bought a non refundable ticket. He is elderly at age 84 and has a number of infirmities which probably limit his ability to exercise additional flights within the year. Thus I would ask you to consider refunding his ticket price as a special case. I am more than willing to discuss this by telephone if you have any further questions. Thank you in advance for you consideration.

Sincerely,

Walter Brandner, M.D.

WB/cjc

FILED
2008 Jan-10 PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CINDY STREIT; SARAH MOSELEY; <br> BEN K. MCKINNON; MICHAEL M. <br> JARED; AND LYNN S. JARED, <br><br>     PLAINTIFFS, <br><br> VS. <br><br> TWENTIETH CENTURY FOX FILM <br> CORPORATION, ET AL., <br><br>     DEFENDANTS. | ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO.:  CV-07-J-1918-S |

## DECLARATION OF SARAH MOSELEY

Sarah Moseley declares as follows:

1.    My name is Sarah Moseley.  I am fifty-nine (59) years old, and I have personal knowledge of the facts and information contained in this Declaration.

2.    On October 24, 2005, I attended a dinner party at Magnolia Springs Manor in Helena, Alabama.  It was my understanding that the dinner party would be filmed as part of an educational documentary for Belarus Television.  I also understood that the film was documenting the American cultural experiences of a "dignitary" from Belarus as he was traveling through the United States and that the footage would be used only for educational purposes on Belarus Television.  I was never made aware that Twentieth Century Fox was in any way connected with the project.

3.    I arrived at Magnolia Springs Manor at about the time that the dinner party was supposed to begin — around 6:00 p.m.

4.    The representatives of Springland Films did not arrive until about 6:30 p.m. We all waited for the "dignitary" to arrive, which occurred about an hour later.

01585256.1

1

5.    A phone call alerted Todd Lewis that the "dignitary" was about to arrive, and it was only then that Lewis, the representative of Springland Films, presented the "Standard Consent Agreement" to us.  By that time, I had been waiting about one and a half hours. Springland Films did not give us sufficient time to review the "Standard Consent Agreement." Immediately after handing out the "Standard Consent Agreements," Lewis began rushing us to sign the agreements so that filming could begin as soon as the "dignitary" walked in the door. Lewis quickly collected the agreements and left.

6.    The paragraph in the "Standard Consent Agreement" requiring that any lawsuit be filed in New York was placed at the very end of the document.  Because of the rush to sign the "Standard Consent Agreement," I did not have time to thoroughly review it, particularly the last paragraph about filing lawsuits in New York.  In addition, I did not have an attorney present to review the "Standard Consent Agreement" and advise me about its terms.  The word "standard" in the title is misleading to me.  I do not consider having to travel to New York to file a claim to be "standard" in any agreement.

7.    The honorarium that I received from Springland Films for appearing in an educational documentary for Belarus Television was paid in cash.

8.    I did not undertake any activities outside of the State of Alabama relating to the dinner party or the filming.  All of the guests at the dinner party are, to my knowledge, residents of the State of Alabama.  I am not aware of any connection that anyone associated with the dinner party or the filming has with the State of New York.

9.    Because of my health and my financial situation, it would be extremely difficult for me to bring this lawsuit in the State of New York.  I have Stage 3-C ovarian cancer that has been in remission since March 2004.  Because of the extensive chemotherapy treatments and my

age, I have other physical ailments, such as neuropathy of the feet, irritable bowel syndrome, and arthritis of the spine, which are worsening and sometimes require emergency medical treatment. It would be difficult and painful for me to travel to New York and to sleep in a bed which was not equipped with the only type of mattress on which I can comfortably sleep. If I required emergency medical treatment while there, I might not have health insurance coverage in a New York hospital or treatment center. It would be a physical and financial burden to bring this lawsuit in New York. I fear that the stress would be severe and could possibly bring about a recurrence of the ovarian cancer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _January 9_, 2008.

Sarah Moseley

01585256.1

FILED
2008 Jan-10  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY STREIT; SARAH MOSELEY; BEN K. MCKINNON; MICHAEL M. JARED; AND LYNN S. JARED, | ) ) ) | |
| PLAINTIFFS, | ) ) | |
| VS. | ) ) | |
| TWENTIETH CENTURY FOX FILM CORPORATION, ET AL., | ) ) ) | CIVIL ACTION NO.:  CV-07-J-1918-S |
| DEFENDANTS. | ) ) | |

## DECLARATION OF MICHAEL M. JARED

Michael M. Jared declares as follows:

1.    My name is Michael M. Jared.  I am over the age of eighteen (18) years, and I have personal knowledge of the facts and information contained in this Declaration.

2.    On October 24, 2005, my wife, Lynn, and I attended a dinner party at Magnolia Springs Manor in Helena, Alabama, that we understood would be filmed as part of an educational documentary to be shown on Belarus Television.

3.    Prior to the dinner party, I reviewed the contract between Springland Films and Etiquette Training Services.  Cindy Streit provided a copy of that contract to me for my review. A copy of the contract between Springland Films and Etiquette Training Services is attached hereto as Exhibit 1.  I relied upon some of the terms in that contract in deciding to be filmed at the dinner party.  In particular, I relied on the representations that the footage would be used in an educational documentary with a "dignitary" from Belarus to be shown on Belarus Television.

4.    Had I known that the footage of the dinner party would be used in a major motion picture in the United States, I would not have agreed to appear at the dinner party.

1

5.      After arriving at Magnolia Springs Manor on October 24 for the dinner party, my wife and I, along with the other dinner party guests, had to wait for approximately one and a half hours for the arrival of the person who we thought was a dignitary. Although representatives of Springland Films were present during most of that wait, they did not present the "Standard Consent Agreement" until the last minute before the dignitary arrived and the filming commenced.

6.      I did not have sufficient time to thoroughly review and comprehend the "Standard Consent Agreement." Todd Lewis, a representative of Springland Films, assured me that it was just a standard contract and a formality for beginning the filming. He also stated that the "Standard Consent Agreement" did not change the contract between Springland Films and Etiquette Training Services.

