Slade R. Metcalf (SM 8360)
Katherine M. Bolger (KB 6206)
Rachel F. Strom (RS 9666)
Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
*Attorneys for Defendants Twentieth Century*
*Fox Film Corporation, One America*
*Productions, Inc., Todd Lewis Schulman,*
*Monica Levinson, Julie Lynn Chouinard,*
*Everyman Pictures, and Dune Entertainment LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

| | |
|---|---|
| Cindy Streit; Sarah Moseley; Ben K.     : | |
| McKinnon; Michael M. Jared; and Lynn   : | |
| S. Jared,     : | Case No.: 08 CIV 01571 (LAP) |
|        : | |
|      Plaintiffs,   : | |
|        : | |
| v.     : | |
|        : | |
| Twentieth Century Fox Film   : | |
| Corporation; One America Productions,   : | |
| Inc.; Springland Films; Todd Lewis   : | |
| Schulman; Monica Levenson; Julie Lynn  : | |
| Chounard; Sacha Baron Cohen;   : | |
| Everyman Pictures; Gold/Miller;   : | |
| Productions; Major Studio Partners, Inc.;  : | |
| Dune Entertainment, LLC; Four by   : | |
| Two Production Company; Peter   : | |
| Baynham; Jan Mazer; and Anthony   : | |
| Hines,     : | |
|        : | |
|      Defendants.   : | |
|        : | |

-------------------------------------------------------------------X

**DECLARATION OF SLADE R. METCALF IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

I, **SLADE R. METCALF**, declare as follows:

1.      I am a partner in the law firm of Hogan & Hartson LLP, counsel for defendants

Twentieth Century Fox Film Corporation, One America Productions, Inc. d/b/a Springland Films (incorrectly sued herein as a separate entity), Todd Lewis Schulman, Monica Levinson (incorrectly sued herein as "Monica Levenson"), Julie Lynn Chouinard (incorrectly sued herein as "Julie Lynn Chounard"), Everyman Pictures and Dune Entertainment LLC (collectively, "Defendants").  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.  I submit this Declaration in support of Defendants' Motion to Dismiss the First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.      On or about October 22, 2007, plaintiffs Cindy Streit, Sarah Moseley, Ben K. McKinnon, Michael M. Jared  and Lynn S. Jared (collectively "Plaintiffs") filed a complaint in the United States District Court for the Northern District of Alabama asserting several causes of action arising out of Plaintiffs' alleged inducement to appear in the film *Borat – Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan* (the "Film") and their subsequent appearances in the Film.

3.      On December 5, 2007, Defendants moved to transfer the case to this Court, or, in the alternative, to dismiss the case for improper venue.

4.      On January 24, 2008, that court granted that motion insofar as it issued an order transferring this action to this Court (the "Order").  A true and correct copy of the Order is annexed hereto as Exhibit "A."

5.      Plaintiffs moved to vacate the Order, and on January 30, 2008, that court denied that motion (the "Second Order").  A true and correct copy of the Second Order is annexed hereto as Exhibit "B."

\\\NY - 027721/000009 - 1082791 v2

6.    Pursuant to the Order, this case was transferred to this Court as of February 15, 2008.

7.    Pursuant to a stipulation among the parties, so ordered by this Court on March 19, 2008, the parties agreed that Plaintiffs would have until April 7, 2008 to file an amended complaint (the "Stipulation").  Plaintiffs did so on that date.  A true and correct copy of the First Amended Complaint is annexed hereto as Exhibit "C."

8.    Pursuant to the Stipulation, the parties agreed that Defendants would have until May 12, 2008 to move, answer or otherwise respond to Plaintiffs' amended complaint.

I declare under the penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct and that this Declaration was executed in New York, New York on May 12, 2008.

 s/  Slade R. Metcalf
**SLADE R. METCALF**

\\\NY - 027721/000009 - 1082791 v2

**<u>EXHIBIT A</u>**

**To the Declaration of Slade R. Metcalf
in Support of Defendants' Motion To Dismiss the First Amended Complaint**

FILED
2008 Jan-24  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CINDY STREIT, ET AL.,

        Plaintiffs,

v.                              CV 07-J-1918-S

TWENTIETH CENTURY FOX
FILM CORPORATION, ET AL.,

        Defendants.

## MEMORANDUM ORDER AND OPINION

Pending before the court is the defendants' Motion to Transfer, or in the alternative to Dismiss for Improper Venue (doc. 19).  In their motion, the defendants seek to have this case transferred to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a) or, in the alternative, dismissed pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure for improper venue.

Having considered the parties' submissions, the court is of the opinion for the reasons that follow that the defendants' motion is due to be **GRANTED**

1

**Factual Background**

The facts in this case arise out of the filming, production, and distribution of a scene from the major motion picture *Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan* (the "Borat movie"). Plaintiff Cindy Streit is the owner of ETS, an etiquette training business located in Birmingham, Alabama. Compl. ¶ 23. At the request of the defendants, Streit agreed to organize an etiquette training class and a formal southern-style dinner for a "foreign dignitary" from the Republic of Belarus. *Id*., ¶¶ 24-25. The other plaintiffs, Ben McKinnon, Michael Jared, Lynn Jared, and Sarah Moseley, attended the dinner as guests. *Id*., ¶ 30. All of the plaintiffs believed that they were being filmed as part of an educational documentary about the foreign dignitary's travels through America which would be shown on Belarus Television. *Id*., ¶¶ 24, 27.

