ADAM RICHARDS LLP
Adam Richards (AR-2489)
40 Fulton Street, 7th Floor
New York, New York 10038
Telephone: (212) 233-4400
adam@richardslaw.com

Attorneys for Plaintiffs Cindy Streit,
Sarah Moseley, Ben K. McKinnon,
Michael M. Jared and Lynn S. Jared

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Cindy Streit, Sarah Moseley, Ben K.
McKinnon, Michael M. Jared and Lynn
S. Jared,

                              Plaintiffs,

          - against –

Twentieth Century Fox Film
Corporation, One America Productions,
Inc., Springland Films, Todd Lewis
Schulman, Monica Levenson, Julie Lynn
Chounard, Sacha Baron Cohen, Everyman
Pictures, Gold/Miller Productions, Major
Studio Partners, Inc., Dune Entertainment,
LLC, Four by Two Production Company,
Peter Baynham, Dan Mazer and Anthony
Hines,

                              Defendants.

**Index No. 08 CIV 01571 (LAP)**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................1

FACTUAL ALLEGATIONS .................................................................3

ARGUMENT ...............................................................................4

   I.   SINCE PLAINTIFFS ALLEGE THAT THE CONSENT AGREEMENTS WERE
       PROCURED BY FRAUD THE MOTION TO DISMISS SHOULD BE DENIED .........4

   II. PLAINTIFFS' FRAUD CLAIMS ARE NOT CONTRADICTED BY THE
       TERMS OF THE RELEASE...........................................................7

      A.  The Release is Deliberately Misleading, is Unenforceable and Does
          Not Contradict the Claims of Fraud in the Complaint ..................................8

      B.  Even If the Term "Documentary-Style Film" is Not Found to be
          Misleading, it is an Ambiguity Which Cannot be Resolved
          as a Matter of Law ...........................................................12

      C.  The Merger Clause and Disclaimers in the Release Do Not Bar
          Plaintiffs' Claims .........................................................13

      D.  The Defendants Were Under a Duty to Disclose Their True Identities
          As Well As the True Nature of the Film......................................15

   III. PLAINTIFF STREIT'S CLAIMS ARE NOT BARRED BY
       THE RELEASE OF LIABILITY ...................................................16

   IV. PLAINTIFFS STATE A VALID CLAIM FOR UNJUST ENRICHMENT....................18

   V.  PLAINTIFFS HAVE STATED A VALID CLAIM FOR INTENTIONAL
       INFLICTION OF EMOTIONAL DISTRESS ...................................20

CONCLUSION...........................................................................21

# TABLE OF AUTHORITIES

## Cases

*Accord Cleangen Corp. v. Filmax Corp.*, A.D.3d 468;
772 N.Y.S.2d 692 (2d Dep't 2004) ........................................................................ 17

*Accord Solutia v. FMC Corp.*, 456 F. Supp. 2d 429 (S.D.N.Y. 2006) ......................... 16

*Alexander & Alexander of New York, Inc. v Fritzen*,
68 N.Y.2d 968 (1986) .......................................................................................... 6

*Anger v. Ford Motor Co. Dealer Development*, 80 A.D.2d 736;
437 N.Y.S.2d 165 (4th Dep't 1981) ........................................................................ 5

*Banque Arabe et Intern'l D'Investissement v. Maryland Nat. Bank*,
57 F.3d 146 (2d Cir. 1995) .................................................................................... 18

*Banque Arabe Et International D'Investissement v. Maryland Nat. Bank*,
819 F. Supp. 1282 (S.D.N.Y. 1993) ........................................................................ 15

*Bloss v. Va'ad Harabonim of Riverdale*, 203 A.D.2d 36;
610 N.Y.S.2d 197 (1st Dep't 1994) ........................................................................ 5

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993). ................. 18

*Cahill v. Regan*, 5 N.Y.2d 292; 184 N.Y.S.2d 348 (1959) ...................................... 9, 20

*Comi v. Breslin & Breslin*, 257 A.D.2d 754; 683 N.Y.S.2d 345
(3rd Dep't 1999) ................................................................................................ 17

*Demaria v. Brenhouse*, 277 A.D.2d 344; 716 N.Y.S.2d 99
(2d Dep't 2000) ................................................................................................. 9, 20

*Dimon Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359 (S.D.N.Y 1999) ................................ 16

*Doldan v. Fenner*, 309 A.D.2d 1274; 765 N.Y.S.2d 401 (4th Dep't 2003) ................. 14

*Ex parte Procom Services, Inc.*, 884 So.2d 827 (Ala. 2003) ..................................... 9

*Farber v. Breslin*, 47 A.D.3d 873; 850 N.Y.2d 604 (2d Dep't 2008) ......................... 5

*Federal Deposit Ins. Corp. v. First International Bank*,
1999 WL 1114692, No. 98 Civ. 8374 (S.D.N.Y., Dec. 7, 1999) .............................. 21

*Gibli v. Kadoshi*, 279 A.D.2d. 35; 717 N.Y.S.2d 553 (1st Dep't 2000)........................................ 5

*Golden Pacific Bancorp. V. Fed. Deposit Ins. Corp.*,
    273 F.3d 509 (2d Cir. 1993)........................................ 14, 15

*Hoffenberg v. Hoffman & Pollok*, 248 F. Supp. 2d 303
    (S.D.N.Y. 2003) ........................................ 8

*Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115;
    596 N.Y.S.2d 350 (1993). ........................................ 23

*Information Superhighway, Inc. v. Talk America, Inc.*
    274 F. Supp. 2d 466 (S.D.N.Y. 2003)........................................ 14

*Integrated Book Technology, Inc. v. T/R Systems, Inc.*,
    2 A.D.3d 1193; 770 N.Y.S.2d 186 (3rd Dep't 2003)........................................ 14

