# EXHIBIT B

FILED
2008 Jan-10 PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CINDY STREIT; SARAH MOSELEY; BEN K. MCKINNON; MICHAEL M. JARED; AND LYNN S. JARED,<br><br>PLAINTIFFS,<br><br>VS.<br><br>TWENTIETH CENTURY FOX FILM CORPORATION, ET AL.,<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO.: CV-07-J-1918-S<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF CINDY STREIT

Cindy Streit declares as follows:

1. My name is Cindy Streit. I am sixty (60) years old, and I have personal knowledge of the facts and information contained in this declaration.

2. On October 22, 2005, I met with a representative of Springland Films Production Company who identified himself as Todd Lewis. Ben McKinnon was also present at this meeting. The meeting occurred at the Bottega Restaurant in Birmingham, Alabama.

3. At the Bottega meeting, Lewis explained that Springland Films was working on an educational documentary for Belarus Television. He explained that a dignitary from The Republic of Belarus was traveling throughout the United States filming the documentary on American cultural experiences.

4. Lewis requested that I, on behalf of my business, Etiquette Training Services, conduct a training session with the dignitary on dining and social skills. He also requested that I plan and coordinate a dinner party, to be held immediately after the training session, in honor of the dignitary and that would allow the dignitary to experience Southern hospitality and a

Southern meal. Lewis represented that the dinner party would be filmed for the purpose of promoting cultural awareness in the educational documentary to be shown on Belarus Television.

5.   After the meeting with Lewis, I began planning for and coordinating the dinner party for what I thought was a dignitary. After consulting with other representatives of Springland Films by phone on October 24, I prepared a written contract between Etiquette Training Services ("ETS") and Springland Films relating to the services to be rendered for an etiquette training session and the dinner party and which contained many of the representations made by Lewis during the meeting held October 22 at Bottega Restaurant. The agreement was executed by both ETS and Springland Films on October 24, 2005 ("the ETS Agreement"). A copy of the ETS Agreement is attached as Exhibit 1 to this Declaration.

6.   Following Springland Films' request that, in addition to the dinner party, I provide an etiquette training session to the Belarus dignitary, I set forth in the ETS Agreement the topics to be covered in the training session. The etiquette training session with the dignitary was to last from 4:00 p.m. until 6:00 p.m. on October 24, 2005. The dinner party was to begin shortly thereafter and run until 9:00 p.m.

7.   I arranged for the etiquette training and the dinner party to take place at the Magnolia Springs Manor in Helena, Alabama.

8.   In reliance on the representations of Lewis and the additional representations set forth in the ETS Agreement, I arranged for several guests to attend the dinner party. I explained to the guests the circumstances surrounding the dinner party as had been represented to me by Lewis and by the other Springland Films representatives.

01579026.1

2

9. I was informed by Todd Lewis by phone at 3:30 p.m. that the dignitary from Belarus was delayed and could not show up for the etiquette training session at 4:00 p.m. and that we should all meet at the Magnolia Springs Manor at 6:00 p.m. Although my other dinner guests arrived on time at around 6:00 p.m., Todd Lewis and the Springland Films crew did not arrive until about 6:30 p.m. The "dignitary" arrived about an hour later.

10. While we waited for the "dignitary" to arrive, Todd Lewis, as Springland Films' representative, asked that I have the wait staff of the Magnolia Springs Manor serve wine to the dinner guests. At approximately 7:30 p.m., Lewis received a phone call and then told us "the man is on his way!"

11. Despite the long delay, Lewis and the other representatives (the film director and camera crew) of Springland Films did not present the "Standard Consent Agreement" to me or to any of the other dinner guests until just before the "dignitary" arrived. Lewis waited until the last possible moment to present the "Standard Consent Agreements" for the review and signature of the dinner party participants. By the time Lewis presented the "Standard Consent Agreements," several of the guests had been drinking wine for nearly an hour. Once he handed out the "Standard Consent Agreements," Lewis repeatedly stated to me and the other guests that we needed to "hurry up" and sign them so that filming could begin as soon as the dignitary arrived. Then Lewis quickly collected the "Standard Consent Agreements," telling us he was going to go have them copied for us. He left the premises and immediately the "dignitary" entered by the side door. Lewis did not return to the dinner party at all. The whole process of handing out the "Standard Consent Agreements," having them signed, and retrieving them lasted only a few minutes.

