# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL PSENICSKA,

                                            Case No.: 07 CIV 10972 (LAP)

                          Plaintiff,

        -against-

TWENTIETH CENTURY FOX FILM
CORPORATION, ONE AMERICA
PRODUCTIONS, INC., TODD LEWIS, and
SACHA BARON COHEN,

                          Defendants.



## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT



PETER M. LEVINE
488 Madison Avenue, 19th Floor
New York, New York 10022
(212) 599-0009

Diane F. Krausz, Esq.
D. Krausz and Associates
322 8th Avenue – Suite 601
New York, New York 10001
(212) 244-5292

ATTORNEYS FOR PLAINTIFF

## ARGUMENT

**I.    EVEN IF ENFORCEABLE, THE CONSENT AGREEMENT DOES NOT COVER A WORK OF FICTION SUCH AS THE BORAT FILM**

Defendant Todd Lewis Shulman[1] told Psenicska that his production company, One America Productions, Inc., was producing a "documentary about the integration of foreign people into the American way of life." *Complaint ¶ 13.*

The cover letter for the Consent Agreement was consistent with Shulman's description: "Thanks very much for your interest in appearing in our Film. We're glad that you want to appear in the Film to share your views or insights with the public." (The letter did not define word "Film.") *Hansen Decl., Ex. A.* The reasonable inference to be drawn from these simple words is that Psenicska will be interviewed for the purpose of expressing a point of view on a specific subject or relating an experience – not for the purpose of being a straight man in a comedy routine.

The Consent Agreement itself (at ¶ 1) was also consistent with Shulman's description: "The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the "Film")." *Hansen Decl., Ex. A.* These words do not even hint at the true nature of the Borat film, and defendants cannot conjure new meanings for them. The word "documentary," as an adjective, means "(of a movie, a television or radio program, or photography) using pictures or interview with people involved in real events to provide a factual record or report: *he has directed documentary shorts and feature films*; as a noun, the word means "a movie or a television or radio program that provides a factual record or report." *New Oxford American Dictionary* (Erin McLean, ed., 2d ed., New York: Oxford University Press, Inc. 2005). The word "–style," as a suffix forming adjectives

---

[1] The Complaint does not mistakenly name this defendant as "Todd Lewis." That was the name Shulman gave to Psenicska, and that was the name Shulman appeared to use when he signed the Consent Agreement, though some may discern the signature as illegible. *Hansen Decl., Ex. A.*

-4-

and adverbs, means: "in a manner characteristic of: *family-style | church style.*" *Id.* Therefore, the

phrase "documentary-style film" means a work displaying the characteristics of a film that provides

a factual record or report, and the Borat film is not such a work. A documentary chronicles actual

people in actual events and by definition cannot be a work of fiction. A film made in the style of a

documentary is based on facts that can be documented by reliable sources, and such a film does not

contain fictional characters engaging in deliberately outre behavior to comedic effect. This obvious

conclusion may be derived from the application of settled canons of construction. *See Bauersfeld v.*

*Board of Educ. of Morrisville-Eaton Cent. School Dist.*, 46 A.D.3d 1003, 1005, 846 N.Y.S.2d 809,

811 (3d Dep't 2007) (court "duty-bound" to "give words and phrases employed their plain

meaning"); *Innophos, Inc. v. Rhodia, S.A.*, 38 A.D.3d 368, 374, 832 N.Y.S.2d 197, 203 (1st Dep't

2007) (words in a written contract "should not be unnaturally forced beyond their ordinary

meaning"), *aff'd*, 10 N.Y.3d 25 (2008).

Applying only to a "documentary-style film" and making no reference to a work of

fiction, the Consent Agreement by its terms does not apply to the Borat film.[2] *See Cahill v. Regan,*

5 N.Y.2d 292, 184 N.Y.S.2d 348 (1959) (a release may not be read to cover matters which the parties

did not intend to cover); *Demaria v. Brenhouse*, 277 A.D.2d 344, 345, 716 N.Y.S.2d 99, 100 (2d

Dep't 2000) (same).

