USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/3/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL PSENICSKA, Plaintiff, v. TWENTIETH CENTURY FOX FILM CORP., ONE AMERICA PRODUCTIONS, INC., TODD LEWIS SCHULMAN, and SACHA BARON COHEN, Defendants. | 07 Civ. 10972 (LAP) |
| CINDY STREIT, BEN K. MCKINNON, MICHAEL M. JARED, LYNN S. JARED, and SARAH MOSELEY, Plaintiffs, v. TWENTIETH CENTURY FOX FILM CORP., ONE AMERICA PRODUCTION, INC., SPRINGLAND FILMS, TODD LEWIS SCHULMAN, MONICA LEVENSON, JULIE LYNN CHOUNARD, EVERYMAN PICTURES, DUNE ENTERTAINMENT, LLC, Defendants. | 08 Civ. 1571 (LAP) |

KATHIE MARTIN,

Plaintiff,

v.

LARRY CHARLES, MONICA LEVINSON, JAY ROACH, TWENTIETH CENTURY FOX FILM CORP., ONE AMERICA PRODUCTIONS, INC., SPRINGLAND FILMS, DUNE ENTERTAINMENT, LLC, MTV NETWORKS d/b/a COMEDY CENTRAL, DAKOTA NORTH ENTERTAINMENT, INC., FOUR BY TWO PRODUCTIONS COMPANY, TODD SCHULMAN,

Defendants.

08 Civ. 1828 (LAP)

MEMORANDUM AND ORDER

LORETTA A. PRESKA, U.S.D.J.

The above captioned actions all arise from the film BORAT -- Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan ("Borat" or "the Movie"). In short, Plaintiffs all seek damages for the use of their images in the Movie, and Defendants have moved to dismiss each complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed more fully below, I conclude that each Plaintiff has executed a valid agreement releasing the claims he or she now attempts to litigate, and, consequently, Defendants' motions are hereby GRANTED.

## I. BACKGROUND

### A. The Plaintiffs

Released in theaters in 2006, Borat tells the story of a fictional Kazakh television personality, Borat, sent to the United States to report on American culture. (See Hansen Decl.[1] (Psenicska) ¶ 4.) This Court has described the Movie before:

> [T]he movie employs as its chief medium a brand of humor that appeals to the most childish and vulgar in its viewers. At its core, however, Borat attempts an ironic commentary of "modern" American culture, contrasting the backwardness of its protagonist with the social ills [that] afflict supposedly sophisticated society. The movie challenges its viewers to confront, not only the bizarre and offensive Borat character himself, but the equally bizarre and offensive reactions he elicits from "average" Americans.

Lemerond v. Twentieth Century Fox Film Corp., 07 Civ. 4635, 2008 WL 918579, at *3 (S.D.N.Y. Mar. 31, 2008). Each Plaintiff in the above-captioned actions appeared in the Movie; the circumstances surrounding their appearances are described below.

[1] "Hansen Decl." refers to the Declaration of Joan Hansen in Support of Defendants' Motion to Dismiss the Complaint, sworn to on February 14, 2008, and filed in connection with the Psenicska action.

1. Michael Psenicska[2]

Among other things, Plaintiff Michael Psenicska ("Psenicska") has owned a driving school for 32 years, where he personally administers driving lessons. (See Complaint ¶ 12, Psenicska v. Twentieth Century Fox Film Corp., 07 Civ. 10972 (filed Dec. 3, 2007) (hereinafter "Psenicska Compl.").) In May 2005, he was contacted by Defendant Schulman,[3] who informed him that Defendant One America was producing a "documentary about the integration of foreign people into the American way of life." (Id. ¶ 13.) Psenicska was interested in participating in the Movie (id. ¶ 14) and agreed to meet the production crew in Washington, D.C. for filming on June 13, 2005 (see id. ¶ 15).

Before filming, Psenicska informed Schulman that he would need to leave by 5:00 p.m. to teach a driving class at 6:00 p.m.