7.      Todd Lewis rushed me and the other dinner guests to sign the "Standard Consent Agreement" in order to begin the filming upon the arrival of the "dignitary." I am not an attorney, and I did not have a lawyer present to review the "Standard Consent Agreement" with me. By rushing me and the other dinner guests to sign, the Springland Films representative encouraged me to overlook some of the requirements of the "Standard Consent Agreement," particularly the requirement that any lawsuit be brought in the State of New York. That requirement is inconsistent with the title of the agreement because it is not "standard" in contracts based on my experience.

8.      I was paid a $100 honorarium for appearing in what I thought to be an educational documentary. The honorarium was paid in cash.

9.      I did not have to leave the State of Alabama or conduct any activities outside of the State of Alabama relating to the dinner party, the filming, or the "Standard Consent

2

Agreement." It would be a serious inconvenience and a financial hardship to have to travel to New York to prosecute this lawsuit.

10.    It was not until many months after the dinner party that I learned that the footage would be part of a movie to be released in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___JAN 9___, 2008.

Michael M. Jared

3

# EXHIBIT 1

*Final completed Contract*    p.1

Oct 24 05 01:24p

October 24, 2005

Facsimile # 323 850-3112
Email: Julie@SpringlandFilms.com

To:    Julie Lynn Chounard
       Monica Levenson
       Springland Films
       8023 Beverly Boulevard Suite 5-505
       Los Angeles, California 90048

       From:    Cindy Streit    Fax: (205) 836-3221)    Email: Charmnlady@hotmail.com
       Etiquette Training Services (ETS)
       1236 Stonecrest Drive
       Birmingham, AL 35235

**Regarding:** Letter of commitment for ETS to conduct an etiquette and dining training session *plus* plan and implement a three-course formal dining dinner for Springland Films Production Company. The purpose of this writing is to provide a letter of agreement (contract) setting forth the services, and the rates for those services, that Etiquette Training Services Inc., (ETS) will provide.

ETS will customize its "Business Etiquette and Leadership Programs" and Dining Tutorial Program and present a two-hour training session for an international guest from Belarus Television for Springland Films. Additionally, ETS will plan, design, facilitate, coordinate and implement an in-home style atmosphere dining experience for the dignitary.

This will be two separate consulting and training sessions. The training sessions will be held at a place to be determined by ETS. Planning, coordinating, facilitating and set up will conducted on Sunday and Monday October 23 and 24. These sessions will be held on October 24, 2005 from 4:00pm until approximately 9:00pm. These sessions will be filmed as part of a documentary for Belarus Television and for those purposes only. A copy of the film will be given to ETS.

**Session 1:** Will consist of training this individual in social skills and dining etiquette as part of the documentary. The social skills training will be approximately two-hours in length. (Starting at approximately 4:00pm until 6:00pm (CST). The purpose of this film session is to train the international guest in dining skills and social interactive skills.

**Session 2:** For the second session, ETS will plan, organize, coordinate and facilitate a dinner party conducted in honor of this dignitary. This will be at a place to be determined by ETS. The purpose of this film session is to enable the dignitary to interact in a home-like setting of southern hospitality and comfort to learn about southern traditional values and southern-style living as part of the entire cultural experience in his travels throughout America. The portrayal of participants will be filmed and used for purposes only of the utmost dignity and class. There will not be any embarrassment to the participants or ETS.

**Cost:** For session one, ETS will charge a basic minimum fee of $350 for the two-hour dining tutorial and social graces skills training. Additionally, catering service, food, wait staff service and gratuities, facilitation of set up, room fees and any other additional service charges will be at the expense of Springland Films Company. For session two, the consultant fee will be charged at a rate of $150 per hour for planning, facilitating, coordinating and implementing all of the functions stated in session two -- not to exceed $1800 *per day (for Sunday & Monday)* -- for said consulting fees. Overtime ETS fees and expenses will be extra.

All expenses will be paid in advance to the catering service and in advance for all other expenses and additional services rendered. A down payment of $1500 shall be paid to ETS (Etiquette Training Services) in

TOTAL P.02

advance through the catering service and the balance will be charged at the completion of the meal and tutorial. Furthermore, as agreed, an honorarium of $100 per participant for on-camera appearance plus an additional $600 for the host in-home facility will be an additional expense paid by Springland Films.

Springland Films has authorized ETS to charge all fees, expenses and cost involved in this undertaking to a Visa Card in the name of Monica Levenson, a producer with the company. (Visa # 4778133660011462 Expiration date 11/06.) This Visa card will be used as *method of payment* (US currency) for all expenses, services and consultant fees. The signed return of this facsimile will authorize ETS to use this card to pay for these aforementioned services, expenses and fees. **Please fill in credit card mailing address and code digit on the back of the card.** Signed                                    Monica Levenson

Please initial your confirmation and agreement of the contract and scheduled time for the sessions and return by facsimile at (205) 856-3221.

Monica Levenson, Springland Films                    ml ____          date 10/24/05
Julie LynnHoward, Representative Springland Films     jlh ____          date 10-24-05
Cindy Streit, ETS ____                                cs ____          date 10/24/05

----------------------------------------

Menu of topics covered in the one-on-one training session is:
Introductions and Greetings
Business Manners and Social Skills
Dining Etiquette
Proper Dress and Grooming
Conversation Skills

Julie, if you wish to add to this "menu of skills" that you want covered please add any subject or topic as you deem necessary. Also, I will need this returned A.S.A.P. because I cannot make definite catering reservations until this is signed, authorized and returned. Please make sure the authorization code, appropriate signature and credit card mailing address is included above because the caterer cannot process and prepare this event without those items. We are on an extreme timeline now.
Thanks,
Cindy Streit

FILED

2008 Jan-10 PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CINDY STREIT; SARAH MOSELEY;            )
BEN K. MCKINNON; MICHAEL M.             )
JARED; AND LYNN S. JARED,               )
                                        )
       PLAINTIFFS,                      )
                                        )
VS.                                     )
                                        )   CIVIL ACTION NO.:  CV-07-J-1918-S
                                        )
TWENTIETH CENTURY FOX FILM              )
CORPORATION, ET AL.,                    )
                                        )
       DEFENDANTS.                      )
                                        )

## DECLARATION OF LYNN S. JARED

Lynn S. Jared declares as follows:

1.      My name is Lynn S. Jared.  I am over the age of eighteen (18) years, and I have personal knowledge of the facts and information contained in this Declaration.