As part of their participation in the film, each plaintiff signed a document entitled Standard Consent Agreement. *See* Exhibits 1-5 to Exhibit A of Defendants' Motion to dismiss (doc. 19). The Standard Consent Agreement states that any claim brought by a participant "must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York." *Id*.

At the dinner, defendant Cohen behaved in an outlandish and offensive

2

manner.  Compl. ¶ 32, 34-40.  The plaintiffs did not realize until later that they had

been filmed as part of a scene for the Borat movie.  *Id.* at p. 2.  The Borat movie

carries an R-rating "for pervasive strong crude and sexual content including

graphic nudity, and language."  *Id.*, ¶ 48.  Since its release, the Borat movie has

grossed over $200 million.  *Id.*, ¶ 49.

## Discussion

Forum selection clauses in contracts are enforceable in federal court.  *See*

*e.g. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).  The district

court's decision about whether to transfer a case pursuant to a forum selection

clause that requires litigation in a domestic forum is governed by 28 U.S.C. §

1404(a).  *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988).

Under Section 1404(a), a court may transfer a civil action to any other

district where it could have been brought "[f]or the convenience of  parties and

witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  Generally, a valid

forum selection clause is "a significant factor that figures centrally in the district

court's calculus," *Stewart Organization, Inc.*, 487 U.S. at 29, and will rarely be

outweighed by other 1404(a) factors because it is, in effect, the intent of both

parties to proceed in the selected forum.  *In re Ricoh Corp.*, 870 F.2d 570, 573

(11th Cir. 1989).   Forum selection clauses are valid and enforceable if they are

"freely and fairly negotiated by experienced business professionals." *In re Ricoh Corp.*, 870 F.2d at 573. However, proof of "fraud, duress, misrepresentation, or other misconduct" in negotiation can bar a forum selection clause's enforcement. *Id.* at 573-74.

In this case, the plaintiffs argue that the forum selection clause is unenforceable because it was not "freely and fairly negotiated by experienced business professionals" and because the contract was entered into based on the fraudulent representations made by the defendants. The United States Court of Appeals for the Eleventh Circuit has held that a forum selection clause is not rendered unenforceable every time there is an allegation of fraud. *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1296 (11th Cir. 1998) (citing *Scherk v. Alberto-Culver & Co.*, 417 U.S. 506, 519 n. 14 (1974)). Rather, the test is whether "the inclusion of that clause in the contract was the product of fraud or coercion." *Id.*; *see also Ex parte Leasecomm Communication,* 879 So. 2d 1156, 1159 (Ala. 2003) ("the proper inquiry is whether the forum-selection clause is the result of fraud in the inducement in the negotiation or inclusion in the agreement of the forum-selection clause itself.")

The court finds that the plaintiffs have failed to allege that the inclusion of the forum selection clause itself in the Standard Consent Agreement was the

4

product of fraud or coercion.  Therefore, even if all of the plaintiffs' allegations

are accepted as true, the forum selection clause is due to be enforced.

The plaintiffs also argue that the defendants' motion to transfer is due to be

denied because Springland Films is barred from enforcing the Standard Consent

Agreement under Alabama Code § 10-2B-15.02.  Alabama Code § 10-2B-15.02

renders a foreign corporation's contracts void where the foreign corporation does

not have a registered agent within the state and has not filed its articles of

incorporation with the secretary of state.  However, application of § 10-2B-15.02

is barred by the Commerce Clause of the United States Constitution where the

primary purpose of the transaction constitutes an interstate activity.  *Kathie Martin*

*v. Sacha Baron Cohen, et al.*, 2008 WL 162598 at *5 (Ala.).  In *Martin*, another

case arising out of the Borat movie involving the same Standard Consent

Agreement, the Alabama Supreme Court held that the plaintiff's "appearance in

recorded footage that might be used 'without restriction in any media throughout

the universe'" constituted an interstate activity.  *Id*.  Therefore, the Alabama

Supreme Court held that § 10-2B-15.02 did not render the forum selection clause

unenforceable.  *Id*. at * 7.  Since application of § 10-2B-15.02 is a matter of state

law, this court is bound by the *Martin* holding.  As such, the court is of the opinion

that the defendants' motion to transfer is due to be granted.

For the above reasons, the defendants' motion to transfer is hereby

**GRANTED**.  It is therefore **ORDERED** that this case is **TRANSFERRED** to the

United States District Court for the Southern District of New York pursuant to this

court's discretion under 28 U.S.C. § 1404(a).

**DONE** and **ORDERED** this the 24th day of January 2008.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

**<u>EXHIBIT B</u>**

**To the Declaration of Slade R. Metcalf
in Support of Defendants' Motion To Dismiss the First Amended Complaint**

FILED
2008 Jan-30  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

CINDY STREIT, ET AL.,

        Plaintiffs,

v.                               CV 07-J-1918-S

TWENTIETH CENTURY FOX
FILM CORPORATION, ET AL.,

        Defendants.

**<u>ORDER</u>**

Pending before the court is the plaintiffs' Motion for Relief from Order (doc. 31).  In their motion, the plaintiffs request the court to vacate its Order of January 24, 2008, transferring this case to the Southern District of New York (doc. 29).  Having considered the motion and being of the opinion that it is due to be denied for the reasons that follow, it is hereby **ORDERED** that the plaintiffs' motion is **DENIED**.