*Joseph v. NRT Inc.*, 43 A.D.3d 312; 841 N.Y.S.2d 38
    (1st Dep't 2007). ........................................ 17

*Ladenburg Thalman & Co., Inc. v. Imaging Diagnositc
    Systems, Inc.*, 176 F.Supp.2d 199 (S.D.N.Y. 2001)........................................ 4

*Lemerond v. Twentieth Century Fox Film Corp.*,
    No. 07 Civ. 4635 (LAP), (S.D.N.Y. Mar. 31, 2008) ........................................ 23, 24

*Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349 (2d Cir. 2003)........................................ 15, 20

*Louros v. Cyr*, 175 F. Supp. 2d 497, 514, n. 8 (S.D.N.Y. 2001). ........................................ 21, 23

*Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2d Cir. 1980) ........................................ 16

*Morby v. Di Siena Assocs. LPA*, 291 A.D.2d 604;
    737 N.Y.S.2d 678 (3d Dep't 2002)........................................ 12, 13

*Newin Corp. v. Hartford Acc. & Indem. Co.*, 37 N.Y.2d 211;
    371 N.Y.S.2d 884 (1975). ........................................ 4, 8

*Nunez v. A-T Fin. Info. Inc.*, 957 F. Supp. 438 (S.D.N.Y. 1997)........................................ 24, 25

*Psenicska v. Twentieth Century Fox Film Corp., et al*;
    Case No. 07 Civ. 10972 ........................................ 9, 10

*Starr v. Johnson*, 143 A.D.2d 130; 531 N.Y.S.2d 589 (2d Dep't 1988)........................................ 19

*Steen v. Bump*, 233 A.D.2d 583; 649 N.Y.S.2d 731 (3d Dep't 1996) ........................................ 4

*Weil v. Johnson*, No. 119431/02, 2002 WL 31972157
    (Sup. Ct. N.Y. Co., Sept. 27, 2002) ........................................................................ 13

## Statutes

New York Civil Rights Law § 51 ............................................................................. 2, 19

## Other Authorities

http://huffingtonpost.com/2008/05/19/Bruno-sacha-baron-cohen-t?n?102416. html
    (last viewed June 5, 2008). .................................................................................. 20

http://www.goldenglobes.org/nominations/year/2006 (last viewed June 4, 2008)........................ 9

http://www.oscar.com/nominees/index?pn=index#10_BestDocumentary
    FeatureNominationCategory (last viewed June 7, 2008)............................................. 10

http://www.telegraph.co.uk/arts/main.jhtml? xml+/arts/2007/12/2`/bfborat121.xml
    (last viewed June 4, 2008). .................................................................................. 10

# INTRODUCTION

Defendants' motion seeks to enforce a deliberately misleading release procured by fraud and executed by an individual using a false name, on behalf of a production company that did not exist.  *See generally* Amended Complaint; Richards Decl., Exh. A.  As the Plaintiffs' Amended Complaint makes clear, the Release is a product of fraud and deception and is unenforceable.

Plaintiff Cindy Streit ("Streit") agreed to provide dining etiquette training to, and, along with the other Plaintiffs, have dinner with a "foreign dignitary" from the country of Belarus to be filmed for a purported "educational documentary" that would be shown only on Belarus Television.  Streit memorialized this understanding, which was based on the Defendants' oral representations, in a written agreement executed by the parties (the "ETS Agreement").

On the night that the training and dinner were to occur, the Defendants served some of the Plaintiffs wine while they waited for almost two hours for the dignitary to arrive.  At no time during that long wait did the Defendants present the Plaintiffs with the "Standard Consent Agreement" (the "Release") which they now contend absolves them of their fraudulent conduct.  Instead, the Defendants waited until just moments before the "dignitary" arrived to present the Releases.  They then rushed the Plaintiffs to sign the Releases.  Prior to the execution, Defendant Todd Schulman (acting under the alias "Todd Lewis"), an employee of Springland Films (a d/b/a of One America Productions, Inc.), assured Streit and the other Plaintiffs that the Releases did not change any of the terms of the ETS Agreement and would not harm the guests in any way.  Unbeknownst to the Plaintiffs, the Defendants were scamming them in an effort to shoot a scene for the now infamous movie, "*Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan*" (the "*Borat* movie").

In their motion, Defendants ask this Court to ignore the well-plead allegations that the Defendants repeatedly lied to and systematically defrauded the Plaintiffs into appearing in the

*Borat* movie and signing the Release.  Under long-standing New York law, however, well-plead allegations of fraud defeat a motion to dismiss premised on a release.  For that reason alone, Defendants' motion should be denied.

Although Defendants argue that the wording of the Release contradicts any claim of fraud, they are wrong.  Defendants contend that the *Borat* movie is exactly the "documentary-style film" described in the Release.  This argument is not only belied by Defendant Sacha Baron-Cohen ("Cohen") himself but also by film journalists, authors and the awards bestowed upon the *Borat* movie, none of which were in the "documentary" category.  The *Borat* movie is not a documentary, nor can it correctly be categorized as "documentary-style."  Instead, the entire movie is premised on fooling multiple innocent and unwitting participants like the Plaintiffs.  At the very least, the phrase "documentary-style film" is ambiguous and, as a matter of law, cannot be used as a basis to grant Defendants' motion.

Defendants also claim that the disclaimers in the merger clause of the Release preclude Plaintiffs' reliance on Defendants' misrepresentations.  That is not so.  Defendants, who were all Hollywood insiders, had peculiar knowledge of the material facts, had a duty in equity and good conscience to disclose the true nature of their business, and, in failing to do so, effectively made it impossible for the Plaintiffs to conduct any meaningful investigation into the ramifications of the Release or the veracity of the Defendants' representations.