12. I specifically asked Lewis if the "Standard Consent Agreement" changed any of the terms in the ETS Agreement. Lewis assured me that the "Standard Consent Agreement" did not change the ETS Agreement and that there was nothing in it that would harm me, my company, or the guests.

13. Lewis misled me about the contents of the "Standard Consent Agreement," particularly the term requiring me to file a claim in New York. He accomplished this deception, first, by handing out the "Standard Consent Agreement" at the very last moment before the filming began even though he could have presented it to me on October 22 or to me and the other guests while we waited for the "dignitary" to arrive for the dinner party. Second, I was misled by the word "Standard" in the title of the document. To me, it is not "standard" to require a person to travel thousands of miles to a different state to file a claim. Third, Lewis misled me by encouraging me and the other participants to quickly sign the "Standard Consent Agreement" since it was, in their words, just a "standard" form. Fourth, Lewis misled me by saying that the "Standard Consent Agreement" was neither harmful to me, my business, or my guests nor inconsistent with the ETS Agreement. Fifth, by placing the provision requiring me to file a claim in New York at the very end and by hurrying me and the other guests through the process, Lewis caused me not to fully appreciate or thoughtfully consider the last paragraph requiring lawsuits to be filed in New York. Finally, I did not have a lawyer present at the time that this "Standard Consent Agreement" was presented for signing.

14. Lewis could have provided me with a copy of the "Standard Consent Agreement" at the Bottega meeting two days before the dinner party. He made no mention of the "Standard Consent Agreement" at the Bottega meeting. Likewise, no one from Springland Films mentioned the "Standard Consent Agreement" during the negotiation of the ETS Agreement,

nor did they bring it up during the pre-dinner delay — a longer time period in which we could have more closely read, discussed, and considered the agreement's contents. Instead, Lewis suggested that we have wine, and he waited to present the "Standard Consent Agreement" until the very last moment and rushed me and the other guests to sign it.

15. As per the ETS Agreement Springland Films paid each dinner guest $100 as an "honorarium" for their on-camera appearance in the educational documentary. This money was paid in cash.

16. It was not until days after the dinner party that I learned that the "dignitary" from Belarus was actually a professional actor named Sacha Baron Cohen. It was not until the spring of 2006 that I learned the footage of the dinner party was part of a movie to be released in the United States. At no point after the filming of the dinner party did anyone from Springland Films request my permission or consent to use the footage in a motion picture to be released in the United States. Not until I saw the *Borat* film in the movie theater did I know that my dinner party would be included as part of an R-rated movie, with worldwide release, carrying graphic nudity, pornography, anti-Semitic remarks, racist stereotyping, and other highly offensive material.

17. All of the filming of the dinner party occurred in Alabama. All of the dinner party guests are residents of Alabama. I did not perform any activities outside of the State of Alabama relating to the dinner party or the filming.

18. To my knowledge, there are no witnesses from the dinner party in the State of New York. All of the dinner party guests live in either Jefferson County or Shelby County, Alabama. In addition, the other witnesses to the dinner party who are not involved in this law suit also reside in the Birmingham, Alabama, area. Among those individuals are three other

dinner guests, the owner of the Magnolia Springs Manor, the waiter for the dinner party, the chef who prepared the food for the dinner party in the Magnolia Springs kitchen, and the police officers from the Helena Police Department who came to the scene at the end of the evening.

19. If I were required to pursue this case in New York, it would place a significant financial burden on me. In addition, it would be severely inconvenient for me and, most likely, for the other dinner party guests and witnesses to appear in New York to testify in this case.

20. It was not until a few months ago that I learned that the individual who identified himself as "Todd Lewis" is actually Todd Schulman and that he was not using his real name in his dealings with me on behalf of Springland Films. In addition, at no point in time did "Lewis" or anyone else from Springland Films disclose to me that Springland Films is affiliated with Twentieth Century Fox.

21. To me, the "Standard Consent Agreement" was signed with two false names. Todd Schulman identified himself and appears to have signed the agreement as Todd Lewis. In addition, Springland Films has now been identified as an alias for One America Productions, Inc. In other words, neither of the signers used their real name and at no point did anyone disclose that there was any relationship between Springland Films and Twentieth Century Fox Film Corporation. The entire process and event was a fraud, and I signed the "Standard Consent Agreement" under false pretenses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___1-9___, 2008.