Defendants' expression of "hope[] to reach a young adult audience by using

entertaining content and features" does not lead to a contrary conclusion or even create a contrary

impression. First of all, the phrase "entertaining content" is not a term of art and is not necessarily

---

[2]    Defendants cannot be heard to say that the Borat film may be deemed a species of
documentary. A true documentary is rarely a signatory to an agreement with the Screen
Actors Guild, because actors do not appear in documentaries unless there are re-enactments
of actual events. Containing no such re-enactments, the Borat film presented fictitious
characters portrayed by paid professional actors who were SAG members.

understood to be limited to comedy or puerile satire. Many movie viewers, even young adults, would find a serious treatment of a topical issue to be entertaining. *See, e.g., Super Size Me* (2004, directed by Morgan Spurlock) (a demonstration of the physical and mental effects of consuming fast food and an examination of the food culture in America). Secondly, it's easy to list *bona fide* documentaries that a young adult audience would likely find entertaining: *Gimme Shelter* (1970, directed by Albert and David Maysles) (chronicle of Rolling Stones' 1969 tour, with much of the focus on the tragic concert at Altamont, California); *Let It Be* (1970, directed by Michael Lindsay-Hogg) (the recording of the Beatles' final album culminating in a performance by the band on the roof of Apple Records in London); *Woodstock* (1970, directed by Michael Wadleigh) (chronicle of legendary 1969 music festival); *The Last Waltz* (1978, directed by Martin Scorsese) (final concert of The Band); *Jazz On a Summer's Day* (1960, directed by Aram Avakian and Bert Stein) (1958 Newport Jazz Festival).

The phrase "documentary-style film" gave defendants the flexibility to produce a documentary in the style of any one of a number of sub-genres without having to answer to Psenicska about the method they chose to cover the topic of assimilating the foreign born into the American way of life. They could have followed the classic style of presenting archival footage mixed with interviews, as director Marcel Ophüls did in *The Sorrow and the Pity* (1972) (collaboration of France's Vichy government with Nazi Germany from 1940 to 1944; archival footage mixed with interviews of collaborators, resistance fighters, and observers).They could have varied the classic style by including dramatic re-enactments of actual events based on forensic evidence, as director Errol Morris did in *The Thin Blue Line* (1988) (arguing that a man was wrongly convicted for murder by a corrupt justice system in Dallas, this documentary combined dramatic re-enactments of the crime and the investigation with contemporaneous newspaper accounts and photographs of the case and with interviews of the suspects, defense counsel, and trial witnesses). They could have presented

their film in a news format in the style of CBS Reports, *e.g.*, *Harvest of Shame* (1960, directed by Fred W. Friendly) (in this production broadcast on Thanksgiving, 1960, Edward R. Murrow reported on the plight of migrant farm workers in America). They could have followed the style of cinema verite, as directors Albert and David Maysles did in *Salesman* (1968) (Four relentless door-to-door salesmen deal with constant rejection, homesickness and burnout as they go across the country selling very expensive bibles to low-income Catholic families) and *Grey Gardens* (1975) (the bizarre and reclusive lives of Edith Bouvier Beale and her daughter Edie among cats and raccoons in a crumbling mansion in East Hampton). They could have included in their documentary-style film slow pans across sepia-toned photographs while professional actors read from news accounts, letters, or diaries – a technique used to interesting effect by Ken Burns in *The Civil War* documentary (1990).