---

[2] The Psenicska parties have filed the following briefs in connection with Defendants' motion to dismiss Psenicska's Complaint: Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint dated February 15, 2008 ("Psenicska Defs.' Mem."); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint dated April 8, 2008 ("Psenicska Pl.'s Opp'n"); and Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Complaint dated April 29, 2008 ("Psenicska Defs.' Reply").

[3] In his Complaint, Psenicska refers to Defendant Todd Lewis Schulman as "Todd Lewis." (See, e.g., Psenicska Compl. ¶ 13.) For ease of reference, the Court shall refer to Defendant Schulman by his proper surname. See Decl. of Slade R. Metcalf in Supp. of Defs.' Mot. to Dismiss the Compl. ¶ 1 (sworn to Feb. 15, 2008) (noting Schulman incorrectly named as "Todd Lewis").

(See id.) On the day of filming, however, Schulman and the production crew arrived 90 minutes late (id. ¶ 16) with $500 in cash for Psenicska, as well as papers "needed by the producers for the documentary" (id. ¶ 17). According to his Complaint, Psenicska was unaware that he would be asked to sign something and, consequently, failed to bring his reading glasses. (Id.) Nevertheless, because he was rushed for time due to Schulman's late arrival, Psenicska signed the document, entitled the Standard Consent Agreement ("the Agreement"), without reading it, claiming to rely on previous conversations with Schulman. (See id.)

Psenicska was then shown to a driver-education car and instructed to follow a production van through a driving course. (See id. ¶ 19.) The ensuing events involved Defendant Cohen, as Borat ("Cohen/Borat"), driving irresponsibly and erratically while engaging in conversations with strangers and making derogatory and offensive remarks about sexual intercourse, Jews, women and African-Americans. (See id. ¶ 22.) Once taping ended, Psenicska approached a group of men he believed were producers of the Movie and accused them of setting him up, but elicited no response. (Id. ¶ 24.) Over the next several days, Psenicska attempted to contact Schulman to determine the intent of the film but again received no response (id. ¶ 24) and subsequently commenced his action on December 3, 2007.

2. Cindy Streit et al.[4]

Plaintiff Cindy Streit ("Streit") is the owner of an etiquette training business called ETS. (See First Amended Complaint ¶ 25, Streit v. Twentieth Century Fox Film Corp., 08 Civ. 1571 (filed Apr. 7, 2008) (hereinafter "Streit Compl.").) In October 2005, she was contacted by Schulman and asked to provide etiquette training to a Belarus dignitary and arrange a dinner party with guests to be filmed for an educational documentary made for Belarus television. (Id. ¶ 26.)

On October 24, 2005, Streit and Defendant Springland Films[5] negotiated and signed a written contract for Streit's services. (See id. ¶ 33; see also Hansen Decl. (Streit) Ex. C (ETS Contract).)[6] That same day, Schulman informed Streit that

---

[4] The Streit parties have filed the following briefs in connection with Defendants' motion to dismiss the Streit Plaintiffs' First Amended Complaint: Defendants' Memorandum of Law in Support of Their Motion to Dismiss the First Amended Complaint dated May 12, 2008 ("Streit Defs.' Mem."); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint ("Streit Pls.' Opp'n"); and Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the First Amended Complaint dated July 7, 2008 ("Streit Defs.' Reply").

[5] Springland Films is a registered d/b/a of One America -- the producer of Borat. (See Hansen Reply Decl. (Streit) Ex. A (Certified Fictitious Name Statement).)