2.      On October 24, 2005 my husband, Michael, and I attended a dinner party at Magnolia Springs Manor in Helena, Alabama that we understood would be filmed as part of an educational documentary to be shown on Belarus Television.

3.      Prior to the dinner party, Michael reviewed the contract between Springland Films and Etiquette Training Services.  He explained that the footage of the dinner party would be used in an educational documentary with a "dignitary" from Belarus to be shown on Belarus Television as part of a cross-cultural exchange.

4.      Had I known that the footage of the dinner party would be used in a major motion picture in the United States, I would not have agreed to appear at the dinner party.

5.      After arriving at Magnolia Springs Manor on October 24 for the dinner party, we had to wait for approximately one and a half hours for the arrival of the person who we thought

1

was a dignitary.  Although representatives of Springland Films were present during most of that wait, they did not present the "Standard Consent Agreement" until the last minute before the dignitary arrived and filming commenced.

6.    I did not have sufficient time to thoroughly review and comprehend the "Standard Consent Agreement."  The representative of Springland Films rushed me and the other dinner guests to sign the "Standard Consent Agreement" in order to begin the filming.  I am not an attorney, and I did not have a lawyer present to review the "Standard Consent Agreement" with me.  By rushing me and the other dinner guests to sign, the Springland Films representatives encouraged me to overlook some of the requirements of the "Standard Consent Agreement," particularly the requirement in the last paragraph that any lawsuit be brought in the State of New York.  That requirement does not seem to be "standard."  As a result, the title of the document is misleading.

7.    I was paid a $100 honorarium for appearing at the dinner party to be in what I thought was to be an educational documentary.  The honorarium was paid in cash.

8.    I did not have to leave the State of Alabama or conduct any activities outside of the State of Alabama relating to the dinner party, the filming, or the "Standard Consent Agreement."  It would be a serious inconvenience and a financial hardship to have to travel to New York to prosecute this lawsuit.

9.    It was months after the dinner party that I learned the footage would be part of a movie to be released in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___January 9___, 2008.

Lynn S. Jared

2

FILED

2008 Jan-10 PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

Beth Chapman
Secretary of State

P.O. Box 5616
Montgomery, AL 36103-5616

# STATE OF ALABAMA

**I, Beth Chapman, Secretary of State of the State of Alabama, having custody of the Great and Principal Seal of said State, do hereby certify that**

after a diligent search of the alphabetical corporate records on file in this office, consisting of domestic and foreign corporations, profit and non-profit, domestic and foreign limited partnerships, domestic and foreign limited liability companies and domestic and foreign limited liability partnerships no record is found to exist of any entity by the name:

**Springland Films**

I further certify that this is the office having legal custody of such records.



**In Testimony Whereof, I have hereunto set my hand and affixed the Great Seal of the State, at the Capitol, in the City of Montgomery, on this day.**

02/20/07

**Date**

*Beth Chapman*

**Beth Chapman**                    **Secretary of State**

Beth Chapman
Secretary of State

P.O. Box 5616
Montgomery, AL 36103-5616

# STATE OF ALABAMA

**I, Beth Chapman, Secretary of State of the State of Alabama, having custody of the Great and Principal Seal of said State, do hereby certify that**

after a diligent search of the alphabetical corporate records on file in this office, consisting of domestic and foreign corporations, profit and non-profit, domestic and foreign limited partnerships, domestic and foreign limited liability companies and domestic and foreign limited liability partnerships **no record** is found to exist of any entity by the name:

**One America Productions, Inc.**

I further certify that this is the office having legal custody of such records.



**In Testimony Whereof, I have hereunto set my hand and affixed the Great Seal of the State, at the Capitol, in the City of Montgomery, on this day.**

02/20/07

**Date** _____

_Beth Chapman_

**Beth Chapman**                    **Secretary of State**

FILED
2008 Jan-10  PM 03:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA OFFICE

| | | |
|---|---|---|
| Kathie Martin, | ) | |
| | ) | DEC 22 2006 |
| Plaintiff, | ) | |
| | ) | ANNE-MARIE ADAMS |
| v. | ) | Clerk |
| | ) | |
| Sacha Baron Cohen, Twentieth Century Fox | ) | |
| Film Corporation, One America Productions, | ) | CV200607333 |
| Inc., Everyman Pictures, Gold/Miller | ) | |
| Productions, Springland Films, Todd Lewis, | ) | CIVIL ACTION NO. _____ |
| Major Studio Partners, Inc., Dune | ) | |
| Entertainment, LLC, MTV Networks d/b/a | ) | |
| Comedy Central, YouTube, Inc., Dakota | ) | |
| North Entertainment, Inc., Four by Two | ) | |
| Production Company and Fictitious Party | ) | |
| Defendants A, B, C, D, E, F, G, H, and I, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff Kathie Martin ("Mrs. Martin"), by and through her undersigned counsel, brings this Complaint against defendants Sacha Baron Cohen, Twentieth Century Fox Film Corporation, One America Productions, Inc., Everyman Pictures, Gold/Miller Productions, Springland Films, Todd Lewis, Major Studio Partners, Inc., Dune Entertainment, LLC, MTV Networks d/b/a Comedy Central, YouTube, Inc., Dakota North Entertainment, Inc., Four by Two Production Company and fictitious defendants A through I (collectively "Defendants") and alleges the following:

### INTRODUCTION

This lawsuit arises from the fraudulently obtained appearance of Mrs. Martin in the recently released movie "*Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan*" (the "*Borat* Movie") and the knowing, intentional, negligent and/or

reckless acts Defendants committed against Mrs. Martin.  Mrs. Martin, who owns an etiquette training business for children and adults, was victimized and later exploited by Defendants. Defendants, under false pretenses, fraudulently induced Mrs. Martin to be filmed under the guise of conducting a dining etiquette training class for a foreign reporter filming a "documentary for Belarus Television."  The *Borat* Movie carries an R-rating and contains scenes that are anti-Semitic, sexist, racist, and depict graphic nudity, vulgarity and, specific to Mrs. Martin's scenes in the *Borat* Movie, child pornography.  The *Borat* Movie is a far cry from a "documentary for Belarus Television" and, without Defendants' wrongful conduct described herein, Mrs. Martin would never have associated herself with the *Borat* Movie.