The plaintiffs contend that they have presented enough evidence of fraud relating to the inclusion of the forum selection clause to, at a minimum, create a jury issue.  Plaintiff's motion at 5.  In support of this argument, the plaintiffs cite *Blue Cross and Blue Shield of Alabama v. Woodruff*, 803 So.2d 519 (Ala. 2001),

1

for its holding that fraud in the inducement of an arbitration clause "would be determined by a jury." Plaintiff's motion at 5. Despite the plaintiffs' best efforts to the contrary, *Woodruff* provides no support for their argument. In *Woodruff*, the defendant filed a motion to compel arbitration pursuant to an arbitration clause in the plaintiff's insurance policy. *Id*. at 520-21. The plaintiff advanced "numerous 'defenses' and arguments" including fraud in the inducement as to why the case should not be submitted to arbitration. *Id*. at 523. However, the critical issue was "whether Blue Cross complied with the procedures specified in its contract for amending that contract." *Id*. at 527. The Alabama Supreme Court held that "the evidence before the trial judge was insufficient to establish that Blue Cross effectively amended the 1991 contract to add the arbitration provision." *Id.* at 528. The Court never considered nor discussed the plaintiff's allegation of fraud in the inducement.

As this court stated in its Order of January 24, 2008, the law of the Eleventh Circuit Court of Appeals is that an allegation of fraud renders a forum selection clause unenforceable solely when "the inclusion of that clause in the contract was the product of fraud or coercion." *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1296 (11th Cir. 1998) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n. 14 (1974)); *see also Ex parte Leasecomm Communication,* 879 So. 2d

2

1156, 1159 (Ala. 2003) ("the proper inquiry is whether the forum-selection clause is the result of fraud in the inducement in the negotiation or inclusion in the agreement of the forum-selection clause itself . . . if the claim of fraud in the inducement is directed toward the entire contract, the fraud exception to enforcement of the forum-selection clause does not apply").  In *Scherk*, the Court specifically stated that this "does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable."  *Scherk*, 417 U.S. at 519 n. 14.

The fraud that the plaintiffs have asserted is that they did not thoroughly read the Standard Consent Agreement because the defendants did not allow them enough time and that they were misled by the use of the term "Standard" in the title of the contract.  Plaintiff's motion at 2-5.  Under Alabama law, "a person who signs a contract is on notice of the terms therein and is bound thereby even if he or she fails to read the document."  *Locklear Dodge City, Inc. v. Kimbrell*, 703 So.2d 303, 306 (Ala. 1997).  Had the plaintiffs read the Standard Consent Agreement, it would have been apparent from the clear and unambiguous language in the forum selection clause that all claims must be brought in the State and County of New York.

The plaintiffs' argument that they were rushed into signing the Standard

3

Consent Agreement also does not render the forum selection clause unenforceable. In *Ex parte Perry*, 744 So.2d 859 (Ala. 1999), the Alabama Supreme Court was faced with a similar set of facts in which the plaintiff argued that an arbitration provision should not be enforced because the defendant automobile dealer "hurried her through the purchase of her new Hyundai automobile and did not give her an opportunity to read the purchase-agreement form before she signed it." *Id*. at 862. The Court noted that a party is responsible for reading a contract before signing it, regardless of whether the party felt "hurried." *Id*. at 863 (noting that if the plaintiff felt hurried "she could have slowed the process down or could have refused to sign the contract until she had had time to read it in its entirety").

In regard to the use of the term "Standard" in the title of the contract, the court is of the opinion that the term "Standard" is not so misleading as to render the forum selection clause unenforceable.

The plaintiffs' final argument is that the court failed to address plaintiff McKinnon and plaintiff Moseley's health problems in its Order of January 24, 2008. The Eleventh Circuit has held that a forum selection clause will rarely "be outweighed by other 1404(a) factors." *In re Ricoh Corp*., 870 F.2d 570, 573 (11th Cir. 1989). While the plaintiffs' health is a factor to be considered under 1404(a) which weighs in favor of the plaintiffs, it is not enough to overcome the

4

presumption in favor of enforcing the valid forum selection clause.

## **Conclusion**

For the above reasons, the plaintiffs' Motion for Relief from Order is hereby

**DENIED**.

**DONE** and **ORDERED** this the 30th day of January 2008.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

**<u>EXHIBIT C</u>**

**To the Declaration of Slade R. Metcalf
in Support of Defendants' Motion To Dismiss the First Amended Complaint**

ADAM RICHARDS LLP
Adam Richards (AR-2489)
40 Fulton Street, 7th Floor
New York, New York 10038
Telephone: (212) 233-4400
adam@arichardslaw.com

Attorneys for Plaintiffs Cindy Streit,
Sarah Moseley, Ben K. McKinnon,
Michael M. Jared and Lynn S. Jared



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Cindy Streit, Sarah Moseley, Ben K.
McKinnon, Michael M. Jared and Lynn
S. Jared,

         Plaintiffs,

   - against -

Twentieth Century Fox Film
Corporation, One America Productions,
Inc., Springland Films, Todd Lewis
Schulman, Monica Levenson, Julie Lynn
Chounard, Sacha Baron Cohen,
Everyman Pictures, Gold/Miller
Productions, Major Studio Partners, Inc.,
Dune Entertainment, LLC, Four by
Two Production Company, Peter
Baynham, Dan Mazer and Anthony
Hines,

         Defendants.