The Defendants' arguments that do not turn on the Release are also baseless and improper for a Motion to Dismiss.  Defendants argue that New York Civil Rights Law § 51 preempts the Plaintiffs' unjust enrichment claim.  Plaintiffs have not, however, alleged anything close to a Civil Rights Law claim.  The unjust enrichment claim is not based on the Defendants' unauthorized use of the Plaintiffs' image.  On the contrary, the unjust enrichment claim hinges

on the fact that the Defendants have made hundreds of millions of dollars based, in large part, on the Plaintiffs' contribution to the *Borat* movie, and they have not compensated the Plaintiffs for their contribution. In equity and good conscience, the Defendants must disgorge some of their profits to the Plaintiffs.

Plaintiffs' claim for intentional infliction of emotional distress should also stand. Through the Defendants' distorted editing of the filmed footage, the Plaintiffs are, and forever will be, captured in a film portraying them as racially intolerant and linking them to pornography and anti-semitism. The Plaintiffs must now live with the fact that they will forever be linked to a vulgar and offensive film and that the Defendants, through a fraudulent scheme, made hundreds of millions of dollars without paying them for their contribution or humiliation. The Plaintiffs are entitled to their day in court.

## FACTUAL ALLEGATIONS

Plaintiffs respectfully request that the Court review the facts of their Amended Complaint, attached as Exh. A to the moving declaration of Adam Richards, Esq. The Amended Complaint sets forth the systematic deception and fraud that the Defendants planned and executed. Plaintiffs also urge the Court to review the Declaration of Cindy Streit dated January 9, 2008, originally submitted to the U.S. District Court for the Northern District Alabama in support of Plaintiffs' Opposition to Defendants' Motion to Transfer Venue. *See* Richards Decl. Exh. B. Streit's declaration provides further details about the Defendants' fraudulent scheme as it played out in the moments leading up to and including the Plaintiffs' execution of the Releases. A review of the Amended Complaint and Streit's declaration can lead to only one conclusion—the Releases are the product of fraud and are unenforceable.

3

<u>**ARGUMENT**</u>

I.  **SINCE PLAINTIFFS ALLEGE THAT THE RELEASES WERE PROCURED BY FRAUD THE MOTION TO DISMISS SHOULD BE DENIED**

At the motion to dismiss stage, the Defendants face an extremely high burden, and the Plaintiffs' allegations must be accepted as fact.  Because the Plaintiffs have alleged, with specificity and particularity, that they executed the Releases because of fraud, duress, and undue influence, this Court should deny the Defendants' motion to dismiss.

In 1975, the Court of Appeals held that where a complaint alleges that the execution of a release was "improperly obtained," that allegation, in and of itself, is sufficient to support a denial of a motion to dismiss a complaint on the basis of such a release. *Newin Corp. v. Hartford Acc. & Indem. Co.*, 37 N.Y.2d 211; 217, 371 N.Y.S.2d 884, 889 (1975).

Since then, numerous New York Courts have followed the decision of the Court of Appeals in *Newin Corp*.  *See, e.g.*, *Ladenburg Thalman & Co., Inc. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 199, 205 (S.D.N.Y. 2001) ("[u]nder relevant New York case law, mere allegations of fraud in the inducement of a release warrant denial of a motion to dismiss that is grounded on a release"); *Steen v. Bump*, 233 A.D.2d 583, 584; 649 N.Y.S.2d 731, 732 (3d Dep't 1996) ("[p]laintiff's factual allegations of fraud in the procurement of the release were sufficient to defeat defendant's … motion to dismiss the complaint"); *Farber v. Breslin*, 47 A.D.3d 873, 877; 850 N.Y.S.2d 604, 608 (2d Dep't 2008) (finding that the trial court erred in granting a motion to dismiss on grounds of a release where "the allegations of fraud were sufficient to support a possible finding that the release signed by the plaintiff was obtained 'under circumstances which indicate unfairness;'" and that "Dismissal … overlooks the fact that the plaintiff alleged that [plaintiff] procured the release by means of fraud.") (citation omitted); *Bloss v. Va'ad Harabonim of Riverdale*, 203 A.D.2d 36, 37; 610 N.Y.S.2d 197, 198 (1st Dep't

4

1994) ("[w]here fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied"); *Anger v. Ford Motor Co. Dealer Development*, 80 A.D.2d 736, 736; 437 N.Y.S.2d 165, 165 (4th Dep't 1981) (ordering an evidentiary hearing on the validity of the release after finding that the trial court erred in dismissing complaint based on release where plaintiff had alleged fraud in its procurement); *Gibli v. Kadoshi*, 279 A.D.2d. 35, 40; 717 N.Y.S.2d 553 (1st Dep't 2000) ("it is inequitable to allow a release to bar a claim where, as here, it is alleged that the releaser had little time for investigation or deliberation and that it was the result of overreaching or unfair circumstances").

Here, of course, the Plaintiffs go beyond the standards set by the Court of Appeals; they not only contend that the execution of the Releases was "improperly obtained" or obtained "under circumstances which indicate unfairness," they also allege outright fraud. The Amended Complaint details the Defendants' well-planned scheme to defraud the Plaintiffs. It alleges, among other things, that Defendants, acting in concert through Defendant Schulman,[1] Springland, and One America, represented to Streit and Plaintiff McKinnon that Springland Films was filming an educational documentary for Belarus Television about a foreign dignitary's tour of the United States. *See* Amended Complaint at ¶29. Schulman stated that the documentary would be similar to those shown by National Geographic, was being made to build relations between the United States and Belarus, and that the Plaintiffs' role in the documentary was mainly for school children to learn about cultural diversity and traditional Southern values. Schulman repeatedly referred to the visiting guest as a "dignitary." *See* Amended Complaint at

---

[1] In their motion to dismiss, the Defendants argue that the Plaintiffs have failed to meet the heightened pleading standard of Fed. R. Civ. P. 9(b) because the Plaintiffs did not allege that Defendants Dune, Fox, or Everyman misrepresented anything to anyone and further that Plaintiffs Moseley and Mr. and Mrs. Jared do not allege that any of the Defendants misrepresented anything to them. This argument is without merit. Plaintiffs have alleged that at all times Defendants were acting in concert and conspiracy to defraud Plaintiffs. Complaint at ¶¶33 and 103-106. *Alexander & Alexander of New York, Inc. v Fritzen,* 68 N.Y.2d 968, 969 (1986) ("[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort").