_____
Cindy Streit

01579026.1                                                              6

# EXHIBIT 1

*Final Completed Contract*

P. 1

Oct 24 05 01:24p

October 24, 2005

Facsimile # 323 850-3112
Email: Julie@SpringlandFilms.com

To:   Julie Lynn Chounard
      Monica Levenson
      Springland Films
      8023 Beverly Boulevard Suite 5-505
      Los Angeles, California 90048

From:  Cindy Streit    Fax: (205) 836-3221)    Email: Charmnlady@hotmail.com
       Etiquette Training Services (ETS)
       1236 Stonecrest Drive
       Birmingham, AL  35235

Regarding: Letter of commitment for ETS to conduct an etiquette and dining training session *plus* plan and implement a three-course formal dining dinner for Springland Films Production Company. The purpose of this writing is to provide a letter of agreement (contract) setting forth the services, and the rates for those services, that Etiquette Training Services Inc., (ETS) will provide.

ETS will customize its "Business Etiquette and Leadership Programe" and Dining Tutorial Program and present a two-hour training session for an international guest from Belarus Television for Springland Films. Additionally, ETS will plan, design, facilitate, coordinate and implement an in-home style atmosphere dining experience for the dignitary.

This will be two separate consulting and training sessions. The training sessions will be held at a place to be determined by ETS. Planning, coordinating, facilitating and set up will conducted on Sunday and Monday October 23 and 24. These sessions will be held on October 24, 2005 from 4:00pm until approximately 9:00pm. These sessions will be filmed as part of a documentary for Belarus Television and for those purposes only. A copy of the film will be given to ETS.

Session 1:  Will consist of training this individual in social skills and dinning etiquette as part of the documentary. The social skills training will be approximately two-hours in length. (Starting at approximately 4:00pm until 6:00pm (CST). The purpose of this film session is to train the international guest in dining skills and social interactive skills.

Session 2:  For the second session, ETS will plan, organize, coordinate and facilitate a dinner party conducted in honor of this dignitary. This will be at a place to be determined by ETS. The purpose of this film session is to enable the dignitary to interact in a home-like setting of southern hospitality and comfort to learn about southern traditional values and southern-style living as part of the entire cultural experience in his travels throughout America. The portrayal of participants will be filmed and used for purposes only of the utmost dignity and class. There will not be any embarrassment to the participants or ETS.

Cost:  For session one, ETS will charge a basic minimum fee of $350 for the two-hour dining tutorial and social graces skills training. Additionally, catering service, food, wait staff service and gratuities, facilitation of set up, room fees and any other additional service charges will be at the expense of Springland Films Company. For session two, the consultant fee will be charged at a rate of $150 per hour for planning, facilitating, coordinating and implementing all of the functions stated in session two -- not to exceed $1800 per day (for Sunday & Monday) -- for said consulting fees. Overtime ETS fees and expenses will be extra.

All expenses will be paid in advance to the catering service and in advance for all other expenses and additional services rendered. A down payment of $1500 shall be paid to ETS (Etiquette Training Services) in

TOTAL P.02

advance through the catering service and the balance will be charged at the completion of the meal and tutorial. Furthermore, as agreed, an honorarium of $100 per participant for on-camera appearance plus an additional $600 for the host in-home facility will be an additional expense paid by Springland Films.

Springland Films has authorized ETS to charge all fees, expenses and cost involved in this undertaking to a Visa Card in the name of Monica Levenson, a producer with the company. (Visa # 4778133660011462 Expiration date 11/06.) This Visa card will be used as *method of payment* (US currency) for all expenses, services and consultant fees. The signed return of this facsimile will authorize ETS to use this card to pay for these aforementioned services, expenses and fees. Please fill in **credit card mailing address** and **code digit on the back of the card.** Signed _____  Monica Levenson   526

Please initial your confirmation and agreement of the contract and scheduled time for the sessions and return by facsimile at (205) 856-3221.

Monica Levenson, Springland Films            ml _____   date 10/24/05
Julie Lynn Hounard, Representative Springland Films   jlh _____   date 10-24-05
Cindy Streit, ETS _____                       cs _____   date 10/24/05

---

Menu of topics covered in the one-on-one training session is:
Introductions and Greetings
Business Manners and Social Skills
Dining Etiquette
Proper Dress and Grooming
Conversation Skills

Julie, if you wish to add to this "menu of skills" that you want covered please add any subject or topic as you deem necessary. Also, I will need this returned A.S.A.P. because I cannot make definite catering reservations until this is signed, authorized and returned. Please make sure the authorization code, appropriate signature and credit card mailing address is included above because the caterer cannot process and prepare this event without those items. We are on an extreme timeline now.
Thanks,
Cindy Streit