At most, what defendants tout as a general release in the Consent Agreement, even if valid, pertains only to claims in relation to a "documentary-style film," not a work of fiction like the Borat film. The so-called release in Paragraph 4 – by which Psenicska purported to waive "any claims against the Producer ... or anyone associated with the Film" – is limited by the definition of the "Film" in Paragraph 1. *See Morales v. Solomon Management Co.*, 38 A.D.3d 381, 382, 832 N.Y.S.2d 195, 196-97 (1st Dep't 2007) (when "a release contains a recital of a particular claim, obligation or controversy and there is nothing on the face of the instrument other than general words of release to show that anything more than the matters particularly specified was intended to be discharged, the general words of release are deemed to be limited thereby") (citations omitted); *Kaminsky v. Gamache*, 298 A.D.2d 361, 361-362, 751 N.Y.S.2d 254, 256 (2d Dep't 2002) ("if from the recitals therein or otherwise, it appears that the release is to be limited to only particular claims, demands or obligations, the instrument will be operative as to those matters alone"); *Fines v. Gen.*

*Outdoor Adver. Co.*, 171 F.2d 487, 492 (2d Cir.1948) (Hand, J.) ("[I]n a release[,] words of general import, followed or preceded by words relating to specific claims, are, ceteris paribus, limited to the specific claims").

Because Psenicska did not give his consent for the use of his image or the exploitation of his services in a work of fiction, he may pursue his claims in this action. *See Fitzgerald v. Fahnestock & Co.*, 850 N.Y.S.2d 452, 453-54 (1st Dep't 2008) ("the settlement agreement and release between petitioner and Fahnestock, which contained a recital of petitioner's action against Fahnestock and their desire to settle the action, but no reference to petitioner's employment or his employment agreement, is not necessarily a general release"); *Blog v. Sports Car Club of America, Inc.*, 254 A.D.2d 65, 66, 678 N.Y.S.2d 609, 610 (1st Dep't 1998) (release of negligence claims arising out of go-kart race does not cover claims involving the design, manufacture, or sale of the go-kart); *Lanni v. Smith*, 89 A.D.2d 782, 783, 453 N.Y.S.2d 497, 498 (4th Dep't 1982) (release referring to specific claims does not cover all claims arising from same accident, because "There is no phrase indicating that the release covers all claims arising from the accident").

The cases cited by defendants in which a claim for commercial misappropriation was explicitly covered by a release are, perforce, inapposite. *See Myskina v. Conde Nast Publications, Inc.*, 386 F.Supp.2d 409, 416 (S.D.N.Y. 2005) ("The purported oral agreement contradicts the plain language of the Release"); *Ruffino v. Neiman*, 17 A.D.3d 998, 1000, 794 N.Y.S.2d 228, 229 (4th Dep't 2005) ("the alleged misrepresentations ... directly conflict with the terms of the written consent"); *Weil v. Johnson*, 2002 WL 31972157 (Sup. Ct. N.Y. Co.) (three "clearly worded" releases preclude claim under section 51 of the New York Civil Rights Law when the plaintiff's "allegations are contradicted by the very face of the Release"). *Weil* is also distinguishable on another ground: The film in which the plaintiff appeared was exactly what had been orally described to him by the

producers – a documentary about the lives of children who had grown up very wealthy. Here, what both Todd Lewis Shulman and the Consent Agreement said about the documentary-style film and what was actually produced were two very different species of motion picture.

Defendants' strained interpretation of the Consent Agreement shows that they tried to write it to obfuscate, not elucidate – a point confirmed by Todd Lewis Schulman's signing a phony name. Defendants could have told Psenicska that he was being asked to appear in a motion picture portraying a fictional account of a staged journey across America by a fictional character whose *raison d'etre* was to provoke base reactions from the unwitting. Of course, had they been forthright, defendants would have risked Psenicska's refusal to participate or risked the loss of spontaneity. Rather than face such risks, defendants chose to mask their intentions with outright lies and sleazy business practices. That choice, however, does not come without a consequence: Defendants cannot now impose their hidden intent on Psenicska. *See Gross v. Sweet*, 49 N.Y.2d 102, 110, 424 N.Y.S.2d 365, 369-70 (1979) ("In short, instead of specifying to prospective students that they would have to abide any consequences attributable to the instructor's own carelessness, the defendant seems to have preferred the use of opaque terminology rather than suffer the possibility of lower enrollment. But, while ... the law grudgingly accepts the proposition that men may contract away their liability for negligently caused injuries, they may do so only on the condition that their intention be expressed clearly and in unequivocal terms") (quotation omitted).