[6] "Hansen Decl. (Streit)" refers to the Declaration of Joan Hansen in Support of Defendants' Motion to Dismiss the First Amended Complaint, sworn to on May 9, 2008, and filed in

(continued on next page)

Cohen/Borat would not attend the etiquette training session but would attend the 6:00 p.m. dinner as previously arranged. (See Richards Decl.[7] Ex. B (Streit Declaration), ¶ 9 (hereinafter "Streit Decl.").) Plaintiffs Sarah Moseley, Ben McKinnon, Michael Jared and Lynn Jared (collectively with Streit, the "Streit Plaintiffs") were among the guests attending the dinner party. (Streit Compl. ¶ 32.) Schulman and the film crew arrived at 6:30 p.m.; Cohen/Borat arrived approximately one hour later. (See Streit Decl. ¶¶ 9-10.) Schulman did not present the Streit Plaintiffs with copies of the Agreement until immediately before Cohen's arrival. (See id. ¶ 11.)[8] Though Schulman allegedly

---

(continued from previous page)

connection with the Streit action. After filming but before commencing her action, Streit, ETS and Springland Films signed an additional "Release of Liability" (see Hansen Decl. (Streit) Ex. E (Release of Liability)), whereby, in exchange for $4450, Streit agreed to release Springland Films and its related entities from any and all claims accruing to Streit or ETS against those entities (see Hansen Decl. (Streit) ¶ 7).

[7] "Richards Decl." refers to the Declaration of Adam Richards in Opposition to Defendants' Motion to Dismiss the First Amended Complaint, sworn to on June 13, 2008, and filed in connection with the Streit action.

[8] The consent agreements signed by Plaintiffs are identical in all material respects and, therefore, this Court will refer to the consent agreement executed by each Plaintiff as "the Agreement." The only differences appear to be (1) Springland Films was named in the agreements signed by the Streit Plaintiffs and Plaintiff Kathie Martin, while One America was named in the agreement signed by Psenicska (see Hansen Decl. (Psenicska) Ex. A (Standard Consent Agreement) pmbl.); and (2)

(continued on next page)

rushed them to review the Agreement, each of the Streit Plaintiffs signed and returned a copy. (Id.)

During the dinner, Cohen/Borat performed offensive acts and made sexist remarks before introducing the guests to an African-American woman who Cohen/Borat described as a prostitute. (See Streit Compl. ¶¶ 34, 36-38.) The Movie depicts that certain of the guests chose to leave at that point, whereupon Cohen/Borat made derogatory comments insinuating that the guests were racially intolerant. (Id. ¶¶ 42-44, 46.) After the Movie's release, the Streit Plaintiffs commenced this action in the U.S. District Court for the Northern District of Alabama, and it was subsequently transferred to this Court on February 15, 2008.

---

(continued from previous page)

the agreement signed by Martin included an additional term releasing claims "arising out of the Participant's viewing of any sexually-oriented materials or activities" (see Metcalf Decl. (Martin) Ex. B (Standard Consent Agreement) ¶ 4).

3. Kathie Martin[9]

Plaintiff Kathie Martin ("Martin") owns and operates the Etiquette Training School of Birmingham. (See First Amended Complaint ¶ 25, Martin v. Mazer, 08 Civ. 1828 (filed Apr. 11, 2008) (hereinafter "Martin Compl.").) In October 2005, Martin was contacted by Schulman to provide dining etiquette training to a foreign reporter whose travel experiences were being filmed by Springland Films for Belarus television. (Id. ¶¶ 28-30.) The etiquette class was scheduled to take place on October 23, 2005, at Martin's home. (Id. ¶ 32.)

While awaiting the film crew, Schulman learned that Martin's husband, who was present at the house, was somewhat familiar with another character created by Cohen in connection with his television show, "Da Ali G Show." (See id. ¶ 35.) According to the Martin Complaint, Schulman requested to reschedule the filming for the following day to avoid any chance Mr. Martin might recognize Cohen. (See id. ¶¶ 37-39.) At the rescheduled meeting, Martin was presented with $350 and the

[9] The Martin parties have filed the following briefs in connection with Defendants' motion to dismiss Martin's First Amended Complaint: Defendants' Memorandum of Law in Support of Their Motion to Dismiss the First Amended Complaint dated May 5, 2008 ("Martin Mem."); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint dated June 6, 2008 ("Martin Opp'n"); and Defendants' Memorandum of Law in Further Support of Their Motion to Dismiss the First Amended Complaint dated June 20, 2008 ("Martin Reply").