Apparently not everyone in the film was manipulated and treated as underhandedly and deceptively as Mrs. Martin.  Paid professional actresses, such as Pamela Anderson, were aware of the theme and plot of the *Borat* Movie and were allowed to make an informed decision about whether to be filmed.  Mrs. Martin was not given any true information about the filming. Instead, through fraud and deceit, Defendants hijacked Mrs. Martin's name, image, likeness and goodwill and used them in an R-rated blockbuster movie without her permission.  In short, Defendants' actions toward Mrs. Martin were designed to evade meaningful consent and, thereby, subject her to ridicule for the sole purpose of enriching Defendants at her expense.  Mrs. Martin neither would have agreed to appear in such a distasteful film nor participate in the massive public debate spawned by the *Borat* Movie.

## PARTIES

1.    Mrs. Martin is an individual over the age of 19 and a resident of Jefferson County, Alabama.

2.     Defendant Sacha Baron Cohen ("Defendant Cohen") is a resident of a state other than Alabama and participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

3.     Defendant Twentieth Century Fox Film Corporation ("Defendant Twentieth Century Fox") is a Delaware corporation with its principal place of business in Los Angeles County, California and filmed, produced and distributed the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

4.     Defendant One America Productions, Inc. ("Defendant One America") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

5.     Defendant Everyman Pictures ("Defendant Everyman") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

6.     Defendant Gold/Miller Productions ("Defendant Gold/Miller") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

7.     Defendant Springland Films ("Defendant Springland") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

8.     Defendant Todd Lewis ("Defendant Lewis"), upon information and belief, resides in Los Angeles County, California and participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

9.     Defendant Major Studio Partners, Inc. ("Defendant Major Studio") is a Delaware corporation with its principal place of business in Suffolk County, New York that participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

10.    Defendant Dune Entertainment, LLC ("Defendant Dune") is a Delaware corporation with its principal place of business in Suffolk County, New York that participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

11.    Defendant MTV Networks d/b/a Comedy Central ("Defendant Comedy Central") is a Delaware corporation that provides television programming and that participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

12.    Defendant YouTube, Inc. ("Defendant YouTube") is a Delaware corporation that provides Internet services and participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

13.    Defendant Dakota North Entertainment, Inc. ("Defendant Dakota North") is an out of state entity responsible for and/or involved with "*Reel Comedy: Borat Special*", a show airing on Defendant Comedy Central that participated in the filming, production and/or

distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

14.    Defendant Four by Two Production Company ("Defendant Four by Two") is a California corporation that participated in the filming, production and/or distribution of the *Borat* Movie and for all allegations relevant hereto, committed torts in the State of Alabama.

15.    Fictitious Party Defendants A, B, C, D, E, F, G, H, and I, whether singular or plural, are those individuals, corporations or other entities who, alone or in concert with others, operated to plan, commit or otherwise facilitate the conduct and/or practices that is the subject of this Complaint, and whose identities are presently unknown but will be added when their identities can be ascertained.

### JURISDICTION AND VENUE

16.    Mrs. Martin is a resident of Jefferson County, Alabama and the acts and omissions giving rise to this complaint occurred in Jefferson County, Alabama.

17.    The amount in dispute is in excess of $10,000 and as such, venue and jurisdiction are appropriate in this Court.

### FACTS AND GENERAL ALLEGATIONS

18.    Mrs. Martin owns and operates The Etiquette School of Birmingham in Birmingham, Alabama. The focus of her business is etiquette training for children and adults, including corporate groups.

19.    Mrs. Martin also is employed by Alabama Public Television, a non-commercial television station designed to "motivate children to learn, empower students and teachers to succeed, and provide a lifelong path to knowledge" and "committed to the values of honesty, fairness, civility and ethics in [their] programming and [their] everyday interaction with viewers,

volunteers, co-workers, funding partners, and the community at large." *See* Alabama Public Television Website *available at* http://www.aptv.org/Inside/mission.asp.

20.    In or about October 2005, Defendant Lewis telephoned Mrs. Martin. Defendant Lewis told Mrs. Martin that he had located the Etiquette School of Birmingham on the Internet and asked about the type of etiquette training she offered. Among other classes, Mrs. Martin told Defendant Lewis that she offered dining etiquette training.

21.    Defendant Lewis told Mrs. Martin that he worked for Defendant Springland and that they were assisting a reporter from a former Soviet Bloc country ("Foreign Reporter"). The Foreign Reporter's name was not provided.

22.    Defendant Lewis told Mrs. Martin that Defendant Springland was filming the Foreign Reporter's travels and experiences in the United States for a documentary to be created for and shown on Belarus Television.

23.    Defendant Lewis scheduled a dining etiquette training class ("Class") with Mrs. Martin for the Foreign Reporter that was to be conducted at her home on or about October 23, 2005. A fee of $300 was agreed upon to cover the cost of the Class.

24.    In preparation for the Class, Mrs. Martin spent several hours researching Russian customs and culture as well as Belarus Television. Mrs. Martin did not want to do or say anything to offend the Foreign Reporter.

25.    On the day of the Class, Mrs. Martin prepared a meal at her home, set her table and arranged for her husband to serve the meal during the Class with the Foreign Reporter.