**Index No. 08 CIV 01571 (LAP)**

**FIRST AMENDED COMPLAINT**

   Plaintiffs Cindy Streit, Sarah Moseley, Ben K. McKinnon, Michael M. Jared and Lynn S.

Jared, by and through counsel, and bring this First Amended Complaint against Defendants

Twentieth Century Fox Film Corporation, One America Productions, Inc., Springland Films,

Todd Lewis Schulman, Monica Levenson, Julie Lynn Chounard, Sacha Baron Cohen, Everyman

Pictures, Gold/Miller Productions, Major Studio Partners, Inc., Dune Entertainment, LLC, Four

by Two Production Company, Peter Baynham, Jan Mazer, and Anthony Hines (referred to collectively as "Defendants").

## Introduction

Plaintiffs come before the Court as victims of an unlawful and fraudulent scheme committed by the Defendants. Sarah Moseley, Ben McKinnon, Michael Jared, Lynn Jared and Cindy Streit, the latter of whom owns the etiquette training business, Etiquette Training Services, Inc., were unknowingly and unwillingly made subjects of the recent movie "*Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan*" (the "*Borat* movie"), an R-rated film containing depictions of racism, child pornography, sexism, nudity, anti-Semitism and vulgarity. Defendants fraudulently represented that they were filming an "educational documentary for Belarus Television" and requested that Cindy Streit provide etiquette and dining skills training to a "foreign dignitary" from the Republic of Belarus. Defendants also requested that Streit and Etiquette Training Services, Inc. arrange a dinner to be attended by the "foreign dignitary." Streit and other attendees of Streit's choosing, which included Plaintiffs Sarah Moseley, Ben McKinnon, Michael Jared and Lynn Jared, among others. Defendants filmed both the etiquette training and dinner.

Unbeknownst to Plaintiffs, the "educational documentary" was actually the highly offensive *Borat* movie and the "foreign dignitary" was actually the actor/Defendant Sacha Baron Cohen who, along with all other Defendants, had conspired to subject the Plaintiffs to Cohen's lewd, insulting and offensive conduct, all while casting Plaintiffs as racially intolerant. Unlike actors and actresses who are paid for their services and perform according to an agreed-upon role and script, Defendants defrauded Plaintiffs for their part in the film. Had Plaintiffs not been the

2

subjects of Defendants' scheme, they would have never agreed to play any role in the *Borat* movie.

## Parties

1.    Plaintiff Cindy Streit ("Streit") is an individual residing in Jefferson County, Alabama.

2.    Plaintiff Sarah Moseley ("Moseley") is an individual residing in Shelby County, Alabama.

3.    Plaintiff Ben K. McKinnon ("McKinnon") is an individual residing in Jefferson County, Alabama.

4.    Plaintiff Michael M. Jared ("Michael Jared") is an individual residing in Shelby County, Alabama.

5.    Lynn S. Jared ("Lynn Jared") is an individual residing in Shelby County, Alabama.  Unless designated individually, Plaintiffs Streit, Moseley, McKinnon, Michael Jared and Lynn Jared are collectively referred to herein as "Plaintiffs."

6.    Defendant Twentieth Century Fox Film Corporation, a Delaware corporation with its principal place of business in Los Angeles County, California, filmed, produced and distributed the *Borat* movie.

7.    Defendant One America Productions, Inc. ("One America"), a California corporation with its principal place of business in Los Angeles County, California, participated in the filming, production and/or distribution of the *Borat* movie.

8.    Defendant Springland Films ("Springland"), a California corporation with its principal place of business in Los Angeles County, California, participated in the filming,

production and/or distribution of the *Borat* movie. Upon information and belief, Springland Films is a registered d/b/a of One America.

9.     Defendant Todd Lewis Schulman ("Schulman"), upon information and belief, resides in Los Angeles County, California and was at all times relevant hereto employed by One America as the Field Coordinator for the *Borat* movie and participated in its filming, production and/or distribution.  At all times relevant, Schulman communicated and interacted with Plaintiffs under the alias "Todd Lewis."

10.     Upon information and belief, Defendant Monica Levenson ("Levenson") is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* movie.

11.     Upon information and belief, Defendant Julie Lynn Chounard ("Chounard") is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* movie.

12.     Defendant Sacha Baron Cohen ("Cohen") is a resident of a state other than New York and, at all times relevant hereto, was employed by One America as the feature actor in the *Borat* movie, as well as a writer and producer of the film.

13.     Defendant Everyman Pictures, a California corporation with its principal place of business in Los Angeles County, California, participated in the filming, production and/or distribution of the *Borat* movie.

14.     Defendant Gold/Miller Productions, a California corporation with its principal place of business in Los Angeles County, California, participated in the filming, production and/or distribution of the *Borat* movie.

15. Defendant Major Studio Partners, Inc., a Delaware corporation with its principal place of business in Suffolk County, New York, participated in the filming, production and/or distribution of the *Borat* movie.

16. Defendant Dune Entertainment, LLC, a Delaware corporation with its principal place of business in Suffolk County, New York, participated in the filming, production and/or distribution of the *Borat* movie.

17. Defendant Four by Two Production Company is a California corporation that participated in the filming, production and/or distribution of the *Borat* Movie.

18. Upon information and belief, Defendant Peter Baynham is a resident of a state other than New York and was a writer for and participated in the filming, production, and distribution of the *Borat* movie.

19. Upon information and belief, Defendant Dan Mazer is a resident of a state other than New York and was a writer for and participated in the filming, production, and distribution of the *Borat* movie.