¶29.    Streit and Springland Films executed a written contract for Streits' business (ETS) to arrange for a dinner and to provide etiquette training.  *See* Amended Complaint at ¶33.  The contract provides, among other things, that "[t]hese sessions will be filmed as part of a documentary for Belarus Television and for those purposes only."  It also states that "[t]he portrayal of the participants will be filmed and used for purposes only of the utmost dignity and class" and that "[t]here will not be any embarrassment to the participant or ETS."  *Id.*

At no time during the days leading up to the filming or during the negotiation of the ETS Agreement did the Defendants provide Streit with a copy of the Release so that she could review it, investigate, or consult an attorney.  Instead, Schulman waited until the last minute before filming commenced and after some of the Plaintiffs had been drinking wine and then hurriedly thrust the Releases on the Plaintiffs and rushed them to sign.  *See* Declaration of Cindy Streit at ¶11; Richards Decl., Exh. B.  Further, Streit specifically asked Lewis if the Release changed any of the terms in the ETS Agreement.  Lewis assured Streit that the Release did not change the ETS Agreement and that there was nothing in it that would harm the guests. *Id.* at ¶12.

The Defendants' earlier representations, the ETS Agreement, and Schulman's assurances in the face of the Release all made the Plaintiffs feel comfortable with the Release.  The systematic deception, which the Defendants' carried out over several days leading up to the filming, made the last minute execution of the Releases possible.  It was all part of a well-orchestrated scheme of fraudulent inducement.

The Borat character was not a dignitary from Belarus; the *Borat* movie was not a documentary to be created for and shown only on Belarus Television; Springland was a shell company created to hide the true identity of One-America and 20th Century Fox; Springland was not Schulman's employer and was not the producer of the *Borat* Movie; the individual "Todd

Lewis" was an illusion to hide Schulman's true identity; the *Borat* movie is not a "documentary-style film;" and the Releases did change the ETS Agreement, or at least Plaintiff Streit's' rights thereunder. Indeed, nothing that the Defendants represented to the Plaintiffs before they executed the Releases was true. It was all false. The Releases were the product of fraud.

## II.    PLAINTIFFS' FRAUD CLAIMS ARE NOT CONTRADICTED BY THE TERMS OF THE RELEASE

Defendants acknowledge that the terms of a release are not necessarily binding where, as here, a plaintiff alleges fraudulent inducement of a release. Relying on *Hoffenberg v. Hoffman & Pollok*, 248 F. Supp. 2d 303 (S.D.N.Y. 2003), however, Defendants argue that in order to avoid the preclusive effects of a release due to allegations of fraudulent inducement, a party must prove: "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." 248 F. Supp. 2d at 310.[2]

Plaintiffs have alleged facts sufficient to satisfy each of the elements of fraud. Indeed, Defendants challenge only one element – reliance. First, Defendants contend that the Plaintiffs could not have reasonably relied upon the misrepresentations because those misrepresentations were contradicted by the terms of the Release.[3] Second, Defendants argue that the Plaintiffs specifically disclaimed reliance on the misrepresentations. Neither argument has merit.

---

[2] As set forth in Plaintiffs Argument in Part I, *infra*, at this stage of the case, New York law only requires that Plaintiffs ***allege*** fraud. Whether or not Plaintiffs are able to ***prove*** fraud will be determined at trial.

[3] It is worth noting that Defendants do not dispute that the misrepresentations were in fact made or that such misrepresentations were intended to deceive Plaintiffs so that the Plaintiffs would execute the Releases and appear in the film without knowing its true nature. Rather, Defendants rely exclusively on a technicality – the execution of the Releases and the inclusion in the Releases (which were part of Defendants' fraudulent scheme) of a merger clause in which the signatory to the Release purportedly disclaims reliance on all representations other than those contained in the Release itself. To contend that Plaintiffs cannot now claim to have reasonably relied on the representations of Schulman and the other agents of Springland Films, particularly in light of Schulman's

**A. The Release Is Deliberately Misleading, Is Unenforceable And Does Not Contradict The Claims Of Fraud In The Complaint[4]**

In relevant part, the Release provides that:

> "[t]he Participant agrees to be filmed and/or taped by the Producer for a documentary-style film (the "Film").  It is understood that the Producer hopes to reach a young adult audience by using entertaining contents and formats."

*See* Defendants' Memorandum of Law at p. 5; Release at ¶1.

The Release provides that the producer of the *Borat* movie was Springland Films.  In fact, it was One America Productions.  The Release provides that the production would be a "documentary-style" film.  To the contrary, the film is a fictional account of a staged journey across the United States by a fictional character, from a fictional country, who intentionally provokes base reactions from the unwitting.  As such, the Release is unenforceable.  *See Cahill v. Regan*, 5 N.Y.2d 292; 184 N.Y.S.2d 348 (1959); *Demaria v. Brenhouse*, 277 A.D.2d 344, 345; 716 N.Y.S.2d 99, 100 (2d Dep't 2000) (each standing for the proposition that a release may not be read to cover matters which the parties did not intend it to cover).

In *Psenicska v. Twentieth Century Fox Film Corp., et al*; Case No. 07 Civ. 10972, Psenicska, another victim of Defendants' fraud, develops a line of argument demonstrating how the words of his identically worded release do not come close to describing the true nature of the *Borat* movie.  *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint, dated April 8, 2008; pp. 4-9; *Psenicska v. Twentieth Century Fox Film*

---

representations that the Releases did not change any of the terms of the ETS Agreement, is circular and fraught with exactly the type of unfairness that *Newin Corp*. and its progeny seek to prevent.