Agreement, described by Schulman as a "standard filming release form," which Martin signed and returned. (Id. ¶¶ 39-40.)

Over the course of the etiquette class, Cohen/Borat allegedly repeatedly offended Martin by making sexist and anti-Semitic remarks, as well as by producing naked photographs of Cohen/Borat's supposed son. (See id. ¶¶ 42-43, 45-46.) At the end of filming, the director apologized to Martin for the inappropriate photos, and Martin left the hotel. (Id. ¶ 48.) After hearing about Cohen's behavior, Mr. Martin identified the alleged foreign reporter as Cohen, and Martin made an unsuccessful attempt to contact Schulman. (See id. ¶ 50.) Thereafter, Martin commenced her action in this Court on February 22, 2008.

B. The Agreements[10]

As noted above, the Agreements signed by the various Plaintiffs herein are identical in all material respects. They set forth each Plaintiff's consent to appear in a "documentary-style . . . motion picture" (Agmt. pmbl.) intended "to reach a young adult audience by using entertaining content and formats" (id. ¶ 1). Each Agreement states that the relevant Plaintiff:

[10] For true copies of each Agreement, see Hansen Decl. (Psenicska) Ex. A; Metcalf Decl. (Martin) Ex. B; Hansen Decl. (Streit) Ex. D (Standard Consent Agreement).

> specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, that include assertions of (a) infringement of rights or publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), . . . (d) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), . . . (m) prima facie tort, . . . [and] (n) fraud (such as any alleged deception or surprise about the Film or this consent agreement).[11]

(Id. ¶ 4.) Furthermore, each Agreement includes a merger clause which notes, among other things, that "the Participant acknowledges that in entering into [the Agreement], the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film." (Id. ¶ 5.)

## II. DISCUSSION

On a motion to dismiss, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. See Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001). Furthermore, on such a motion, courts may consider "any written instrument attached to [the complaint] as an exhibit or any

---

[11] As also noted above, the Agreement signed by Martin includes that Plaintiff waives "any claim arising out of the Participant's viewing of any sexually-oriented materials or activities." (See Metcalf Decl. (Martin) Ex. B, ¶ 4.)

statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000). So construed, to survive a motion to dismiss, a complaint must contain enough facts to suggest that the allegations are plausible. See Bell Atl. Corp. v. Twombly, --- U.S. ----, 127 S.Ct. 1955, 1965 (2007); see also Cannon v. Douglas Elliman, LLC, No. 06 Civ. 7092, 2007 WL 4358456, at *4 (S.D.N.Y. 2007).

A. The Agreement is not Ambiguous

Each Agreement at issue in these actions contains an explicit waiver clause that on its face prevents Plaintiffs from bringing the above-captioned actions. To avoid their waivers, Plaintiffs argue that the Agreement -- specifically, the term "documentary-style film" as it is used in Paragraph 4 of the Agreement -- is ambiguous and cannot be enforced at this stage of the litigation. (See Psenicska Pl.'s Opp'n 10-11; Streit Pls.' Opp'n 12; Martin Pl.'s Opp'n 11.) Further, Plaintiffs argue that the term "documentary-style film" does not describe Borat and, therefore, that they have not waived any right to bring claims against Defendants relating to Borat.

Under New York law,[12] issues of contract interpretation, including determining whether a contract term is ambiguous, are threshold questions of law to be determined by the court and suitable for disposition on a motion to dismiss. See Aon Financial Products, Inc. v. Societe Generale, 476 F.3d 90, 95 (2d Cir. 2007) (citing Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000). A contract term is ambiguous as a matter of law if it is:

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987) (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y. 1968)). Where there are alternative, reasonable interpretations of a contract term rendering it ambiguous, the issue should be submitted to the trier of fact and is not suitable for disposition on a motion to dismiss. See K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996). A court should not find contract language ambiguous, however, on the basis of the interpretation urged by one party where that interpretation

[12] New York law governs construction of the Agreement pursuant to a choice of law provision, about which there is no dispute among the parties.

would strain the contract language beyond its reasonable and ordinary meaning. See Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990); see also E.Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993) (contracting parties may not create an ambiguity merely by urging conflicting interpretations of their agreement).