26.    Defendant Lewis was the first to arrive at Mrs. Martin's home before the Class. While they were waiting for the film crew to arrive, Mrs. Martin and her husband, Mr. Ray Martin, talked with Defendant Lewis about Defendant Springland.

27.    In the course of conversation, Defendant Lewis attributed the Da Ali G Show[1] to Defendant Springland.  Mr. Martin had some vague knowledge of the Ali G character but Defendant Lewis assured the Martins that the segment Defendant Springland was filming with Mrs. Martin would not be anything like the Da Ali G Show.  The Martins did not have any familiarity with Defendant Cohen or the Borat character portrayed by Defendant Cohen on the Da Ali G Show.

28.    Following this assurance, Defendant Lewis excused himself and stepped outside of the Martin's home.  He told the Martins that it was his sister's birthday and he needed to wish her a happy birthday.

29.    Meanwhile, the camera crew and director arrived to set up for filming at Mrs. Martin's home.  Defendant Lewis came back inside and said that the director wanted Mr. Martin and Mrs. Martin's young daughter to go outside before the Foreign Reporter arrived and during the filming.  Mrs. Martin assumed that the director thought her daughter might interfere with the filming in some way.  Mrs. Martin explained to Defendant Lewis that Mr. Martin needed to remain inside to serve the food for the Class.  Mrs. Martin assured Defendant Lewis that her daughter would stay upstairs in her room and not interfere with the filming.

30.    After some discussion between Defendant Lewis and the director, Defendant Lewis approached Mrs. Martin and said that they were having trouble with the time code on one of the cameras.  Defendant Lewis told Mrs. Martin that another camera was on its way, but that it would not arrive in time to conduct and film the Class that day.  Defendant Lewis requested that they reschedule the Class for the following day.  Upon information and belief, Defendants staged the need to re-schedule in order to ensure that Mr. Martin would not be present for filming for

---

[1] Unbeknownst to the Martins at the time, the Da Ali G Show regularly appears on HBO and consists of various characters portrayed by Defendant Cohen (including a character known as Borat) who prey on unsuspecting guests.

fear that he may recognize the similarity between the Foreign Reporter and the characters portrayed by Defendant Cohen on the Da Ali G Show. Defendants were successful; given the re-scheduling from Sunday to Monday, Mr. Martin was unable to attend the make-up Class and filming.

31.     The Class was rescheduled for the following day, October 24, 2005, at the Tutwiler Hotel in Birmingham, Alabama. Shortly after Mrs. Martin arrived at the Tutwiler Hotel, Defendant Lewis handed Mrs. Martin a Standard Consent Agreement. Defendant Lewis said it was a standard filming release form. Based upon Defendant Lewis' previous representations concerning, among other things, the Foreign Reporter, the nature of the Class and filming and the intended audience, Mrs. Martin signed the form and requested a copy. *See* Exhibit A.

32.     Defendant Lewis gave Mrs. Martin $350.00. Mrs. Martin and Defendant Lewis had previously agreed on a $300.00 fee for the Class and Defendant Lewis gave her an additional $50.00 for the cost of the meal she had prepared at her home the day before.

33.     Defendant Lewis took Mrs. Martin to the filming area where she was introduced (for the first time) to the Foreign Reporter (in reality, Defendant Cohen), and Defendant Springland began filming for what Mrs. Martin had been told was a documentary for broadcast on Belarus Television.

34.     During the Class, Mrs. Martin was highly offended by Defendant Cohen but she attempted to be respectful. For example, Defendant Cohen suggested to Mrs. Martin that "now is the time that we have sexual intercourse." Stunned and shaken, Mrs. Martin politely declined and attempted to direct the conversation back to the subject of the Class – dining etiquette. Mrs. Martin attributed the comment to the Foreign Reporter's extreme cultural ignorance.

35.    Defendant Cohen did not stop there.   Instead, he continued to make highly offensive sexist comments and insults directed at people of the Jewish faith.  The latter subject was particularly upsetting to Mrs. Martin given the very recent death of one of her close friends who was of the Jewish faith.  Undaunted, Defendant Cohen repeatedly attempted to bait Mrs. Martin into agreeing with his derogatory comments.

36.    Although Mrs. Martin was truly repulsed by the Foreign Reporter, she attempted to calmly explain to Defendant Cohen the offensive nature of such comments and behavior in America and bring the Class to a close.

37.    The situation only got worse.  Defendant Cohen showed Mrs. Martin pictures of what he represented to be his family.  She was shocked and embarrassed to be shown a series of pornographic pictures by Defendant Cohen of his son, who she remembers him saying was fifteen (15) years old.  The pictures of Defendant Cohen's son depicted a boy exposed from the waist down and focused on the child's penis.

38.    Defendant Cohen boasted about his son "being strong," an obvious reference to the penis.  One of the pictures showed Defendant Cohen's head very close to the penis with a "thumbs up" sign.

39.    Mrs. Martin was terribly upset and shaken by the outrageous behavior of Defendant Cohen yet she tried to remain calm and not offend the "Foreign Reporter."

40.    After the filming was over, and obviously recognizing how shaken she was, the director asked Mrs. Martin what was in the pictures she had been shown.  Mrs. Martin told him about the pornographic images.  The director apologized and Mrs. Martin immediately left.

41.    The Class was one of the longest and most uncomfortable hours of Mrs. Martin's life, or so she thought.  As a result of the encounter with Defendant Cohen, Mrs. Martin was

extremely humiliated, embarrassed and felt both violated and foolish. She left the hotel and immediately telephoned her husband and repeated the sequence of events, incredibly shaken and very upset.

42.    Mr. Martin, after hearing how upset his wife was and what had occurred during filming, went to the Internet, found a picture of the Ali G character and sent it to Mrs. Martin's office. Mrs. Martin looked at the picture and told her husband that this was not the Foreign Reporter. Mr. Martin then found a photograph of the Borat character and sent it to his wife.