20. Upon information and belief, Defendant Anthony Hines is a resident of a state other than New York and was a writer for and participated in the filming, production, and distribution of the *Borat* movie.

## Amount in Controversy

21. Plaintiffs, each and individually, seek relief in the form of monetary damages exceeding $75,000, exclusive of interest and costs.

## Jurisdiction and Venue

22. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 on the basis that there is complete diversity of citizenship between the parties and the

amount in controversy exceeds the jurisdictional minimum of $75,000, exclusive of interest and costs.

23. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b), because under the terms of a "standard consent agreement" which the Plaintiffs were fraudulently induced to enter into with Defendant One America Productions, Inc., any claim brought in connection with the *Borat* movie must be "brought before and adjudicated by only a competent court located in the State of New York and County of New York."

### Factual Allegations

25. Plaintiff Streit is the owner of ETS, an etiquette training business. On or about October 21, 2005, Defendant Schulman, operating under the alias "Todd Lewis" of Springland Films, contacted Streit to request the services of Streit and ETS.

26. Schulman represented that he was assisting Springland in filming an educational documentary for Belarus Television about a foreign dignitary's tour of the United States. Schulman stated that the dignitary needed etiquette and dining skills training and inquired whether Streit and ETS could provide such services. Schulman also explained that this portion of the documentary was designed to portray a Southern, in-home style dining experience and requested that Streit arrange for such a dinner. During all times relevant hereto, Schulman was acting as an agent for and in conspiracy with the other Defendants

27. Streit agreed to perform the requested etiquette and dining skills training and to arrange a catered dinner complete with appropriate guests.

28.    On the evening of October 21st, Schulman requested to meet with Streit in order to finalize the arrangements and for Schulman to examine a potential training location. Schulman also requested to meet one of the guests that would be present at the dinner party.

29.    The following day, October 22nd, Schulman and Plaintiffs Streit and McKinnon met at a Birmingham, Alabama, restaurant to discuss the arrangements for the training and dinner. During that meeting, Schulman provided further details about the "foreign dignitary," discussing the dignitary's home country of The Republic of Belarus, which he described as a small country in the former Soviet Union. Schulman also stated that the dignitary worked with Belarus Television and this "educational documentary" was for the cultural enrichment of that country. Schulman further represented that the documentary was to be in the nature of those shown by National Geographic and was being made to help build relations between the United States and Belarus. Streit asked Schulman whether Belarus Television was similar to Alabama Public Television and he replied that it was very similar. Schulman represented that Plaintiffs' role in the documentary was mainly for school children to learn cultural diversity and to learn about Southern traditional values and Southern-style living. Plaintiff McKinnon asked whether Schulman knew the dignitary's name. Schulman responded that he did, but was unsure how to pronounce it. Schulman further stated that the dignitary spoke English so there would not be problems with communication. Schulman repeatedly referred to the visiting guest (now known to be Defendant Cohen) as a "dignitary."

30.    During the same meeting, Schulman performed a short, filmed interview of Streit and filmed the training site.

31.    That evening, Schulman notified Streit that Springland had authorized Streit to perform the requested training and dinner services. At that time, Schulman stated that the

restaurant at which they met would not be appropriate for filming and, as such, requested that the dinner and training take place in a Southern home "with columns." Schulman stated that he would pay $600 extra for an in-home setting. Both the training and dinner were to take place on October 24, 2005.

32.    On the evening of October 22nd and on October 23rd, Streit arranged for the attendance of dinner guests, including Plaintiffs Moseley, McKinnon, Michael Jared and Lynn Jared, among others. Streit also arranged for catering services and reserved a dining facility — a home with columns.

33.    In the hours prior to the training and dinner on October 24, 2005, Streit and Springland Films, by way of Springland Films representatives, Julie Lynn Chounard and Monica Levenson, negotiated a written contract for Streit's services. At all times relevant hereto, Chounard and Levenson were acting as agents for and in conspiracy with the other Defendants. Consistent with the representations of Defendants Schulman, Levenson, Chounard and Springland, the contract contains the following provisions:

> ETS will customize its "Business Etiquette and Leadership Programs" and Dining Tutorial Program and present a two-hour training session for an international guest from Belarus Television for Springland Films. Additionally, ETS will plan, design, facilitate, coordinate and implement an in-home style atmosphere dining experience for the dignitary.

> ***

> These sessions will be filmed as part of a documentary for Belarus Television and for those purposes only.

> ***

> The purpose of this film session is to enable the dignitary to interact in a home-like setting of southern hospitality and comfort to learn about southern traditional values and southern-style living as part of the entire cultural experience in his travels throughout America. The portrayal of participants will be filmed and used for purposes only of

the utmost dignity and class. There will not be any embarrassment to the participants or ETS.

34.    During the dinner later that evening. Defendant Cohen performed numerous offensive and outrageous acts, several of which, identified below, became part of the final, edited version of the *Borat* movie, its trailers and other promotional material.

35.    The scenes in the *Borat* movie leading up to the dinner include Cohen driving to the house where the dinner is scheduled to take place. At this point, the *Borat* movie flashes to the following road name: "Secession, Private Drive." The road on which the dinner facility was located does not bear this name, nor do any of the Plaintiffs live on or know of such a road. Upon information belief, Defendants scripted the "Secession Drive" scene to set the stage for Cohen's portrayal of Plaintiffs as being racially intolerant.