[4] As a preliminary matter, any contention by Defendants that the United States District Court for the Northern District of Alabama recognized the enforceability of the Release as a whole is misleading.  The Alabama proceedings focused solely on the limited issue of the enforceability of the forum-selection clause in the Release. Under Alabama law, whether or not the Release as a whole was fraudulently induced is not an issue the court can consider with regard to a forum selection clause.  *Ex parte Procom Services, Inc.*, 884 So.2d 827, 832 (Ala. 2003). As such,  the limited review of the enforceability of the forum selection clause in the Release cannot be construed as an endorsement of the portions of the Release presently before the Court.

*Corp., et al*; Case No. 07 Civ. 10972.  He further argues that, in seeking to enforce the Release, Defendants attempt to conjure a whole new meaning for the words Defendants chose.

More specifically, using the dictionary definitions of the word "documentary" and "style" together with an appraisal of what, typically, has constituted a "documentary" in modern cinema, Psenicska argues convincingly that the term "documentary-style" is misleading when viewed in the context of the *Borat* movie.  *Id.*  Further, Psenicska argues that the Defendants' expression in the Release that they "hope to reach a young adult audience with entertaining content" creates neither a contrary conclusion nor a contrary impression with respect to the substance of the film. *Id.* at 5-6.  Citing to a number of documentaries aimed at young adults, Psenicska argues that young people are more than capable of finding serious treatment of a topical issue to be entertaining. *Id.*  Plaintiff adopts and incorporates the arguments articulated by Psenicska as if set forth fully herein.  *See Id.*, pp. 4-9; Richards Decl., Exh. C.

Further, Defendant Cohen was nominated for, and won, the 2007 Golden Globe Award for Best Actor: *Musical or Comedy*.  Cohen's fellow nominees were Johnny Depp, for "Pirates of the Caribbean: Dead Man's Chest," Aaron Eckhart for "Thank You for Smoking," Chiwetel Ejiofor for "Kinky Boots" and Will Ferrell for "Stranger than Fiction." http://www.goldenglobes.org/nominations/year/2006 (last viewed June 4, 2008).  The *Borat* Movie was also nominated for Best Motion Picture in the same category.  Its fellow nominees were "The Devil Wears Prada," "Dreamgirls," "Little Miss Sunshine" and "Thank You for Smoking." *Id.*  None of these movies could even remotely be described as "documentary-style."

By contrast, the 2008 Academy Award Nominees for "Documentary Feature" included the following films: (1) "Taxi to the Darkside" – The case of an Afghan taxi driver beaten to death in 2002 while in U.S. military custody forms the heart of this examination of the abuses

committed during the detainment and interrogation of political prisoners. (2) "No End in Sight" – Analyst and scholar Charles Ferguson examines the process behind the Bush Administration's decision to invade Iraq in 2003. (3) "Operation Homecoming: Writing the Wartime Experience" – The experiences of Iraq War veterans are seen through their writings, accompanied by news footage and photographs. (4) "Sicko" –Michael Moore's look at American health care explores the reasons behind the adoption of a for-profit system and profiles individuals whose lack of proper care and battles with insurance companies have drastically affected their lives. (5) "War/Dance" – Chief among the victims of the ongoing warfare in northern Ugandan are the country's children. Three students in the Patongo refugee camp, all victims of terrible violence and losses, nevertheless prepare to enter a music competition that offers them a lifeline of hope. http://www.oscar.com/nominees/index?pn=index#10_BestDocumentaryFeatureNominationCate gory (last viewed June 7, 2008). It goes without saying that the *Borat* movie bears no similarities to any of these bona fide documentaries.[5]

For further, and perhaps conclusive, evidence that the *Borat* movie is not one made in a "documentary-style," the Court need only look to the words of Cohen himself. In a rare interview with England's Daily Telegraph, lamenting the demise of his Borat character, Cohen states: "It is hard, and the problem with success, although it's fantastic, is that every new person who sees the Borat movie is one less person I "get" with Borat, so it's a self-defeating form, really." http://www.telegraph.co.uk/arts/main.jhtml?_xml+/arts/2007/12/2`/bfborat121.xml (last viewed June 4, 2008).

For sure, Cohen's "getting" of people is referring to the form of "comedy" for which Cohen's characters have become so notorious. Most certainly, however, the "getting" of

---

[5] For further evidence that the *Borat* movie is more deserving of a comedic or satirical definition, the Court need look no further than the UK's definitive film guide, Halliwell's, which describes the movie as "a spoof." *See* Gritten: *Halliwell's Film Video & DVD Guide 2008* at p. 151 (Harper Collins 2007); Richards Decl., Exh. D.

innocent people for satirical purposes has nothing whatsoever to do with the documentary genre to which Defendants claim the *Borat* movie belongs.  Plaintiffs submit that Cohen's words should be given greater weight here than the dicta expressed by the Courts in California and Mississippi upon which the Defendants rely in their motion to dismiss.

Defendants' reliance on *Morby v. Di Siena Assocs. LPA*, 291 A.D.2d 604; 737 N.Y.S.2d 678 (3d Dep't 2002) is misplaced.  In *Morby*, the release was unambiguous and the court found that "a reading of the simple, straightforward document would have readily advised [the plaintiff] that he was indeed discharging claims against defendant for 'personal injury.'" *Id.* at 605.  Here, the Release is not "unambiguous," rather, it is deliberately misleading.  At the very least, it is ambiguous since a reading of the Release, which describes the film as a "documentary-style film," would not apprise the reader of the film's true nature.  *See* Richards Decl, Exh. C.