Here, the term "documentary-style film" is not ambiguous. Indeed, Psenicska offers a definition of that term that neither Defendants (see, e.g., Psenicska Defs.' Reply 6) nor the other Plaintiffs contest (See Streit Opp'n 9; Martin Opp'n 8). Quoting the New Oxford American Dictionary, he states that

> [t]he word "documentary," as an adjective, means "(of a movie, a television or radio program, or photography) using pictures or interviews with people involved in real events to provide a factual record or report . . .;" as a noun, the word means "a movie or a television or radio program that provides a factual record or report.

(Psenicska Opp'n 4 (quoting New Oxford American Dictionary (2d ed. 2005)).) Noting that "[t]he word '-style,' as a suffix forming adjectives and adverbs, means 'in a manner characteristic of'" (id. at 4-5 (quoting New Oxford American Dictionary, supra)), he concludes that "the phrase 'documentary-style film' means a work displaying the characteristics of a film that provides a factual record or report" (id. at 5; see also Streit Opp'n 9; Martin Opp'n 8). Whether that term is

"capable of more than one meaning when viewed objectively by a reasonably intelligent person," Walk-In Med. Ctrs., 818 F.2d at 263, is not presently at issue: there is only one meaning that the parties attribute to that term.

Instead, confusion appears to have resulted from the fact that, though its definition may not be ambiguous, the class of films defined as "documentary-style" is subject to some debate. There can be no reasonable debate, however, that Borat is a film "displaying the characteristics of a film that provides a factual record or report." The Movie comprises interviews with real people and depictions of real events that are intended to provide a "factual record or report" albeit of a fictional character's journey across America. To the contrary, Plaintiffs seem unwilling to recognize that the operative word in the phrase "documentary-style film" is "style" and not "documentary." (See, e.g., Streit Opp'n 8 (arguing that Borat is not a "documentary-style film" because it is a "fictional account of a staged journey across the United States by a fictional character, from a fictional country"); Psenicska Opp'n 5 (arguing that "[a] film made in the style of a documentary is based on facts that can be documented by reliable sources, and such a film does not contain fictional characters engaging in deliberately outré behavior to comedic effect").) The fact that Borat is a fictional character, however, does nothing to

diminish the fact that his fictional story is told in the style of a true one. Indeed, Borat owes such effectiveness as it may have to that very fact.[13]

For these reasons, I conclude that the Agreement is not ambiguous and may be enforced at this stage of the litigation.

B. Fraudulent Inducement Claims

Nevertheless, each Plaintiff seeks to avoid the waiver clause in the Agreement by arguing that he or she was fraudulently induced to enter the Agreement. Specifically, each Plaintiff argues that Schulman's representations about the nature of the film and the identities of Schulman, Cohen and Springland Films were false and were meant to induce him or her to appear in the film. (See Psenicska Compl. ¶¶ 38, 40; Streit Compl. ¶¶ 73-75; Martin Compl. ¶¶ 76-79.)

That line of argument is foreclosed to Plaintiffs here, however, because each waived his or her reliance on "any

[13] Nor does the fact that Borat employs humor disqualify it from the "documentary-style" genre, as Martin seems to suggest. (See Martin Opp'n 9 n.2, 10 (arguing that "the 'getting' of innocent people for satirical purposes has nothing whatsoever to do with the documentary genre to which Defendants claim the Borat Movie belongs.").) Humor is perfectly consistent with documentary. See An Inconvenient Truth (Lawrence Bender Prods. 2006) (employing humor at times to illustrate dangers of global warming); Bowling for Columbine (Alliance Atlantis Communications 2002) (relying on sardonic humor to ease an otherwise grave portrayal of gun violence in America).

promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film." See Agmt. ¶ 5; see also Danann Realty Corp. v. Harris, 5 N.Y.2d 217, 320, 184 N.Y.S.2d 599, 601 (1959). In Danann, the New York Court of Appeals held that the defense of fraud in the inducement is foreclosed to a party who disclaims, in the contract itself, reliance on fraudulent statements allegedly made to induce him to enter into the contract. See Danann 5 N.Y.2d at 323.[14] As this Court recently observed,

> specificity was the touchstone of the disclaimer in Danann: the purchaser in that case could not claim to have relied on the allegedly fraudulent representations when, in the contract, the purchaser stated that "the Purchaser hereby expressly acknowledges that no such representations have been made."

UBS AG, Stamford Branch v. Healthsouth Corp., No. 07 Civ. 8490 (LAP), 2008 WL 2337846, at *5 (S.D.N.Y. June 6, 2008) (quoting Danann, 5 N.Y.2d at 320, 184 N.Y.S.2d at 601).

Here, each Plaintiff argues that the Agreement's merger clause is too general to preclude his or her defense of fraud in the inducement. (See Psenicska Pl.'s Opp'n 15; Streit Pls.'

---

[14] To maintain a claim for fraud in the inducement, a party must show: (1) a material representation or omission of fact made by a defendant with knowledge of its falsity and intent to defraud, and (2) damages sustained as a result of a plaintiff's reasonable reliance on that representation. See Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006).

Opp'n 13; Martin Pl.'s Opp'n 12.) The relevant merger clause, however, states that Plaintiff has not relied "upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film." (Agmt. ¶ 5 (emphasis added).) As in Danann, so too here: a Plaintiff may not claim to have relied on a statement upon which he or she has explicitly disclaimed reliance.

In the alternative, each Plaintiff argues that Defendants had a duty to disclose the nature of the film and the identities of those involved in the film. (See Psenicska Pl.'s Opp'n 13-14, Streit Pls.' Opp'n 15-16, Martin Pl.'s Opp'n 13.) Each Plaintiff invokes the duty to disclose that arises when a "party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge," Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir. 1984), and the principle that "an express disclaimer will not be given effect where the facts are peculiarly within the knowledge of the party invoking it," Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank, 819 F. Supp. 1282, 1292 (S.D.N.Y. 1993). These Plaintiffs cannot avoid the consequences of their waivers, however, simply by restyling their allegations of

misrepresentation as allegations of omission.[15] (See Psenicska Compl. ¶ 29, Streit Compl. ¶¶ 73-75, Martin Compl. ¶¶ 76-77.) Such would empower these Plaintiffs to avoid the clear wording of their own contracts in a manner I must decline to condone under well-settled New York law. In light of the above disposition, I do not reach Defendants' additional arguments.

## III. CONCLUSION

For the reasons stated above, the Agreements in each of the above-captioned actions is unambiguous and, based on the language of those Agreements, these Plaintiffs may not now maintain a defense of fraud in the inducement. The Agreements are thus enforceable, and the provisions contained therein waiving Plaintiffs' respective rights to bring any and all claims against Defendants with respect to Borat prevent the instant actions. Therefore, Defendants' motion to dismiss in Psenicska v. Twentieth Century Fox Corp., 07 Civ. 10972 [dkt. no. 9], Streit v. Twentieth Century Fox Corp., 08 Civ. 1571

[15] Of course, in a sense, every alleged misrepresentation involves an omission of the truth. Plaintiffs argue in the space provided by that ambiguity, asserting that Defendants "concealed the true nature of their film" (see Martin Compl. ¶ 69) and "misrepresent[ed] and conceal[ed] material facts" (Psenicska Compl. ¶ 35).

[dkt. no. 9] and Martin v. Mazel, 08 Civ. 1828 [dkt. no. 12] are all hereby GRANTED.

The Clerk of the Court shall mark each action closed and deny all pending motions as moot.

SO ORDERED:

Dated: September 3, 2008
New York, New York

LORETTA A. PRESKA, U.S.D.J.