43.    At this point, Mrs. Martin knew she had been duped and her humiliation worsened. Mrs. Martin unsuccessfully attempted to contact Defendant Lewis with the number he had provided to her when he scheduled the Class. But, the worst was yet to come.

44.    Shortly before the *Borat* Movie was released, one of Mrs. Martin's co-workers told her that he saw her in a movie, a sneak-preview of the *Borat* Movie at a local Birmingham, Alabama theater.

45.    The *Borat* Movie was released in the United States on or about November 3, 2006.

46.    The *Borat* Movie carries an R-rating "for pervasive strong crude and sexual content including graphic nudity, and language" according to the Motion Pictures Association of America and the National Association of Theatre Owners. *See* http://www.mpaa.org/FlmRat SrchResults.asp.

47.    Based on information and belief, as of December 21, 2006, the *Borat* Movie has grossed more than $227,613,553.00 worldwide. It is currently ranked as Number 247 on the list of highest grossing movies of all time. The term "Borat" retrieves more than 30,300,000 entries on "Google" including several thousand references to Mrs. Martin.

48.    Without Mrs. Martin's consent, the Defendants revised, edited, formatted and/or distributed scenes from the filming with Mrs. Martin into a segment for the *Borat* Movie as well as for use in advertising and promotion of the movie in all entertainment venues, including, but not limited to, the Internet and cable television.

49.    The segment of the *Borat* Movie with Mrs. Martin includes the following: (a) the prominent display of Mrs. Martin's name and the words "etiquette coach" immediately after a map indicating Defendant Cohen is in "Birmingham, Alabama", (b) numerous awkward and embarrassing exchanges between Mrs. Martin and Defendant Cohen and (c) the outrageous and repulsive pornographic photographs of Defendant Cohen's (purported) son. The *Borat* Movie prominently displays these photographs.

50.    Despite Defendant Lewis's representation to Mrs. Martin that her Class with the Foreign Reporter was to be filmed for a documentary to be shown on Belarus Television, Defendants were not filming a documentary for the Foreign Reporter to be shown on Belarus Television, had no intention of filming a documentary for the Foreign Reporter to be shown on Belarus Television, and misrepresented as much to Mrs. Martin.

51.    Defendant Cohen is not a Foreign Reporter as Defendants represented to Mrs. Martin.

52.    Defendant Cohen is not from Russia and/or a former Soviet Bloc country as Defendants represented to Mrs. Martin.

53.    Apparently, not everyone in the filming of the *Borat* Movie was manipulated and treated as underhandedly and deceptively as Mrs. Martin. Defendants selectively disclosed the design, theme, plot, purpose and intent of the scheme of the *Borat* Movie to professional actors and/or actresses.

54. Upon information and belief, professional actors and/or actresses including Defendant Cohen, Pamela Anderson and Luenell Campbell (aka Jane Sanguinetti Luenell) were given an opportunity to review the script and knowingly participated in the *Borat* Movie. They had the option of deciding whether or not to have their names, images and likenesses associated with this R-rated film. Mrs. Martin was never given that opportunity.

55. Mrs. Martin did not authorize or consent to Defendants' use of the film from her Class with Defendant Cohen in the *Borat* Movie, a crude and distasteful R-rated film.

56. Defendants concealed the true nature of their film for their own financial gain and with the intent of humiliating Mrs. Martin.

57. Irrespective of whether the *Borat* Movie is a success or a failure at the box office, Mrs. Martin's name is now tied to, and her image associated with, an R-rated movie that depicts anti-Semitism, sexism and racism and contains graphic nudity, vulgarity and images of purported child pornography. Mrs. Martin would have never agreed to be associated with such a film.

58. Mrs. Martin is a respectable, kind and gracious woman, mother and spouse. She has participated in "Friendship Force International," a non-profit organization dedicated to "building global goodwill through personal friendships." *See* Friendship Force International website *available at* http://www.friendshipforce.org/. As part of Friendship Force, Mrs. Martin has hosted several people in her home from around the world.

59. As a result of her involuntary appearance in the *Borat* Movie, Mrs. Martin has been repeatedly approached by national and international media, colleagues and strangers about her role in the *Borat* Movie. She is humiliated and embarrassed about her connection to the film.

60. Most troubling for Mrs. Martin is that she was embarrassed and humiliated to try to explain to her daughter about the *Borat* Movie and her unknowing role in the film. Mrs.

Martin suffers anxiety about the effect of her association with the *Borat* Movie and the impact it will have on her family, in particular her young daughter.

61.    The Standard Consent Agreement is unenforceable against Mrs. Martin under Alabama law.    It was fraudulently induced, there was no consideration, and Defendant Springland was not licensed or authorized to do business in the State of Alabama on October 24, 2005.

62.    Mrs. Martin would never have signed the Standard Consent Agreement if she had been told the truth about the *Borat* Movie by Defendants.    Instead, based on Defendants' fraudulent representations and inducement about the Foreign Reporter and the documentary for Belarus Television, Mrs. Martin signed the Standard Consent Agreement.    The Defendants' misrepresentations and deceit go to the heart of the Standard Consent Agreement and void any semblance of mutual assent.

### COUNT 1: FRAUD AND DECEIT

63.    Mrs. Martin readopts and incorporates paragraphs 1 through 62 as though set forth fully herein.

64.    Defendant Springland, through its authorized agent, Defendant Lewis, knowingly, intentionally, carelessly, recklessly and negligently made the following material misrepresentations to Mrs. Martin with the intent to defraud:

    (A)    Defendant Cohen was a "foreign reporter" from Russia and/or a former Soviet Bloc country;

    (B)    Defendant Springland was filming a foreign reporter's travels in the United States;

(C)     Defendant Springland and Defendant Cohen were filming for a documentary to be shown on Belarus Television when Defendant Cohen returned home; and

(D)     Defendant Springland was not filming Mrs. Martin for anything like Da Ali G Show.

65.     Each of these representations was a false representation of material fact made with the intent to defraud Mrs. Martin into unknowingly participating in the *Borat* Movie.