36.    During the dinner, Cohen referred to Plaintiff Michael Jared as "retarded" and then complimented the other guests on their willingness to let "retarded" persons dine with them.

37.    He asked the dinner guests whether they owned slaves.

38.    He made several derogatory and sexists comments to the women who were present.

39.    At one point, Cohen excused himself to the bathroom only to come back to the dinner table holding a plastic bag purportedly containing his own feces. Upon information and belief, a member of Springland films had defecated in the plastic bag prior to filming the dinner scenes.

40.    Plaintiff Streit was shocked at the site of the plastic bag, but assisted Cohen to the restroom, only to have Cohen falsely describe his own culture's bathroom etiquette. During this scene in the film, Cohen tells Streit that his understanding is that the host of the dinner is responsible for "wiping" him.

41.    Believing that Cohen was, as represented, a foreign dignitary unaccustomed to American ideals, Plaintiffs acted with benevolence toward Cohen and made all attempts to be tolerant of his conduct.

42.    After returning from the restroom, there was a knock at the door and Cohen presented an African-American female to the dinner guests as a prostitute he had asked to dine with them.  Plaintiffs have since learned that this was professional actress Luenell Campbell (a.k.a. Jane Sanguinetti Luenell).  The *Borat* movie depicts that, at this point in the dinner, certain of the guests chose to leave.

43.    Defendants purposely edited the scenes in which Ms. Campbell appeared to give the impression that Plaintiffs and others present at the dinner were intolerant of dining with members of another race and left as a result of her presence.  What was filmed, but not shown in the *Borat* movie, however, was that Streit apologized to Ms. Campbell for what Streit believed was Campbell's involuntary participation in the Defendants' scheme.  Plaintiffs at all times acted in goodwill towards Ms. Campbell.

44.    The scripting, filming and showing of the "Secession Drive" scene leading up to the dinner was designed to set the stage for this false portrayal.

45.    At the end of the dinner scenes, the film shows Cohen leaving and asking whether the cause of the commotion was that the "retard had gotten out of his cage."

46.    The scenes of the *Borat* movie following those in which Plaintiffs appeared show Cohen at an "antique" store that sells various civil war and Confederate items, including signage associating the Confederate, or "Rebel" flag, with "Secession."  Upon information and belief, Defendants' scripting, filming and showing of this portion of the *Borat* movie was made for the

purpose of linking the scenes of the dinner with "Secession," its association with the Confederate flag and racial intolerance.

47.    Indeed, this is exactly how it has been interpreted by the viewing public. One movie review describes the "dinner scenes" as follows: "You hear about people so racist they can't stand to be in the same room as one of 'them.'" Another says it this way: "The other guests try to excuse it all away up until Borat's dinner guest arrives, an overweight black prostitute. Not something that someone living on Secession Drive ... can handle."

48.    Without Plaintiffs' consent, the Defendants revised, edited, formatted and distributed scenes from the Plaintiffs' dinner with Cohen into a segment for the *Borat* movie and have used these scenes in advertising and promotion for the movie in multiple media, including print, television and the Internet. The dinner scenes are frequently depicted in trailers for the *Borat* movie and are among the most critical components to the popularity and financial success of the movie.

49.    The *Borat* movie was released in the United States on or about November 3, 2006.

50.    The movie carries an R-rating "for pervasive strong crude and sexual content including graphic nudity, and language" according to the Motion Pictures Association of America and the National Association of Theatre Owners.

51.    In its first ten days in the box office, the *Borat* movie grossed approximately $68,000,000.00. Upon information and belief, as of December 21, 2006, ticket sales for the *Borat* movie had grossed more than $227,613,553.00 worldwide. Upon information and belief, DVD sales and the sale of other movie-related items have dramatically increased the amount of total revenue generated by the film.

52. Upon information and belief, the total production cost for the *Borat* movie was only $18 million. Defendants were able to keep such costs to a minimum by defrauding Plaintiffs and others into playing the roles that would otherwise be occupied by paid actors and actresses.

53. Plaintiffs have been made the subjects of numerous newspaper and magazine articles, internet postings and television programs as a result of their involvement with the movie and their names, likenesses and images have been repeatedly associated with the acts performed by Defendant Cohen at the October 24, 2005, dinner.

54. Contrary to Defendants' oral and written representations to the Plaintiffs, Defendants were not filming an educational documentary for a foreign dignitary to be shown on Belarus Television. There was no "foreign dignitary," but only Cohen, a paid actor who carried out this previously-scripted, outrageous conduct. There was no "educational documentary," but only a film memorializing the mockery, humiliation and degradation of unsuspecting participants.

55. Not everyone involved in the filming of the *Borat* movie were victims of fraud. Defendants selectively disclosed the purpose and intent of the *Borat* movie to professional actors and actresses, including Defendant Cohen, Pamela Anderson and Luenell Campbell (aka Jane Sanguinetti Luenell).

56. These individuals were given an opportunity to review and agree to the movie script and knowingly participate in the *Borat* movie. Unlike the Plaintiffs, they had the option to decide whether or not to have their names, likenesses and images associated with a movie containing racism, child pornography, sexism, nudity, anti-Semitism and vulgarity. And, unlike

12

the Plaintiffs, they had the option to determine how their participation in the *Borat* movie would affect their personal, social and business lives.

57.    Plaintiffs did not authorize or consent to Defendants' use of their names, likenesses and images for a commercial purpose.