Defendants' reliance on *Weil v. Johnson*, No. 119431/02, 2002 WL 31972157 (Sup. Ct. N.Y. Co., Sept. 27, 2002) only strengthens Plaintiffs' argument.  First, as the Court in *Weil* found, the release in question provided on its face that the movie "was a commercial production being undertaken by a professional studio based in Beverly Hills, California" and was entered into with Black River Films, Inc., the producer of the movie.  *Weil*, at *2.  Plaintiffs' Release misrepresents that the producer was Springland Films, when in fact it was Defendant One America. Further, in *Weil*, unlike here, the film in which the plaintiff had agreed to appear was exactly that which had been described to him by the (real) producers – a documentary about the lives of children who had grown up very wealthy.  In this case, what the Defendants represented about the film and the end result were very different.

**B.  Even If The Term "Documentary-Style Film" Is Not Found To Be Misleading, It Is An Ambiguity Which Cannot Be Resolved As A Matter Of Law**

11

Because "[t]he 'law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing],' a release which purports to excuse a party from responsibility for misconduct is subject to the 'closest of judicial scrutiny'" *Golden Pacific Bancorp. V. Fed. Deposit Ins. Corp.*, 273 F.3d 509 (2d Cir. 1993) (citations omitted) (release is a species of contract governed by principles of contract law).

Due to the heightened level of judicial scrutiny of releases, "an ambiguous release may not form the basis for a motion to dismiss." *Information Superhighway, Inc. v. Talk America, Inc.* 274 F. Supp. 2d 466, 470 (S.D.N.Y. 2003) (denying motion to dismiss where release was ambiguous as to the acts to be released); *see also Integrated Book Technology, Inc. v. T/R Systems, Inc.*, 2 A.D.3d 1193, 1195; 770 N.Y.S.2d 186, 187 (3rd Dep't 2003) (affirming trial court's denial of motion to dismiss where release was ambiguous as to what was being released); *Doldan v. Fenner*, 309 A.D.2d 1274; 765 N.Y.S.2d 401 (4th Dep't 2003) (finding that the term "no fault" in a release could be ambiguous to a lay-person entering into a release waiving certain personal injury claims). Moreover any ambiguities must be construed against Defendants as the drafters. *Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349, 353 (2d Cir. 2003).

As set forth above, Defendants contend that the movie is more akin to a documentary type of movie. Plaintiff, as well as movie critics and journalists, have ascribed a wholly different label to the film, claiming it to be a crude satire, spoof, or comedy. At best, therefore, the description of the film in the Release is ambiguous. Accordingly, the motion should be denied. *See Golden Bancorp.*, 273 F.3d at 515-16 ("'[w]here contract language is ambiguous, the differing interpretations of the contract present a trial issue of fact … [t]he language of a contact is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement'").

### C. The Merger Clause and Disclaimers In The Release Do Not Bar Plaintiffs' Claims

Defendants rely upon a general merger clause in the Release to argue that the Plaintiffs disclaimed the Defendants' extensive, intentional, oral and written misrepresentations. This argument ignores a plethora of pertinent case law. "New York law provides that '[e]ven an express disclaimer will not be given effect where the facts are peculiarly within the knowledge of the party invoking it.'" *Banque Arabe Et International D'Investissement v. Maryland Nat. Bank*, 819 F. Supp. 1282, 1292 (S.D.N.Y. 1993) (citations omitted). "As a general rule, '[w]hen matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely [on defendant's representations] without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980); *Accord Solutia v. FMC Corp.*, 456 F. Supp. 2d 429, 448 (S.D.N.Y. 2006) (defendants found to have peculiar knowledge of facts not disclosed even though both parties were represented by experienced corporate counsel and negotiated and entered into a 39 page contract). The factors relevant to this inquiry include the plaintiff's level of sophistication and access to the information underlying the alleged misrepresentation. *Dimon Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y 1999) (disclaimer did not bar fraud claims even though case involved "extremely sophisticated parties" who were represented by "able counsel [and] had access to the resources and specialized skills necessary to conduct a quite thorough review of the financial records").

There can be no doubt that the true facts relating to the Release were not only peculiarly within Defendants' knowledge, but that Defendants misrepresented and concealed those facts. In order to hoodwink the Plaintiffs into signing the Releases, Defendants concealed Schulman's true identity and One America's role as the producer of the movie, misrepresented the purpose of the filming, and, of course, concealed Cohen's involvement. In addition to the concealment, the

13

Defendants made outright misrepresentations—both orally and in writing—about the project and the film.  Defendant's trickery was clearly long in planning, well-conceived and fits the pattern of others who were similarly deceived by Defendants.[6]

In sum, the merger provision in the Release simply does not operate as a bar to any of Plaintiffs' claims.  At the very least, the Plaintiffs have raised questions of fact as to the effect of the disclaimers.  Any dispositive decision on this issue now would be premature.  *See, e.g., Comi v. Breslin & Breslin*, 257 A.D.2d 754; 683 N.Y.S.2d 345 (3rd Dep't 1999) (summary judgment denied where plaintiffs alleged that financial records provided prior to sale contained false entries and those misrepresentations resulted in an inability to ascertain corporation's true financial obligations, even though disclaimer of warranties as to corporation's financial situation had been executed); *accord Cleangen Corp. v. Filmax Corp.*, A.D.3d 468; 772 N.Y.S.2d 692 (2d Dep't 2004); *Joseph v. NRT Inc.*, 43 A.D.3d 312; 841 N.Y.S.2d 38 (1st Dep't 2007).