66.     Defendants knew these material misrepresentations were false but made them nevertheless with the intention of injuring Mrs. Martin.

67.     Defendants defrauded Mrs. Martin into signing a Standard Consent Agreement based on the representations that a "foreign reporter" was filming a documentary for Belarus Television. Mrs. Martin researched Belarus Television and found that it was a legitimate national television station. Instead, Defendants incorporated the film footage of Mrs. Martin and Defendant Cohen into the *Borat* Movie, an internationally distributed movie with an R-rating.

68.     Mrs. Martin reasonably relied on said misrepresentations in entering into an agreement to provide an etiquette training class to the Foreign Reporter for a documentary for Belarus Television.

69.     Defendants engaged in a civil conspiracy designed to exploit and defraud Mrs. Martin into appearing in the *Borat* Movie. The Defendants knowingly, recklessly and negligently combined, conspired and collaborated amongst and between themselves to defraud Mrs. Martin into appearing in an R-rated movie which contains anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography. Furthermore, the Defendants knowingly,

recklessly and negligently combined, conspired and collaborated amongst and between themselves to produce and distribute the *Borat* Movie to the general public.

70.    As a result of Defendants' material misrepresentations and Mrs. Martin's reasonable reliance, Mrs. Martin has been directly and substantially injured in that she has been contacted by local, national and international media, she has suffered emotional distress due to, among other things, the anxiety concerning the effect her role in the movie will have on her family and her job, she has been subjected to public ridicule and humiliation and her role in an R-rated film and connection with pornographic photos of Defendant Cohen's (purported) son have damaged her reputation.

WHEREFORE, Mrs. Kathie Martin prays for the following relief jointly, severally and individually:

a.    Compensatory damages in the amount of all damages resulting from the fraudulent and deceitful misrepresentations made by Defendants to Mrs. Martin;

b.    Punitive damages resulting from the willful, malicious and oppressive misrepresentations in an amount to be proven at trial and determined by an Alabama jury;

c.    The payment of Mrs. Martin's expenses, interest, court costs and attorney's fees incurred in maintaining this action;

d.    Removal of the scenes that refer to, reference, relate to or include Mrs. Martin from all future releases of the *Borat* Movie in any form and particularly those images that depict (purported) child pornography and are unlawful pursuant to Alabama Code §§ 13A-12-192 & 13A-12-197; and

e.    Such other relief which the Court may determine and which Mrs. Martin may be entitled to receive, to be proven more specifically at trial.

## COUNT 2: QUASI CONTRACT / UNJUST ENRICHMENT

71.     Mrs. Martin readopts and incorporates paragraphs 1 through 70 as though set forth fully herein.

72.     Not everyone who appeared in the *Borat* Movie was manipulated and treated as underhandedly and deceptively as Mrs. Martin by Defendants.  Defendants disclosed the design, theme, plot and purpose of the *Borat* Movie to various professional actors and actresses and/or actually hired professional actors and actresses for the *Borat* Movie.  These professional actors and/or actresses including Defendant Cohen, Pamela Anderson and Luenell Campbell were given the opportunity to read, review and accept their role(s) in the *Borat* Movie.  Such professional actors and/or actresses were provided the benefit of avoiding the shame, embarrassment and humiliation associated with unknowingly appearing in the *Borat* Movie.  Upon information and belief, these actors and/or actresses were rewarded for their voluntary appearances.

73.     However, with respect to Mrs. Martin, Defendants conspired to exploit and defraud her into participating in the *Borat* Movie.  Mrs. Martin was not given the same opportunity to decline a role in an R-rated movie that contains anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography.

74.     Mrs. Martin felt like she was doing a public service as an American to show a foreign reporter the best of American hospitality.  Defendants unjustly received the benefit of avoiding the costs of hiring a cast of professional actors and actresses by preying on unknowing individuals like Mrs. Martin.  Defendants, by conspiring to defraud and exploit Mrs. Martin, retained all benefits and profits of the film which is an inequitable result.

WHEREFORE, Mrs. Kathie Martin prays for the following relief jointly, severally and individually:

    a.    Compensatory damages in the amount of all damages resulting from the fraudulent and deceitful misrepresentations made by Defendants to Mrs. Martin and the unjust benefits retained by the Defendants as a direct result of such misrepresentations;

    b.    The payment of Mrs. Martin's expenses, interest, court costs and attorney's fees incurred in maintaining this action;

    c.    Removal of the scenes that refer to, reference, relate to or include Mrs. Martin from all future releases of the *Borat* Movie in any form and particularly those images that depict (purported) child pornography and are unlawful pursuant to Alabama Code §§ 13A-12-192 & 13A-12-197; and

    d.    Such other relief which the Court may determine and which Mrs. Martin may be entitled to receive, to be proven more specifically at trial.

## COUNT 3: COMMERCIAL APPROPRIATION
### INVASION OF PRIVACY / RIGHT OF PUBLICITY

75.    Mrs. Martin readopts and incorporates paragraphs 1 through 74 as though set forth fully herein.

76.    Unbeknownst to Mrs. Martin and without her permission or approval, Defendants misappropriated Mrs. Martin's name, likeness and appearance for their own commercial benefit when they fraudulently induced Mrs. Martin into being filmed for an alleged documentary for use by a foreign reporter for Belarus Television and instead used the film in the *Borat* Movie, an internationally distributed film with an R-rating.

77.    Without Mrs. Martin's permission or approval, Defendants caused Mrs. Martin's name, likeness, appearance and hometown to appear in an internationally released R-rated film

in an outrageous and unreasonable context and have used Mrs. Martin's name, likeness and appearance in advertising and promoting the *Borat* Movie in order to make a profit at the expense of Mrs. Martin.

78.    The final, edited scenes of the *Borat* Movie in which Mrs. Martin appears are not only the most awkward, embarrassing and outrageous moments from her encounter with Defendant Cohen, but also of the entire movie since, among other things, they contain purported child pornography.