58.    Plaintiffs did not authorize or consent to Defendants' portrayal of Plaintiffs in a false light.

59.    Plaintiffs did not authorize or consent to be made involuntary participants in a film celebrating racism, child pornography, sexism, nudity, anti-Semitism and vulgarity.

60.    Plaintiffs have suffered extreme humiliation, embarrassment and ridicule as a result of Defendants' portrayal of them and their association with the *Borat* movie.

61.    To the extent the Defendants contend that the Plaintiffs are bound by a Standard Consent Agreement and/or Release of Liability, all terms therein are unenforceable against Plaintiffs under New York law.  They were fraudulently induced, made under duress, there was no consideration, and there was no "meeting of the minds."

62.    Additionally, the Standard Consent Agreement is unenforceable because, among other things, it provides for each of the participants to appear in a "documentary-style film" and the *Borat* movie is neither a documentary nor a "documentary style" film, it is signed by "Todd Lewis," a fictitious individual dreamt up by Plaintiffs for the purpose of inducing Plaintiffs to sign the document, and because it purports to release Defendants from claims arising from fraud and/or negligence.

13

## AS AND FOR A FIRST CAUSE OF ACTION
### UNJUST ENRICHMENT

63.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

64.    Defendants defrauded Plaintiffs into becoming unwilling participants in the *Borat* movie, a film celebrating racism, child pornography, sexism, nudity, anti-Semitism and vulgarity.

65.    Because of Defendants' misconduct, Plaintiffs became unwilling participants in the *Borat* movie by mistake.

66.    Upon information and belief, the total production cost for the *Borat* movie was only $18 million.  Defendants were able to keep such costs to a minimum by defrauding Plaintiffs and others into playing the roles that would otherwise be occupied by paid actors and actresses.

67.    Defendants unjustly received the benefit of avoiding the costs of hiring a cast of professional actors and actresses by committing fraud upon the Plaintiffs.

68.    Defendants unjustly received the benefit of the Plaintiffs' participation in the *Borat* movie which resulted in the movie being an extremely profitable venture.

69.    Defendants, by exploiting the Plaintiffs, unjustly retained all benefits and profits of the *Borat* movie.  Defendants must disgorge their ill-gotten gains.

70.    The Defendants, therefore, have been unjustly enriched and, in equity and good conscience, should be required to disgorge their ill-gotten gain.

71.    Due to the foregoing, Defendants have been unjustly enriched and Plaintiffs are entitled to recover from defendants, jointly and severally, compensatory damages in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### FRAUD; FRAUDULENT INDUCEMENT

72.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

73.    On October 21, 22, 23 and 24, 2005, Defendants, through their authorized agents, Defendants Schulman, Chounard and Levenson made the following misrepresentations, both orally and in writing, as described above, to Plaintiffs with the intent to defraud:

    (A)    Defendant Cohen was a "foreign dignitary" from The Republic of Belarus;

    (B)    Defendant Springland was filming the dignitary's travels in the United States;

    (C)    Defendants Springland was filming for a documentary to be shown on Belarus Television;

    (D)    Defendants' filming of the Plaintiffs would be solely for the purpose of the purported documentary;

    (E)    The documentary would only be shown on Belarus Television;

    (F)    Defendants' filming for the documentary would not be for the purpose of embarrassment to the Plaintiffs;

    (G)    The portrayal of the Plaintiffs would be with the utmost dignity and class;

    (H)    Those misrepresentations more fully described in Paragraph 24, above.

74.    Each of these representations was a false representation of material fact made with the intent to defraud Plaintiffs into unknowingly participating in the *Borat* movie.

15

75.    Defendants knew these material misrepresentations were false when made and, in fact, planned, collaborated and scripted such misrepresentations with the intent to deceive the Plaintiffs.

76.    Plaintiff Streit reasonably relied on the foregoing fraudulent misrepresentations in agreeing to provide etiquette and dining skills training and to be filmed during the dinner made the subject of the *Borat* movie.

77.    Plaintiffs Moseley, McKinnon, Michael Jared and Lynn Jared reasonably relied on the foregoing fraudulent misrepresentations in agreeing to be filmed at the dinner made the subject of the *Borat* movie.

78.    The Standard Consent Agreement and/or Release of Liability were procured by the foregoing fraudulent representations and are void as a matter of law.

79.    As a result of Defendants' material and fraudulent misrepresentations and Plaintiffs' reasonable reliance, Plaintiffs have suffered extreme emotional distress, anxiety, embarrassment, ridicule and humiliation due to their involvement and portrayal in the *Borat* movie.

80.    Defendants' actions toward Plaintiffs were wanton, malicious, and reckless and were conducted with a conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to recover from defendants, jointly and severally, an award of punitive damages in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

16

82.    Defendants scripted and perpetrated a scheme to defraud Plaintiffs into appearing in the *Borat* movie, which is now the subject of fervent public debate due to its celebration of racism, sexism, vulgarity, child pornography, nudity and anti-Semitism.

83.    Defendants' actions in their dealings with Plaintiffs have been reckless, intentionally conducted in bad faith, extreme and outrageous, and cannot be justified in any respect in a civilized society.

84.    As a result of Defendants' fraud, exploitation and outrageous conduct, Plaintiffs have suffered emotional distress which Defendants knew or should have known would result from their intentional and outrageous conduct.

85.    The Defendants disregarded any and all concern for privacy, reputation and public image at the expense of Plaintiffs and have subjected Plaintiffs to extraordinary and extreme embarrassment, humiliation and emotional distress.

86.    Defendants were certain, or substantially certain, and intended that such distress would result from their conduct.

87.    Defendants' conduct was so extreme, repulsive and outrageous as to exceed all possible bounds of decency.

88.    Plaintiffs have suffered extreme emotional distress as a result of Defendants' conduct.

89.    As a foreseeable victims of defendants' acts, Plaintiffs are entitled to recover from defendants, jointly and severally, compensatory damages in an amount to be determined at trial.

90.    Defendants' actions toward Plaintiffs were wanton, malicious, and reckless and were conducted with a conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are

entitled to recover from defendants, jointly and severally, an award of punitive damages in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### RESCISSION

93.    Plaintiffs adopt and incorporate the foregoing paragraphs, and those that follow below, as though set forth herein.

94.    On October 21, 22, 23 and 24, 2005, Defendants, through their authorized agents, Defendants Schulman, Chounard and Levenson made the following misrepresentations, both orally and in writing, as described above, to Plaintiffs with the intent to defraud:

(A)    Defendant Cohen was a "foreign dignitary" from The Republic of Belarus;

(B)    Defendant Springland was filming the dignitary's travels in the United States;

(C)    Defendants Springland was filming for a documentary to be shown on Belarus Television;

(D)    Defendants' filming of the Plaintiffs would be solely for the purpose of the purported documentary;

(E)    The documentary would only be shown on Belarus Television;

(F)    Defendants' filming for the documentary would not be for the purpose of embarrassment to the Plaintiffs;

(G)    The portrayal of the Plaintiffs would be with the utmost dignity and class;

(H)    Those misrepresentations more fully described in Paragraph 24, above.

18

95.    Each of these misrepresentations of material fact was false when they were made.

96.    Defendants knew these misrepresentations of material fact were false when they were made.

97.    Each of these misrepresentations of material fact was made for the purpose of inducing Plaintiffs' reliance on the misrepresentations.

98.    Plaintiffs rightfully relied upon the misrepresentations of material fact set forth above, believing those misrepresentations to be true.

99.    As a result of Defendants' material misrepresentations and Plaintiffs' reasonable reliance, Plaintiffs have been directly and substantially injured in that they have suffered emotional distress due to, among other things, the anxiety concerning the effect their role in the *Borat* movie will have on their respective families, they have been subjected to public ridicule and humiliation and their role in an R-rated film and connection with racist and vulgar conduct has damaged their respective reputations.

100.    By virtue of defendants' fraudulent conduct, Plaintiffs are entitled to rescission of the Standard Consent Agreement each of them entered into.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1.    On the First Cause of Action, compensatory damages in an amount to be determined at trial, together with interest;

2.    On the Second cause of Action, compensatory damages in an amount to be determined at trial, together with interest, plus punitive damages in an amount to be determined at trial;

19

3.     On the Third Cause of Action, compensatory damages in an amount to be determined at trial, together with interest, plus punitive damages in an amount to be determined at trial;

4.     On the Fourth Cause of Action, declaring each Standard Consent Agreement entered into respectively by Plaintiffs rescinded and null and void;

5.     On each Cause of Action, awarding to Plaintiffs the costs and disbursements of this action, including their reasonable attorneys fees and granting Plaintiffs such other and further relief as this Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims asserted herein.

Dated: New York, New York
   April 7, 2008

Respectfully submitted,

ADAM RICHARDS LLC

By:

Adam Richards (AR-2489)
Attorneys for Plaintiffs
Cindy Streit, Sarah Moseley,
Ben K. McKinnon,
Michael M. Jared and Lynn
S. Jared
40 Fulton Street, 7th Floor
New York, New York 10038
212.233.4400

20

ADAM RICHARDS LLP
Adam Richards (AR-2489)
40 Fulton Street, 7th Floor
New York, New York 10038
Telephone: (212) 233-4400
adam@arichardslaw.com

Attorneys for Plaintiffs Cindy Streit,
Sarah Moseley, Ben K. McKinnon,
Michael M. Jared and Lynn S. Jared

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Cindy Streit, Sarah Moseley, Ben K.
McKinnon, Michael M. Jared and Lynn
S. Jared,

                                    Plaintiffs,

                - against -

Twentieth Century Fox Film
Corporation, One America Productions,
Inc., Springland Films, Todd Lewis
Schulman, Monica Levenson, Julie Lynn
Chounard, Sacha Baron Cohen,
Everyman Pictures, Gold/Miller
Productions, Major Studio Partners, Inc.,
Dune Entertainment, LLC, Four by
Two Production Company, Peter
Baynham, Dan Mazer and Anthony
Hines,

                                    Defendants.

**Index No. 08 CIV 01571 (LAP)**

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK    )
                                       ss.:
COUNTY OF NEW YORK )

    Adam Richards, being duly sworn, deposes and says:

    I am over eighteen years of age, am not a party to this action and reside in

Brooklyn, New York.

On April 7, 2008, I served the within **First Amended Complaint** via DHL Express overnight mail and via pdf electronic mail, addressed to the following person at the address set forth after the name:

> Slade R. Metcalf, Esq.
> Hogan & Hartson LLP
> Attorneys for Defendants.
> 875 Third Avenue
> New York, New York 10022

Adam Richards

Sworn to before me on this
7th day of April, 2008

Notary Public

Amber Alvarado
Notary Public State Of New York
No. 01AL6149425
Qualified In Kings County
Commission Expires July 10, 2010

2