### D.  The Defendants Were Under A Duty To Disclose Their True Identities As Well As The True Nature Of The Film

If a party has a duty to disclose, failure to disclose a material fact may be as actionable as an affirmative misrepresentation. *See Banque Arabe et Intern'l D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995).  Under New York law, three circumstances give rise to a duty to disclose: "first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party, it cannot give only half of the truth; … and third, where one party possesses superior knowledge, not

---

[6] At least two other cases involving claims similar to the Plaintiffs are pending before this Court.  *Psenicska v. Twentieth Century Fox Film Corp., et al*; Case No. 07 Civ. 10972 and *Martin v. Twentieth Century Fox Film Corp., et al*; Case No. 08 Civ. 1828. In both cases the respective plaintiffs were told a false story almost identical to that told the Plaintiffs.  Likewise, they were presented with identically worded releases almost immediately prior to filming which, under the circumstances, all but prevented them from conducting any meaningful investigation, much less obtaining legal advice, as to the possible ramifications of entering into Defendants' Release which, as Defendants concede in their brief, was carefully and clearly worded (presumably to play into the fraud they were about to perpetrate).

readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

The first and third circumstances apply. The Defendants represented to the Plaintiffs that they were producing an educational documentary that was to be shown on Belarus Television, when in reality the Defendants knew the true nature of the film – an R rated major motion picture containing graphic nudity, masturbation, shocking vulgarity, pornography, racist stereotyping, and anti-Semitism which would ultimately be shown throughout the United States and the world.

Under the circumstances, the Plaintiffs could not have uncovered the truth about the *Borat* movie, facts within the exclusive knowledge of the Defendants. The Plaintiffs never had the opportunity to review the script. They were not informed that the film included professional actors, which included celebrities such as Pamela Anderson and Cohen. Even the producer, Defendant Schulman, misrepresented his true identity to the Plaintiffs. Everything appeared to be as represented until filming began. Defendants carefully and strategically concealed all of the material facts regarding the film until after the Releases were signed. And, just to make sure that the Plaintiffs had no opportunity to fully appreciate the gravity and legal significance of the Releases, the Defendants waited until the last possible moment to present the Releases and only after encouraging the Plaintiffs to drink wine for at least an hour and a half; they assured the Plaintiffs that there was nothing in the Releases that would harm them in any way or that changed the ETS Agreement; and, once the Releases had finally been distributed, they repeatedly stated that the Plaintiffs needed to "hurry up" and sign them so that filming could commence. *See generally* Amended Complaint; Richards Decl., Exh. A and Exh. B.

Moreover, Schulman's failure to disclose his true identity and his execution of the Release with a false name, by itself, constitutes grounds to deny the Defendants' motion. *See*

15

*Starr v. Johnson*, 143 A.D.2d 130, 132; 531 N.Y.S.2d 589, 591 (2d Dep't 1988) (holding that the defendant was under a duty at the time of the accident to disclose his true identity in order for a release to be validly asserted). "Todd Lewis" was under a duty to reveal to the Plaintiffs not only that he was, in fact, Todd Schulman, but also that his employer was not Springland, but One America, and the true intent of the filming (i.e. to embarrass the Plaintiffs). Full disclosure would have at least given the Plaintiffs the opportunity to conduct some sort of investigation before signing what Defendants now claim to be a binding agreement. By violating these duties, the Defendants rendered the Releases unenforceable.

## III.    STREIT'S CLAIMS ARE NOT BARRED BY THE RELEASE OF LIABILITY

For all the reasons discussed above, the Release of Liability dated November 16, 2005 between Etiquette Training Services, Cindy Streit and Springland Films (the "Second Release") does not bar Plaintiff Streit's claims. Streit's allegations of fraudulent inducement apply equally to the Second Release as to the first Release.

After filming the dinner scene, Springland refused to pay ETS (Streit's company) for the services it rendered in arranging for the dinner and providing the etiquette training. Instead, Springland withheld payment and forced Streit to execute the Second Release in order to receive the compensation that Springland was already contractually obligated to pay. By requiring Streit to sign the Second Release, Springland was carrying-out its scheme of defrauding Streit and trying to insulate the Defendants from liability.

The Second Release, however, does not apply to Streit's claims in this case. The Second Release applies only to the "services" that ETS and Streit provided "relating to the Dinner Party and the Training Session on 10/23/05." It does not apply to claims relating to the film. This conclusion becomes even more clear by comparing the language of the first Release to the

Second Release. "A release may not be read to cover matters which the parties did not desire or intend to dispose of." *Cahill v. Regan*, 5 N.Y.2d 292; 184 N.Y.S.2d 348 (1959); *See Demaria v. Brenhouse*, 277 A.D.2d 344, 345; 716 N.Y.S.2d 99, 100 (2d Dep't 2000) (standing for the proposition that a release may not be read to cover matters which the parties did not intend it to cover). Moreover any ambiguities must be construed against Defendants as the drafters of the Second Release. *Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349, 353 (2d Cir. 2003).

The first Release purportedly applies to claims **"which are related to the Film or its production, including, but not limited to, claims** involving …" *See* Defendants' Memorandum of Law at p. 5 (emphasis added). By contrast, the Second Release applies only to claims "in connection with **all services relating to the Dinner Party and Training Session on 10/23/05 and all time leading up to and after that event** ("Services")." *See* Defendants' Memorandum of Law at p. 16 (emphasis added).

In the first Release, the language chosen by the Defendants encompasses claims associated with the Film.[7] In the Second Release, however, the Defendants used more restrictive language demonstrating Defendants' intent to seek a release of claims related solely to the services. If the Defendants had intended for a release of all claims related to the Film, then the Second Release would have been worded like the first Release. The Second Release does not warrant a dismissal of Streit's claims.

## IV.    PLAINTIFFS STATE A VALID CLAIM FOR UNJUST ENRICHMENT

"To state a claim for unjust enrichment, a plaintiff must allege that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience requires defendants to make restitution." *Louros v. Cyr*, 175 F.

---

[7] Plaintiffs emphasize that both releases are invalid because they were both fraudulently induced. However, the language of the first Release is useful to distinguish between the Defendants' intent in the first Release, which only applies to claims related to the Film, and the Second Release, which only applies to claims related to the services.

Supp. 2d 497, 514, n. 8 (S.D.N.Y. 2001) (Preska, J.).  "'The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'" *Federal Deposit Ins. Corp. v. First International Bank*, 1999 WL 1114692, No. 98 Civ. 8374 (S.D.N.Y., Dec. 7, 1999).

The dinner scene featuring the Plaintiffs was, unquestionably, one of the keys to the movie's success.  The dinner scene is frequently depicted in trailers for the *Borat* movie and is among the most critical components to its popularity and enormous profits.  *See* Amended Complaint at ¶48.  In its first ten days in the box office, the *Borat* movie grossed approximately $68,000,000.00.  As of 2006, ticket sales for the *Borat* movie had grossed more than $227,613,553.00.  In addition, DVD sales and other movie related items have dramatically increased the amount of total revenue generated by the film.  *See* Amended Complaint at ¶51.

Unlike the Plaintiffs and others similarly duped into appearing in the film, Defendants selectively disclosed the purpose and intent of the *Borat* movie to professional actors and actresses, including Defendant Cohen, Pamela Anderson and Luenell Campbell (aka Jane Sanguinetti Luenell). *See* Amended Complaint at ¶55.  Unlike the Plaintiffs, these individuals were given an opportunity to review and agree to the movie script and negotiate compensation.

Under these circumstances, the Plaintiffs have more than stated a claim for unjust enrichment.  Equity and good conscience demand that appropriate restitution be made to these Plaintiffs.  The Defendants should not be allowed to keep all of the profits from the movie without fairly compensating the Plaintiffs, who unwittingly made enormous contributions to the financial success.  This is a classic unjust enrichment claim.

In their motion to dismiss, Defendants mischaracterize Plaintiffs' unjust enrichment claims as being based on Defendants' use of Plaintiffs' images in the film.  Defendants argue

that the unjust enrichment claims are precluded by New York Civil Rights Law Section 51. Section 51 does not, however, apply here.  The unjust enrichment claims are <u>not</u> based on the unauthorized use of their images.  Instead, Plaintiffs have alleged that they were fraudulently induced into consenting to the use of their image in a major motion picture <u>without</u> <u>being</u> <u>compensated</u>, creating an enormous financial windfall for the Defendants.  *See generally* Amended Complaint.  This claim is not one precluded by New York's Civil Rights Law. Moreover, because Defendants do not argue that the Plaintiffs fail to state an unjust enrichment claim, the claim must stand.  *See Louros*, 175 F. Supp. 2d at 514 (motion to dismiss denied where defendants did not argue plaintiff failed to plead elements of an unjust enrichment claim).

## V.    PLAINTIFFS HAVE STATED A VALID CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs do not dispute that New York Courts set a high bar for intentional infliction of emotion distress (IIED) claims.  However, Plaintiffs have met that high standard.  The elements of a claim for IIED are: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress."  *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121; 596 N.Y.S.2d 350, 353 (1993).

The Court need only look to its opinion in the *Lemerond* case where it held as follows: "The movie challenges its viewers to confront, not only the bizarre and offensive Borat character himself, but the equally bizarre and offensive reactions he elicits from "average" Americans. *Lemerond v. Twentieth Century Fox Film Corp*., No. 07 Civ. 4635 (LAP), (S.D.N.Y. Mar. 31, 2008), at 6.  As the Court notes, the *Borat* movie was premised on the movies' title character carrying out scripted acts that were designed to offend and outrage the unwitting participants with whom he encountered.  In the scene in which the Plaintiffs unwittingly appeared, this

outrageous conduct included bringing human feces to the dinner table, referring to one of the Plaintiffs, Mr. Jared, as "retarded," inviting a prostitute to dinner, and Cohen suggesting that the Plaintiffs were racially intolerant.  Each of the Plaintiffs has been approached countless times by media, friends and strangers about their role in the *Borat* movie.  The Plaintiffs will forever be linked to a movie depicting, not only these offensive scenes, but scenes of masturbation, anti-semitism, pornography, and naked men wrestling in public.

Plaintiffs' distress will not dissipate over time.  The *Borat* movie is shown regularly on TV and will continue to air publicly and be used as advertising for future Cohen films, including the imminent release of another Cohen movie featuring "Bruno the flamboyantly gay Austrian interviewer."   *See*  http://huffingtonpost.com/2008/05/19/Bruno-sacha-baron-cohen-t?n?102416. html  (last viewed June 5, 2008).  The pervasiveness of the *Borat* movie in the media, and the link that the Plaintiffs will forever share with the film, are exactly the type of "day in day out harassment" that New York Courts look for in order to properly state a cause of action for IIED. *See Nunez v. A-T Fin. Info. Inc.*, 957 F. Supp. 438, 442 (S.D.N.Y. 1997) (Preska, J.) (relied on by Defendants).  The Court in *Nunez*, in part, rejected plaintiff's claim for IIED because the statements "took place at an isolated dinner and were unaccompanied by physical threats of any kind."  *Nunez*, 957 F. Supp. at 442.  In this case, however, the Plaintiffs are memorialized in a major motion picture which has been shown across the world.  Plaintiffs' humiliation has been publicized in the media and can be described as anything but isolated.  As such, Plaintiffs' resulting emotional distress is of the pervasive "day in day out" nature that is required under New York law.  At the very least, Plaintiffs have created an issue of fact that cannot be decided at this stage.  The IIED claim should be allowed to proceed.

For all the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Respectfully submitted,

ADAM RICHARDS LLC


By: /s/ Adam Richards
    Adam Richards (AR-2489)
    Attorneys for Plaintiffs
    40 Fulton Street, 7th Floor
    New York, New York  10038
    212.233.4400

21