79.    Mrs. Martin was completely unaware of her participation in the *Borat* Movie until a co-worker who had seen a sneak-preview told her that she was in a movie. Mrs. Martin would never have agreed to appear in an R-rated movie containing anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography.

80.    As a direct result of such commercial misappropriation, the *Borat* Movie has grossed more than $227 million domestically and internationally, yet Mrs. Martin was never made aware of, or offered to be compensated for, her appearance in the *Borat* Movie.

WHEREFORE, Mrs. Kathie Martin prays for the following relief jointly, severally and individually:

a.    Compensatory damages in the amount of all personal harm to Mrs. Martin's dignity and integrity as well as psychological and emotional damages resulting from the commercial misappropriation of Mrs. Martin's name, likeness and appearance;

b.    Punitive damages resulting from the willful, malicious and oppressive commercial misappropriation of Mrs. Martin's name, likeness and appearance in an amount to be proven at trial and determined by an Alabama jury;

    c.    The payment of Mrs. Martin's expenses, interest, court costs and attorney's fees incurred in maintaining this action;

    d.    Removal of the scenes that refer to, reference, relate to or include Mrs. Martin from all future releases of the *Borat* Movie in any form and particularly those images that depict (purported) child pornography and are unlawful pursuant to Alabama Code §§ 13A-12-192 & 13A-12-197; and

    e.    Such other relief which the Court may determine and which Mrs. Martin may be entitled to receive, to be proven more specifically at trial.

## COUNT 4: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81.    Mrs. Martin readopts and incorporates paragraphs 1 through 80 as though set forth fully herein.

82.    Defendants engaged in an intentional and pre-meditated scheme to defraud Mrs. Martin into appearing in the *Borat* Movie which has now spawned much public debate and is linked to anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography.

83.    As a result of Defendants' intentional acts of conspiring to defraud, exploit and take advantage of Mrs. Martin, she has suffered emotional distress which Defendants knew or should have known would result from their deliberate and outrageous scheme.

84.    The Defendants disregarded any and all concern for privacy, reputation and public image at the expense of Mrs. Martin and have subsequently subjected Mrs. Martin to incredible embarrassment, humiliation and emotional distress which would have been avoided but for Defendants' deliberate scheme designed to exploit Mrs. Martin.

85.    Defendants were certain, or substantially certain, and intended that such distress would result from their conduct.

86.    Defendants' conduct was so extreme, repulsive and outrageous as to exceed all possible bounds of decency.

87.    Mrs. Martin has suffered extreme emotional distress as a result of Defendants' conduct.

WHEREFORE, Mrs. Kathie Martin prays for the following relief jointly, severally and individually:

    a.    Compensatory damages in the amount of all damages resulting from the deliberate and intentional scheme designed to exploit and embarrass Mrs. Martin and which Defendants knew or should have known would result in emotional distress to Mrs. Martin;

    b.    Punitive damages resulting from Defendants' deliberate and intentional scheme, which Defendants knew or should have known would result in emotional distress to Mrs. Martin, in an amount to be proven at trial and determined by an Alabama jury;

    c.    The payment of Mrs. Martin's expenses, interest, court costs and attorney's fees incurred in maintaining this action; and

    d.    Such other relief which the Court may determine and which Mrs. Martin may be entitled to receive, to be proven more specifically at trial.

## JURY DEMAND

Mrs. Martin demands a trial by struck jury on all claims asserted herein.

One of the Attorneys for Plaintiff
Kathie Martin

**OF COUNSEL:**

J. Russell Campbell (ASB-0508-L59J)
Kimberly Till Powell (ASB-7120-T80K)
Patrick H. Strong (ASB-3616-T82S)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

PLEASE SERVE THE DEFENDANTS
AT THE FOLLOWING:

Twentieth Century Fox Film Corporation
Agent:  Gary D. Roberts
10201 West Pico Blvd.
Los Angeles, CA  90035

One America Productions
Agent:  Benjamin R. Reder
421 S. Beverly Drive
8th Floor
Beverly Hills, CA  90212

Everyman Pictures
Agent: Howard Abramson
2049 Century Park East
Suite 2690
Los Angeles, CA  90067
Gold/Miller Productions
Eric Gold
9200 Sunset Blvd., 10th Floor
Los Angeles, CA  90069

Springland  Films
Todd Lewis
8023 Beverly Blvd.
Suite 5-503
Los Angeles, CA  90048-4523

Major Studio Partners, Inc.
Attn: Howard Schuster
P.O. Box 2034
East Hampton, NY 11939

Dune Entertainment, LLC
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

Viacom International, Inc. d/b/a Comedy
Central
c/o Corporation Service Company
P.O. Box 526036
Sacramento, CA 95852-6036

DMCA Complaints
YouTube, Inc.
1000 Cherry Avenue, Second Floor
San Bruno, CA 94066

Dakota North Entertainment, Inc.
Agent Troy Miller
4133 Lankershim Blvd.
N. Hollywood, CA 9160

Four by Two Production Company
10201 West Pico Blvd.
Los Angeles, CA  90035

Sacha Baron Cohen
(to be determined)

# Exhibit A

## STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ 35 0   (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1.    The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2.    The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability to the Participant, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3.    The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4.    The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, that include assertions of (a) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (b) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (c) damages caused by acts of terrorism or war, (d) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (e) false light (such as any allegedly false or misleading portrayal of the Participant), (f) infliction of emotional distress (whether allegedly intentional or negligent), (g) trespass (to property or person), (h) breach of any alleged contract (whether the alleged contract is verbal or in writing), (i) allegedly deceptive business or trade practices, (j) copyright or trademark infringement, (k) defamation (such as any allegedly false statements made on the Film), (l) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (m) prima facie tort (such as alleged intentional harm to the Participant), (n) fraud (such as any alleged deception or surprise about the Film or this consent agreement), (o) breach of alleged moral rights, or (p) tortious or wrongful interference with any contracts or business of the Participant, or any claim arising out of the Participant's viewing of any sexually-oriented materials or activities.

5.    This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6.    Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought